```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF NEW YORK
 2
   UNITED STATES OF AMERICA,        )
 3                                  ) Case No. 1:20-CR-00029-3
                                    )            (RJA)(HKS)
 4                   Plaintiff,     )
                                    )
 5   vs.                            ) December 19th, 2022
                                    ) 10:30 a.m.
 6   DAVID BURGIN,                  )
                                    )
 7                   Defendant.     )


 8
                    TRANSCRIPT OF EVIDENTIARY HEARING
 9          BEFORE THE HONORABLE H. KENNETH SCHROEDER, JR.
                    UNITED STATES MAGISTRATE JUDGE
10

11   APPEARANCES:

12   For the Plaintiff:    TRINI E. ROSS, ESQ.
                           UNITED STATES ATTORNEY
13                         BY:  EVAN GLABERSON, ESQ.
                                TIMOTHY LYNCH, ESQ.
14                         ASSISTANT UNITED STATES ATTORNEYS
                           138 Delaware Avenue
15                         Buffalo, NY 14202

16   For the Defendant:    Donald M. Thompson, Esq.
                           16 West Main Street, Suite 243
17                         Rochester, NY 14614

18                         Harrington and Mahoney
                           By:  James P. Harrington, esq.
19                         70 Niagara Streetl
                           Third Floor
20                         Buffalo, NY 14202

21   Audio Recorder:       LLANE GUIDOTTI

22   Transcriber:          MEGAN E. PELKA, RPR
                           Robert H. Jackson US Courthouse
23                         2 Niagara Square
                           Buffalo, NY 14202
24                         (716) 229-0880

25          Proceedings recorded with electronic sound recording,
     transcript prepared with computer-aided transcription.
```

| | | |
|---|---|---|
| 01:44PM | 1 | THE CLERK:  This is United States v. David Burgin |
| 01:44PM | 2 | number 20-CR-29.  This is an evidentiary hearing.  Assistant |
| 01:44PM | 3 | United States Attorneys Timothy Lynch and Evan Glaberson |
| 01:44PM | 4 | appearing on behalf of the government, and James Harrington |
| 01:44PM | 5 | and Donald Thompson appearing with defendant. |
| 01:44PM | 6 | THE COURT:  Good morning. |
| 01:44PM | 7 | MR. GLABERSON:  Good morning, Judge. |
| 01:44PM | 8 | MR. HARRINGTON:  Good morning, Judge. |
| 01:44PM | 9 | THE COURT:  We're ready for the evidentiary hearing? |
| 01:44PM | 10 | MR. HARRINGTON:  Yes, Judge. |
| 01:44PM | 11 | MR. LYNCH:  Yes, Judge I think we just -- |
| 01:44PM | 12 | Mr. Glaberson's computer has to restart, Judge, because I'm |
| 01:44PM | 13 | going to need the computer system for the exhibits, some of |
| 01:45PM | 14 | them anyway.  Some of them are video exhibits.  Okay.  Looks |
| 01:45PM | 15 | like we're all set, Judge.  When we last left off, Detective |
| 01:45PM | 16 | Daniel Granville was on the stand -- Chief Granville was on |
| 01:46PM | 17 | the stand. |
| 01:46PM | 18 | (The witness was sworn at 10:37 a.m.) |
| 01:46PM | 19 | THE COURT:  Please be seated.  State your last name |
| 01:46PM | 20 | and spell your last name for the record please. |
| 01:46PM | 21 | THE WITNESS:  Daniel Granville, last name is |
| 01:46PM | 22 | G-R-A-N-V-I-L-L-E. |
| 01:46PM | 23 | |
| 01:46PM | 24 | |
| 01:46PM | 25 | |

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 01:46PM  | 1  | DIRECT EXAMINATION                                        |
| 01:46PM  | 2  |                                                          |
| 01:46PM  | 3  | BY MR. LYNCH:                                             |
| 01:46PM  | 4  | Q.  Chief Granville, do you recall the last time you were |
| 01:46PM  | 5  | testifying here approximately in August of this year?    |
| 01:46PM  | 6  | A.  Yes.                                                  |
| 01:46PM  | 7  | Q.  And when we last left off, we were talking about entry |
| 01:46PM  | 8  | into 56 Grimes and a fatal funnel -- you testified about a |
| 01:47PM  | 9  | fatal funnel in a stairwell, correct?                    |
| 01:47PM  | 10 | A.  That's correct.                                       |
| 01:47PM  | 11 | Q.  All right.  Now, before we get into that, though, I just |
| 01:47PM  | 12 | want to show some additional portions of Exhibit 1; the  |
| 01:47PM  | 13 | surveillance from the surveillance system inside of 56 Grimes |
| 01:47PM  | 14 | showing David Burgin arriving and exiting that residence. |
| 01:47PM  | 15 | Exhibit 1, slide 8, Mr. Glaberson.  We'll start with 8,   |
| 01:47PM  | 16 | and then the next slide.  I'll have you stop it right there. |
| 01:47PM  | 17 | Is this slide 9?                                          |
| 01:47PM  | 18 | MR. GLABERSON:  Yes.                                      |
| 01:47PM  | 19 | BY MR. LYNCH:                                             |
| 01:47PM  | 20 | Q.  Slide 9, do you see what's depicted on the screen in  |
| 01:47PM  | 21 | front of you?                                             |
| 01:47PM  | 22 | A.  I do.                                                 |
| 01:47PM  | 23 | MR. LYNCH:  And Exhibit 1, if you recall, Judge, this     |
| 01:48PM  | 24 | is in evidence.                                           |
| 01:48PM  | 25 |                                                          |

01:48PM    1    BY MR. LYNCH:

01:48PM    2    Q.  What is the time depicted on this video?

01:48PM    3    A.  Says 16:14 p.m.

01:48PM    4    Q.  And that's February 19th, 2020?

01:48PM    5    A.  Yes, sir.

01:48PM    6    Q.  And what is depicted on the screen at this point?

01:48PM    7    A.  There's a pick-up truck that just drove off Milburn and

01:48PM    8    arrived on Grimes.

01:48PM    9    Q.  And this is surveillance video from the outside of 56

01:48PM   10    Grimes?

01:48PM   11    A.  Yes.

01:48PM   12    Q.  And what direction does the video, I guess, depict?

01:48PM   13    A.  It's pointing in an east direction.

01:48PM   14    Q.  On Grimes?  And it also captures the intersection of

01:48PM   15    Grimes and Milburn?

01:48PM   16    A.  Yes.

01:48PM   17    Q.  All right.  Can you continue to play it?

01:49PM   18        That's the end of that clip, but what did the rest of

01:50PM   19    that clip show?

01:50PM   20    A.  It showed a pick-up truck backing up in a westbound

01:50PM   21    direction down Grimes.

01:50PM   22    Q.  If we can go to slide 10?  Now do you see what's depicted

01:50PM   23    on the screen in front of you?

01:50PM   24    A.  I do.

01:50PM   25    Q.  Can you hit pause?  What -- is this the same angle of the

01:50PM  1   surveillance camera we just saw?

01:51PM  2   A.  No.

01:51PM  3   Q.  Okay.  What is the angle of this surveillance camera?

01:51PM  4   A.  It is pointed in a west direction and it shows Grimes.

01:51PM  5   Q.  Still the front of 56 Grimes also?

01:51PM  6   A.  That's correct.

01:51PM  7   Q.  Okay.  And we've stopped it at 6:16:36.  Do you see that?

01:51PM  8   A.  Yes.

01:51PM  9   Q.  And what is depicted essentially in the screen as we're

01:51PM  10  looking at it right now?

01:51PM  11  A.  The front of 56 Grimes and also there's a pick-up truck

01:51PM  12  located in the street.

01:51PM  13  Q.  Can you continue to play, Mr. Glaberson?  I'm going to

01:52PM  14  have you stop it right there.

01:52PM  15      We stopped at 6:16:49 seconds.  Do you see what's depicted

01:52PM  16  on the screen now?

01:52PM  17  A.  I do.

01:52PM  18  Q.  And what's depicted on the screen?

01:52PM  19  A.  An individual entering the front of 56 Grimes.

01:52PM  20  Q.  Do you recognize the individual from the surveillance

01:52PM  21  video?

01:52PM  22  A.  I do.

01:52PM  23  Q.  And who is that?

01:52PM  24  A.  That's Mr. David Burgin.

01:52PM  25  Q.  If we --

01:52PM    1        MR. HARRINGTON:  Judge, I'll object to this.  There's

01:52PM    2   no basis for him doing that.  He's already testified that

01:52PM    3   while he was on surveillance watching this, he didn't even see

01:52PM    4   this happen.  And how it is that he now can give some opinion

01:52PM    5   as to who the person is?  If he can, he's certainly got to lay

01:52PM    6   the foundation for it.

01:53PM    7        MR. LYNCH:  Well, he already identified Mr. Burgin.

01:53PM    8   He's watching the video.  He recognizes Mr. Burgin in the

01:53PM    9   video, and this exhibit is in evidence.

01:53PM   10        THE COURT:  What's that exhibit number again?

01:53PM   11        MR. LYNCH:  Exhibit 1, slide 10.

01:53PM   12        THE COURT:  I believe the question put to the witness

01:53PM   13   was, do you recognize the individual depicted in the frame on

01:53PM   14   2/19/2020 at 6:16:49 p.m., not whether he was there or not.

01:53PM   15   Overruled.

01:53PM   16        MR. HARRINGTON:  Judge, my objection was the

01:53PM   17   foundation for it.  That's all.

01:53PM   18        THE COURT:  Well -- but, as Mr. Lynch has pointed

01:53PM   19   out, the exhibit is in evidence.

01:53PM   20        MR. HARRINGTON:  The exhibit is.

01:54PM   21        THE COURT:  And so he's asking him about a scene in

01:54PM   22   the exhibit in evidence and if he recognizes the person

01:54PM   23   depicted in the video which is in evidence.

01:54PM   24        MR. HARRINGTON:  Right.  But he has given no basis

01:54PM   25   for how he recognizes him.  That's all.

01:54PM  1          THE COURT:  Well, previously, in August, my notes

01:54PM  2   indicate he testified that he had been working in an

01:54PM  3   investigation involving the defendant allegedly and had had

01:54PM  4   him under surveillance.

01:54PM  5          MR. HARRINGTON:  We'll deal with it on cross-

01:54PM  6   examination, Judge.  That's not accurate.

01:54PM  7          THE COURT:  Well, more specifically, I'm looking at

01:54PM  8   my notes of August 25th, 2022.  He was asked that on and

01:54PM  9   stated that on February 19th, 2020, he was conducting

01:54PM  10  surveillance of drug action and that the person surveilled

01:55PM  11  became a confidential informant.  And then, from there, they

01:55PM  12  went on and continued with the investigation, set up recorded

01:55PM  13  phone calls.

01:55PM  14  BY MR. LYNCH:

01:55PM  15  Q.  And you arrested Mr. Burgin on that date, correct?

01:55PM  16  A.  That's correct.

01:55PM  17          MR. LYNCH:  So, I understand Mr. Harrington's point

01:55PM  18  he's making.  I just want to --

01:55PM  19  BY MR. LYNCH:

01:55PM  20  Q.  Chief Granville, you're making your testimony here today

01:55PM  21  based just on your review of the surveillance video and

01:55PM  22  nothing else?

01:55PM  23  A.  That's correct.

01:55PM  24          THE COURT:  Overruled.

01:55PM  25

01:55PM    1    BY MR. LYNCH:

01:55PM    2    Q.  Okay.  Is this slide 11?  Do you see what's depicted in

01:56PM    3    front of you?

01:56PM    4    A.  Yes.

01:56PM    5    Q.  And that's just a different angle shooting down Milburn

01:56PM    6    and Grimes?

01:56PM    7    A.  That's correct.

01:56PM    8    Q.  Of the individual you identified as Mr. Burgin entering

01:56PM    9    the premises?

01:56PM   10    A.  That's correct.

01:56PM   11    Q.  Okay.  Now, if we can go to slide 15?  Slide 15.  Okay.

01:56PM   12    Slide 16.  Can you see -- you can hit pause.

01:56PM   13        Do you see what's depicted on the screen in front of you?

01:56PM   14    A.  I do.

01:56PM   15    Q.  And what's the time on the video surveillance?

01:56PM   16    A.  Six twenty-eight p.m.

01:56PM   17    Q.  And 58 seconds?

01:57PM   18    A.  Fifty-eight seconds.

01:57PM   19    Q.  Did you recognize the individual depicted in that

01:57PM   20    surveillance video?

01:57PM   21    A.  I do.

01:57PM   22    Q.  And who is that?

01:57PM   23    A.  That's Mr. Burgin.

01:57PM   24    Q.  We can go to the next slide.  Slide 17.  Do you see

01:57PM   25    this -- what's depicted on the screen in front of you?

GRANVILLE -- BY MR. LYNCH -- 12/19/2022

8

01:57PM 1   A.   Yes.

01:57PM 2   Q.   You can hit pause.  It's -- time on it is 6:29:29.   Do

01:58PM 3   you see that?

01:58PM 4   A.   I do.

01:58PM 5   Q.   Do you recognize the individual depicted in this

01:58PM 6   surveillance video?

01:58PM 7   A.   I do.

01:58PM 8   Q.   And who is that?

01:58PM 9   A.   It's Mr. Burgin.

01:58PM 10  Q.   If we could just go to slide 23?  Can you go to slide --

01:59PM 11  I don't know, 22, I guess it must be.  There we go.

01:59PM 12      Slide 22 in front of you.  Do you see what's depicted on

01:59PM 13  the screen in front of you?

01:59PM 14  A.   I do.

01:59PM 15  Q.   Can you hit pause?

01:59PM 16      Stopping at about 6:36:14, do you see that time stamp on

01:59PM 17  the video?

01:59PM 18  A.   I do.

01:59PM 19  Q.   What's depicted in the video?

01:59PM 20  A.   It shows Mr. Burgin departing 56 Grimes.

01:59PM 21  Q.   And this on February 19th, 2020?

01:59PM 22  A.   That's correct.

01:59PM 23  Q.   Okay.  I'm now going to show you and ask --

02:00PM 24          THE COURT:  Wait until you get to a mic when you

02:00PM 25  start talking.

| | | |
|---|---|---|
| 02:00PM | 1 | BY MR. LYNCH: |
| 02:00PM | 2 | Q.  Chief Granville, I've just handed up to you an exhibit. |
| 02:00PM | 3 | Do you see that exhibit in front of you? |
| 02:00PM | 4 | A.  I do. |
| 02:00PM | 5 | Q.  And is that photographs? |
| 02:00PM | 6 | A.  They are. |
| 02:00PM | 7 | Q.  What are they photographs of? |
| 02:00PM | 8 | A.  Photographs of keys in a door. |
| 02:01PM | 9 | Q.  Is it a set of exhibits? |
| 02:01PM | 10 | A.  Yes. |
| 02:01PM | 11 |        MR. LYNCH:  Judge one second, Judge. |
| 02:01PM | 12 | BY MR. LYNCH: |
| 02:01PM | 13 | Q.  Chief Granville, the Bates numbering on Exhibit 10 down |
| 02:01PM | 14 | in the bottom right-hand corner? |
| 02:01PM | 15 | A.  I do. |
| 02:01PM | 16 | Q.  Okay.  And the first page of that exhibit is -- what |
| 02:02PM | 17 | number is that? |
| 02:02PM | 18 | A.  It's one. |
| 02:02PM | 19 | Q.  And then, if you can go -- turn to the last page of the |
| 02:02PM | 20 | exhibit, there's a two-sided -- what's the last page number? |
| 02:02PM | 21 | A.  One one two. |
| 02:02PM | 22 | Q.  So, is it fair to say that this is an exhibit that |
| 02:02PM | 23 | includes 112 photographs? |
| 02:02PM | 24 | A.  Yes. |
| 02:02PM | 25 | Q.  And what are they photographs of? |

| | | |
|---|---|---|
| 02:02PM | 1 | A.  Appears to be the property located at 56 Grimes. |
| 02:02PM | 2 | Q.  And is it the practice of the Erie County Sheriff's |
| 02:02PM | 3 | Department to take photographs of a search scene? |
| 02:03PM | 4 | A.  Yes. |
| 02:03PM | 5 | Q.  Does this appear to be the photographs of the search at |
| 02:03PM | 6 | 56 Grimes -- the search scene the 56 Grimes? |
| 02:03PM | 7 | A.  Yes. |
| 02:03PM | 8 | Q.  On February 19th, 2020? |
| 02:03PM | 9 | A.  Yes. |
| 02:03PM | 10 | Q.  Do those photographs fairly and accurately depict the way |
| 02:03PM | 11 | 56 Grimes looked on that day? |
| 02:03PM | 12 | A.  Yes. |
| 02:03PM | 13 | MR. LYNCH:  I'd ask that Government Exhibit 1 be |
| 02:03PM | 14 | moved into evidence. |
| 02:03PM | 15 | MR. HARRINGTON:  Judge, can I just have a minute with |
| 02:04PM | 16 | Mr. Lynch, please? |
| 02:04PM | 17 | THE COURT:  Any objection? |
| 02:04PM | 18 | MR. HARRINGTON:  Yes. |
| 02:04PM | 19 | MR. LYNCH:  I think he said any objection. |
| 02:04PM | 20 | MR. HARRINGTON:  No.  I'm sorry. |
| 02:04PM | 21 | THE COURT:  Oh.  So, defendant has no objection? |
| 02:04PM | 22 | MR. HARRINGTON:  No.  I'm sorry. |
| 02:04PM | 23 | THE COURT:  There being no objection, Government |
| 02:04PM | 24 | Exhibit 10 is received in evidence. |
| 02:04PM | 25 | (Government Exhibit 10 was received in evidence.) |

| | | |
|---|---|---|
| 02:04PM | 1 | BY MR. LYNCH: |
| 02:04PM | 2 | Q.  Do you recall testifying about the entry into the |
| 02:04PM | 3 | premises? |
| 02:04PM | 4 | A.  Yes. |
| 02:04PM | 5 | Q.  Okay.  Mr. Glaberson, can you pull up Exhibit Number 10, |
| 02:05PM | 6 | Bates number 11 -- 41, I'm sorry, 41. |
| 02:05PM | 7 |     Now, do you see what's depicted on the screen in front of |
| 02:05PM | 8 | you, Chief Granville? |
| 02:05PM | 9 | A.  I do. |
| 02:05PM | 10 | Q.  And what's depicted on the screen? |
| 02:06PM | 11 | A.  It's the side view of 56 Grimes. |
| 02:06PM | 12 | Q.  And from what angle or what is the side street that this |
| 02:06PM | 13 | side of the building is on? |
| 02:06PM | 14 | A.  Milburn. |
| 02:06PM | 15 | Q.  And do you see the door that you entered to make entry |
| 02:06PM | 16 | into 56 Grimes the first time? |
| 02:06PM | 17 | A.  Yes. |
| 02:06PM | 18 | Q.  And where is that door located? |
| 02:06PM | 19 | A.  It's located on the left of the screen. |
| 02:06PM | 20 | Q.  Is it fair to say on the left of the screen there's an |
| 02:06PM | 21 | entryway on the far left with a -- looks like to be, like, a |
| 02:06PM | 22 | metal door, black? |
| 02:06PM | 23 | A.  Yeah.  It's a black gated door. |
| 02:06PM | 24 | Q.  Now, if you could go to Bates stamp page 44? |
| 02:07PM | 25 |     Do you see what's depicted on the screen in front of you |

02:07PM     1    now?

02:07PM     2    A.   I do.

02:07PM     3    Q.   And what is this?

02:07PM     4    A.   This would -- the point of view is from -- in the

02:07PM     5    upstairs of 56 Grimes looking into the stairwell of the door

02:07PM     6    that we entered in.

02:07PM     7    Q.   Okay.  So, this is the top view of that same area,

02:07PM     8    correct?

02:07PM     9    A.   That's correct.

02:07PM    10    Q.   Now, is there a window in the stairwell?

02:07PM    11    A.   Yes, there is.

02:07PM    12    Q.   Okay.  And if we can go back to 41, is that window

02:07PM    13    depicted, those -- stairwell window depicted in this

02:07PM    14    photograph?

02:07PM    15    A.   Yes.

02:07PM    16    Q.   And can you point to its location on the photograph?  So,

02:07PM    17    to be clear, you've marked the -- if you're looking at the

02:08PM    18    second floor windows, it's the farthest window to the left

02:08PM    19    that's lighted?

02:08PM    20    A.   That's correct.

02:08PM    21    Q.   And was this stairwell lit when you made entry into the

02:08PM    22    premises?

02:08PM    23    A.   Yes.

02:08PM    24    Q.   Now, if we can go to slide 31 on Exhibit 1?  If you could

02:08PM    25    stop it right there.

02:08PM    1      Chief Granville, do you see what's depicted on the screen

02:08PM    2   in front of you?

02:08PM    3   A.  I do.

02:08PM    4   Q.  This is slide 31 of Exhibit 1.  Is there a date and a

02:09PM    5   timestamp on this surveillance video?

02:09PM    6   A.  Yeah.  It's February 19th, 2020.  And the timestamp is

02:09PM    7   8:40:23 p.m.

02:09PM    8   Q.  And prior to us stopping it, was there at least some

02:09PM    9   movement on the video?

02:09PM   10   A.  Yes.

02:09PM   11   Q.  One second.  And could you explain to the Court what that

02:09PM   12   movement was?

02:09PM   13   A.  This is showing us entering the side of 56 Grimes.

02:09PM   14   Q.  So, that doorway you just previously spoke about in

02:09PM   15   Exhibit 10, Bates stamp number 41?

02:09PM   16   A.  Yes.

02:09PM   17   Q.  And, again, the hallway is lit at the time you entered?

02:09PM   18   A.  That's correct.

02:09PM   19      MR. THOMPSON:  Sorry, Mr. Lynch, what is this

02:10PM   20   exhibit?

02:10PM   21      MR. LYNCH:  This is Exhibit 1, slide 31.

02:10PM   22      MR. THOMPSON:  Thirty-one.  Thank you.

02:10PM   23   BY MR. LYNCH:

02:10PM   24   Q.  Okay.  I'm going to have Mr. Glaberson play this.  We're

02:10PM   25   going to stop it at times.  If you could identify the members

02:10PM    1    of the entry team as we stop the video, I'd appreciate it,

02:10PM    2    okay?

02:10PM    3    A.   Yes.

02:10PM    4    Q.   Stop it right there.

02:10PM    5         Now, several people have walked up the stairs, correct?

02:10PM    6    A.   That's correct.

02:10PM    7    Q.   Who is first in line?

02:10PM    8    A.   Myself.

02:10PM    9    Q.   Okay.  Continue to play it.  Stop it.

02:10PM   10         Do you see the second person now behind you?

02:10PM   11    A.   Yes.

02:10PM   12    Q.   And do you recognize that individual?

02:10PM   13    A.   Yes.  It's Detective Adam Imiolo.

02:11PM   14    Q.   And that's I-M-I-O-L-O?

02:11PM   15    A.   Yes.

02:11PM   16    Q.   And then, do you see the third individual in the line?

02:11PM   17    A.   I do.

02:11PM   18    Q.   And who is that?

02:11PM   19    A.   Detective Dan Milbrandt.

02:11PM   20    Q.   All right, Mr. Glaberson.  Can you play a little bit

02:11PM   21    longer?  Now, stop right there.

02:11PM   22         Do you see the individual behind Dan Milbrandt?

02:11PM   23    A.   I did.  It's Deputy Jim DeLacy.

02:11PM   24    Q.   Is he also with the sheriff's department?

02:11PM   25    A.   Yes.

02:11PM  1   Q.  Okay.  If you can continue -- we've stopped it just at

02:12PM  2   8:40:36.  If you can continue it from here?

02:12PM  3       Do you see -- I'm going to stop it right there,

02:12PM  4   approximately 8:40:40.  What's just occurred on the video?

02:12PM  5   A.  A pry bar was handed off.

02:12PM  6   Q.  And do you -- did you see the individual that handed off

02:12PM  7   the pry bar?

02:12PM  8   A.  I did.

02:12PM  9   Q.  Who was that?

02:12PM  10  A.  It was Detective Sergeant Mike Maiola.  He's with the

02:12PM  11  Buffalo Police Department.

02:12PM  12  Q.  And that's Maiola, M-A-I-O-L-A?

02:12PM  13  A.  I think so.

02:12PM  14  Q.  Okay.  And what's the purpose of a pry bar?

02:12PM  15  A.  Oftentimes, entry doors open out, and you need to utilize

02:12PM  16  a pry bar in order to open that door.

02:12PM  17  Q.  Is that what you needed to do here?

02:12PM  18  A.  Yes.

02:13PM  19  Q.  If we can continue it, Mr. Glaberson?  You can stop it

02:13PM  20  right there.

02:13PM  21      Now, there's a person who is just off to the right of the

02:13PM  22  screen, correct?

02:13PM  23  A.  Yes.

02:13PM  24  Q.  Who is that individual?

02:13PM  25  A.  That was detective Tony Fanara.

02:14PM    1    Q.  Is he with Buffalo Police?

02:14PM    2    A.  Yes.

02:14PM    3    Q.  And then, there's now -- right behind him, there's an

02:14PM    4    individual with what appears to be the hoodie on?

02:14PM    5    A.  Yes.  That's Deputy Adam Day.

02:14PM    6    Q.  And he's with the sheriff's department?

02:14PM    7    A.  Yes.

02:14PM    8    Q.  Okay.  You can continue it, Mr. Glaberson.

02:14PM    9        And then, the last two individuals, do you see them?

02:14PM   10        Stop it.

02:14PM   11    A.  Yes.

02:14PM   12    Q.  Who are those individuals?

02:14PM   13    A.  Senior Detective Tim Carney and Deputy Joel Arney

02:14PM   14    (phonetic).

02:14PM   15    Q.  So, you and those eight other individuals then made entry

02:14PM   16    into the second floor area, correct?

02:14PM   17    A.  That's correct.

02:14PM   18    Q.  Now, I just want to -- we may have touched on it last

02:14PM   19    time, but it was several months ago.  Why did you go up the

02:14PM   20    second -- these stairs at this time, even though you had the

02:14PM   21    search warrant for the lower front, I guess?

02:14PM   22    A.  So, once we made entry into the side entrance and

02:15PM   23    realized we were in a stairwell, and we noticed that the side

02:15PM   24    door as well, I noted the side door as well, I had committed

02:15PM   25    to that stairwell, and we were going up into an area.

| | | |
|---|---|---|
| 02:15PM | 1 | Q.  Now, when you got up to the second floor though, the door |
| 02:15PM | 2 | was closed, correct? |
| 02:15PM | 3 | A.  That's correct. |
| 02:15PM | 4 | Q.  And why did you enter?  Why did you breach that door? |
| 02:15PM | 5 | Did it provide you some protection? |
| 02:15PM | 6 | A.  The door? |
| 02:15PM | 7 | Q.  Yeah. |
| 02:15PM | 8 | A.  No. |
| 02:15PM | 9 | Q.  Why not? |
| 02:15PM | 10 | A.  It was just a normal framed door.  Those don't provide |
| 02:15PM | 11 | any protection other than of view sight. |
| 02:15PM | 12 | Q.  What could have harmed you through the door? |
| 02:15PM | 13 | A.  Somebody could have shot through the door. |
| 02:16PM | 14 | Q.  Did you have any concerns about your safety at the time |
| 02:16PM | 15 | you executed the warrant? |
| 02:16PM | 16 | A.  Yes. |
| 02:16PM | 17 | Q.  And why is that? |
| 02:16PM | 18 | A.  It's always safety -- officer safety issues when |
| 02:16PM | 19 | executing any type of search warrant; specifically on a |
| 02:16PM | 20 | residence that you don't have any knowledge of the interior |
| 02:16PM | 21 | of. |
| 02:16PM | 22 | Q.  And was there any concern particular to this case? |
| 02:16PM | 23 | A.  Yes. |
| 02:16PM | 24 | Q.  And what was that? |
| 02:16PM | 25 | A.  The group that we were dealing with, specifically an |

02:16PM   1   associate of Mr. Burgin, David Washington.

02:16PM   2   Q.  And what was your concern about Mr. Washington?

02:16PM   3   A.  Very dangerous and violent individual.

02:16PM   4   Q.  And had you learned that through your investigation?

02:16PM   5   A.  Yes.

02:16PM   6   Q.  What kind of violence was associated with Mr. Washington?

02:17PM   7   A.  Homicides and assaults.

02:17PM   8   Q.  So, you approximately made entry into the second floor

02:17PM   9   area around 8:40:21; is that fair to say?

02:17PM  10   A.  That's correct.

02:17PM  11   Q.  What happened when you made entry into the second floor?

02:17PM  12   A.  We cleared the second floor for -- we did a security

02:17PM  13   sweep of the second floor for bodies.

02:17PM  14   Q.  And so, what -- explain to the Court what a security

02:17PM  15   sweep is.

02:17PM  16   A.  It's just an officer safety sweep for -- in an attempt to

02:17PM  17   locate any individuals that might be up in that residence or

02:17PM  18   hiding.

02:17PM  19   Q.  Did you locate anyone in that foyer area?

02:57PM  20   A.  No.

02:57PM  21   Q.  While you were up there, did you make any observations?

02:57PM  22   A.  Yes.

02:57PM  23   Q.  What observations did you make?

02:57PM  24   A.  I observed a piece of mail in the garbage that beared

02:57PM  25   [sic]  Mr. Burgin's name.

02:57PM    1    Q.   And where was this garbage located?

02:57PM    2    A.   In the kitchen area.

02:57PM    3    Q.   And can you describe what you saw as you saw this garbage

02:57PM    4    area?

02:57PM    5    A.   It was a bill.

02:57PM    6    Q.   And where was it located in the garbage?

02:57PM    7    A.   On the top of the garbage.

02:57PM    8    Q.   Did you have to move anything to see this piece of mail?

02:57PM    9    A.   No.

02:57PM   10    Q.   If you can pull up Exhibit 11?

02:58PM   11         Do you see Exhibit 11 in front of you?

02:58PM   12    A.   I do.

02:58PM   13    Q.   Do you recognize what's depicted in that photograph?

02:58PM   14    A.   I do.

02:58PM   15    Q.   What is it?

02:58PM   16    A.   It's a bill bearing Mr. Burgin's name with the address of

02:58PM   17    79 Brunswick.  It's a National Fuel bill.

02:58PM   18    Q.   Is this the bill you saw during your protective sweep of

02:58PM   19    the second floor area?

02:58PM   20    A.   Yes.

02:58PM   21    Q.   And, again, did you have to manipulate this garbage can

02:58PM   22    in any way to see this?

02:58PM   23    A.   No.

02:58PM   24    Q.   Does this fairly and accurately depict the way the

02:59PM   25    garbage can and bill looked on February 19th, 2020 when you

| | | |
|---|---|---|
| 02:59PM | 1 | conducted your protective sweep around 8:40 p.m.? |
| 02:59PM | 2 | A.  Yes. |
| 02:59PM | 3 | MR. LYNCH:  I'd ask that Government Exhibit Number 11 |
| 02:59PM | 4 | be admitted. |
| 02:59PM | 5 | THE COURT:  Mr. Harrington? |
| 02:59PM | 6 | MR. HARRINGTON:  Judge, I'm going to cross-examine |
| 02:59PM | 7 | him on it anyway.  I don't have an objection. |
| 02:59PM | 8 | THE COURT:  All right.  There being no objection, |
| 02:59PM | 9 | Government Exhibit 11 received in evidence. |
| 02:59PM | 10 | (Government Exhibit 11 received in evidence.) |
| 02:59PM | 11 | |
| 02:59PM | 12 | BY MR. LYNCH: |
| 02:59PM | 13 | Q.  Now, how many floors are located at 56 Grimes? |
| 02:59PM | 14 | A.  Three floors. |
| 02:59PM | 15 | Q.  Okay.  So, can you describe the three floors, I guess? |
| 02:59PM | 16 | A.  There's a first floor that contained a bar area, a second |
| 02:59PM | 17 | floor apartment area, and then, there was a third floor |
| 03:00PM | 18 | attic. |
| 03:00PM | 19 | Q.  There was a basement, too, I'd assume, right? |
| 03:00PM | 20 | A.  I don't recall. |
| 03:00PM | 21 | Q.  Okay.  But you know that there was a first floor, second |
| 03:00PM | 22 | floor, and attic? |
| 03:00PM | 23 | A.  Yes. |
| 03:00PM | 24 | Q.  During your protective sweep of the second floor, did you |
| 03:00PM | 25 | go into the attic? |

GRANVILLE -- BY MR. LYNCH -- 12/19/2022

21

03:00PM   1    A.  I did not.

03:00PM   2    Q.  Do you know if any member of your team did?

03:00PM   3    A.  Yes.

03:00PM   4    Q.  Now, once you got to the second floor, did you determine

03:00PM   5    how many points of entry there were to the second floor area?

03:00PM   6    A.  At some point, we did determine that through -- there

03:00PM   7    were a couple points of entry.

03:01PM   8    Q.  And where were they?

03:01PM   9    A.  There was the side door in which we first entered.  There

03:01PM  10    was also a rear entrance.

03:01PM  11    Q.  And did you learn where that rear entrance, I guess,

03:01PM  12    where it comes from?

03:01PM  13    A.  Yes.

03:01PM  14    Q.  Where did it come from?

03:01PM  15    A.  From the back of the building.

03:01PM  16    Q.  And did it come from the outside or from the inside?

03:01PM  17    A.  From the outside.

03:01PM  18    Q.  I'm going to show you what's been marked Exhibit Number

03:01PM  19    1, slide (inaudible).  Do you see what's depicted on the

03:01PM  20    screen in front of you?

03:01PM  21    A.  I do.

03:01PM  22    Q.  Okay.  Can you stop it, Mr. Glaberson?

03:01PM  23        What's depicted on the screen in front of you?

03:01PM  24    A.  It's the rear entrance of 56 Grimes.

03:01PM  25    Q.  Okay.  And the time on this is, again, February 19th,

03:02PM    1    2020, time 8:42:25; is that right?

03:02PM    2    A.  That's correct.

03:02PM    3    Q.  Okay.  And what -- I guess, what angle is this

03:02PM    4    surveillance video from?

03:02PM    5    A.  This is shooting down the stairwell to the rear of 56

03:02PM    6    Grimes.

03:02PM    7    Q.  Okay.  So, this is from the second floor down to the --

03:02PM    8    shoots down to the first floor?

03:02PM    9    A.  That's correct.

03:02PM   10    Q.  And this is a rear staircase?

03:02PM   11    A.  That's correct.

03:02PM   12    Q.  And is there an entry point door at the bottom of this

03:02PM   13    stair?

03:02PM   14    A.  Yes.

03:02PM   15    Q.  And where does that entry point come from?

03:02PM   16    A.  From the outside of 56 Grimes.

03:02PM   17    Q.  Okay.  Are you sure it doesn't come from the inside from

03:02PM   18    the back?

03:02PM   19            MR. HARRINGTON:  Objection, Judge.

03:02PM   20            THE COURT:  I'm sorry?

03:02PM   21            MR. HARRINGTON:  I object.  Mr. Lynch is trying to

03:02PM   22    correct his witness because he's in error in his testimony

03:02PM   23    like he did last time.  I object to it.

03:03PM   24            MR. LYNCH:  Okay.  We'll clarify it.  It's fine,

03:03PM   25    Judge.  We'll get to it.

03:03PM    1              THE COURT:  All right.

03:03PM    2    BY MR. LYNCH:

03:03PM    3    Q.  Do you see -- so this is shooting down a stairwell?

03:03PM    4    A.  That's correct.

03:03PM    5    Q.  Okay.  You can continue to play it.

03:03PM    6         Do you see the individual depicted in the video?

03:03PM    7    A.  I do.

03:03PM    8    Q.  Who is that?

03:03PM    9    A.  I believe that's Detective Mike Maiola.

03:03PM   10    Q.  And is there another individual now?

03:03PM   11    A.  Detective Dan Milbrandt.

03:03PM   12    Q.  And you said this is of the back stairwell?

03:03PM   13    A.  That's correct.

03:03PM   14    Q.  Stop it, Mr. Glaberson.

03:04PM   15         So, this is -- and the time now they both walked away from

03:04PM   16    the, I guess, the video coverage?

03:04PM   17    A.  That's correct.

03:04PM   18    Q.  And what time is it now?

03:04PM   19    A.  Eight forty-two fifty-six p.m.

03:04PM   20    Q.  Okay.  If we can go to slide 35?

03:04PM   21         Slide 35, do you see what's depicted in front of you?

03:04PM   22    A.  I do.

03:04PM   23    Q.  Is this a still footage -- still image of the video

03:04PM   24    surveillance?

03:04PM   25    A.  It is.

03:04PM   1   Q.  And, again, who is the individual depicted on slide 35?

03:04PM   2   A.  I believe that's Detective Sergeant Mike Maiola.

03:04PM   3   Q.  And then slide 36?

03:05PM   4       And, again, do you see what's-- the image depicted in

03:05PM   5   front of you?  Do you see it?

03:05PM   6   A.  I do.

03:05PM   7   Q.  Okay.  And what is it?

03:05PM   8   A.  It's the rear stairwell at 56 Grimes.

03:05PM   9   Q.  Now, after you did a protective sweep of the second

03:05PM  10   floor, what happened next?

03:05PM  11   A.  We proceeded down to the first floor of the residence or

03:05PM  12   the property.

03:05PM  13   Q.  Mr. Glaberson, can you pull up slide 38?  Actually, can

03:06PM  14   you go to slide 37?  Okay.

03:06PM  15       Do you see what's depicted on the screen in front of you?

03:06PM  16   A.  I do.

03:06PM  17   Q.  And what is this?

03:06PM  18   A.  That's me in the corner there and that's the stairwell to

03:06PM  19   the -- which we had come in first.

03:06PM  20   Q.  And what's the time depicted on the surveillance video?

03:06PM  21   A.  Eight forty-three seventeen p.m.

03:06PM  22   Q.  If you could it play it?

03:06PM  23       Now, what does this clip depict?

03:06PM  24   A.  It shows us exiting the second floor of 56 Grimes and

03:06PM  25   traveling to the outside of it, and we ultimately entered the

03:07PM    1    front door.

03:07PM    2    Q.   So, the entry team now approximately 8:43:30 exits the

03:07PM    3    second floor?

03:07PM    4    A.   That's correct.

03:07PM    5    Q.   Now, if we can go to slide 38?

03:07PM    6         Do you see the image that's depicted on slide 38?

03:07PM    7    A.   Yes.

03:07PM    8    Q.   And what does this image depict?

03:07PM    9    A.   We're at the front of 56 Grimes.

03:07PM   10    Q.   And this is a still shot from the surveillance video?

03:07PM   11    A.   That's correct.

03:07PM   12    Q.   And this is -- and which direction is this video footage

03:07PM   13    shooting?

03:07PM   14    A.   Shooting eastbound on Grimes.

03:07PM   15    Q.   We can go to slide 39.

03:08PM   16         And do you see the image on the screen in front of you?

03:08PM   17    A.   Yes.

03:08PM   18    Q.   And what's depicted?

03:08PM   19    A.   Showing us making entry into 56 Grimes.

03:08PM   20    Q.   And what's the timestamp on this image?

03:08PM   21    A.   Eight forty-four thirty-five p.m.

03:08PM   22    Q.   So, approximately, a minute after you left the second

03:08PM   23    floor?

03:08PM   24    A.   Approximately, yes.

03:08PM   25    Q.   If we can go to slide 40?

03:08PM   1       And, again, is this -- what's depicted on this slide?

03:08PM   2   A.  It shows us making entry into 56 Grimes in the lower.

03:08PM   3   Q.  And then slide 41?

03:09PM   4           MR. THOMPSON:  What was the slide number?

03:09PM   5           MR. LYNCH:  Slide 41.

03:09PM   6           MR. THOMPSON:  Thank you.

03:09PM   7   BY MR. LYNCH:

03:09PM   8   Q.  And, again, what's depicted on this screen?

03:09PM   9   A.  Shows us making entry into 56 Grimes in the lower half of

03:09PM  10   the property.

03:09PM  11   Q.  Now, if we can go to slide 42?  I'm going to have you

03:09PM  12   stop it for a second.

03:09PM  13       Is slide 42 a surveillance clip?

03:09PM  14   A.  Yes.

03:09PM  15   Q.  And although it's dark here, can you tell what part of 56

03:09PM  16   Grimes this depicts?

03:09PM  17   A.  Having previously viewed it, I could.

03:09PM  18   Q.  Yes.

03:09PM  19   A.  It's the lower, the bar area, of 56 Grimes.

03:10PM  20   Q.  And in which direction is it shooting?

03:10PM  21   A.  I don't recall.

03:10PM  22   Q.  We'll play it a little bit.  Have you stop it right

03:10PM  23   there.

03:10PM  24       Do you see the time depicted on the screen?

03:10PM  25   A.  I do.

03:10PM   1   Q.  And what time is it?

03:10PM   2   A.  It's 8:44:38 p.m.

03:10PM   3   Q.  And what was just shown on the video clip?

03:11PM   4   A.  It shows the -- us making entry into the lower of 56

03:11PM   5   Grimes and the point of view is right at the front door of 56

03:11PM   6   Grimes.

03:11PM   7   Q.  Can you continue, Mr. Glaberson?  Have you stop it right

03:12PM   8   there.

03:12PM   9       Now, have the lights been turned on now inside the

03:12PM  10   premises?

03:12PM  11   A.  Yes.

03:12PM  12   Q.  Can you just describe for the Court what's depicted --

03:12PM  13   well, what time is depicted on the video surveillance and

03:12PM  14   then what's depicted?

03:12PM  15   A.  It's 8:45:44 p.m., and it shows us, after having turned

03:12PM  16   the light on in the lower, just clearing the lower for us,

03:12PM  17   for safety issues.

03:12PM  18   Q.  Now, your search warrant was for the lower front,

03:12PM  19   correct?

03:12PM  20   A.  That's correct.

03:12PM  21   Q.  When you made entry into the lower area, did you

03:12PM  22   determine -- make any determinations about the accuracy of

03:12PM  23   that request or that description?

03:12PM  24   A.  Yes.

03:12PM  25   Q.  What did you determine?

03:13PM   1   A.  We determined that the entire property was connected in

03:13PM   2   some way and that, obviously, listing the 56 Grimes lower was

03:13PM   3   a mistake.  We should have listed the whole property.

03:13PM   4   Q.  Okay.  Was there even a lower front and a lower rear?

03:13PM   5   A.  No.

03:13PM   6   Q.  Okay.  So, there was just a lower?

03:13PM   7   A.  That's correct.

03:13PM   8   Q.  Okay.  And then, did you make a determination about, I

03:13PM   9   guess, the entire premises as it relates to just the lower

03:13PM  10   and the upper?

03:13PM  11   A.  Yes.

03:13PM  12   Q.  And what did you determine?

03:13PM  13   A.  That they were connected; having a side entrance and a

03:13PM  14   rear entrance.

03:13PM  15   Q.  Now, if we can go to slide 43?  We can go to slide 45.

03:14PM  16   Stop it right there.

03:14PM  17       What's depicted on the screen in front of you?

03:14PM  18   A.  Shows us clearing the lower of 56 Grimes.

03:14PM  19   Q.  And it's just from a different vantage point?

03:14PM  20   A.  It is.

03:14PM  21   Q.  What vantage point is this?

03:14PM  22   A.  It's a side view.

03:14PM  23   Q.  Of the front bar area?

03:14PM  24   A.  Yes.

03:14PM  25   Q.  And then, if we can go to slide 47?  Do you see what's

03:14PM    1    depicted on the screen in front of you?

03:14PM    2    A.  I do.

03:14PM    3    Q.  Can you explain what time is indicated on this

03:14PM    4    surveillance clip?

03:14PM    5    A.  It's 8:44:59 p.m.

03:15PM    6    Q.  And what's depicted on the screen in front of you?

03:15PM    7    A.  It shows officers heading to the rear of the lower of 56

03:15PM    8    Grimes towards that door.

03:15PM    9    Q.  Now, what -- can you describe to the Court what this area

03:15PM   10    is inside of 56 Grimes?

03:15PM   11    A.  This is the lower bar area.

03:15PM   12    Q.  So, one -- is it one continuous area?

03:15PM   13    A.  Yes.

03:15PM   14    Q.  And when you said that they're heading back toward the

03:15PM   15    back of the lower area, what is back in that area?

03:15PM   16    A.  There's an entry door.

03:15PM   17    Q.  And where does that entry door go to?

03:15PM   18    A.  It leads up to the second floor of 56 Grimes.

03:15PM   19    Q.  If we can continue to play it, Mr. Glaberson?  I'm going

03:16PM   20    to stop it right there.

03:16PM   21        Within that red box, what is located or what is depicted

03:16PM   22    inside that red box?

03:16PM   23    A.  It shows a couple officers that just made entry into a

03:16PM   24    rear door.

03:16PM   25    Q.  And where does that rear door take you to?

| | | |
|---|---|---|
| 03:16PM | 1 | A.  The second floor of 56 Grimes. |
| 03:16PM | 2 | Q.  Is that a stairwell here? |
| 03:16PM | 3 | A.  Yes. |
| 03:16PM | 4 | Q.  You previously testified that the stairwell to the second |
| 03:16PM | 5 | floor where Mike Maiola and Milbrandt were, you said that |
| 03:16PM | 6 | that entry door was from the outside.  Was that correct? |
| 03:16PM | 7 | A.  It was not. |
| 03:16PM | 8 | Q.  Okay.  Where was that entry?  That back stairwell, where |
| 03:17PM | 9 | did it come from? |
| 03:17PM | 10 | A.  From the interior of the lower 56 Grimes. |
| 03:17PM | 11 | Q.  If you can continue to play it, Mr. Glaberson?  Now, if |
| 03:24PM | 12 | we can go to slide 48? |
| 03:24PM | 13 | Do you see what's depicted in slide 48? |
| 03:24PM | 14 | A.  I do. |
| 03:24PM | 15 | Q.  Do you recognize what's depicted here? |
| 03:24PM | 16 | A.  Yes.  It shows officers in the lower of 56 Grimes. |
| 03:24PM | 17 | Q.  And do you see to -- the area to the right of that red |
| 03:24PM | 18 | box? |
| 03:24PM | 19 | A.  I do. |
| 03:24PM | 20 | Q.  What is depicted to the right of that red box? |
| 03:24PM | 21 | A.  That's the entry door into the second floor of 56 Grimes, |
| 03:24PM | 22 | the stairwell. |
| 03:24PM | 23 | Q.  Hold on.  So, to the right of the -- so, what's depicted |
| 03:25PM | 24 | in the red box? |
| 03:25PM | 25 | A.  The door I just described entering the second floor of 56 |

03:25PM    1   Grimes.

03:25PM    2   Q.  Okay.  How about to the right of that box?

03:25PM    3   A.  That's another door.

03:25PM    4   Q.  And where does that door go to?

03:25PM    5   A.  To the outside of 56 Grimes.

03:25PM    6          THE COURT:  Is that the first or second outside door

03:25PM    7   on the side of the building that's depicted in the exhibit?

03:25PM    8          MR. LYNCH:  I was just about to get to that, Judge,

03:25PM    9   if -- I think I can clarify.  I can answer your question.  If

03:25PM   10   we can go to slide number 3?

03:26PM   11   BY MR. LYNCH:

03:26PM   12   Q.  Do you see what's depicted in slide number 3?

03:26PM   13   A.  I do.

03:26PM   14   Q.  From this vantage point, can you tell us -- can you see

03:26PM   15   that entry door that you were just speaking about?

03:26PM   16   A.  I can.

03:26PM   17   Q.  Okay.  Where is it depicted in this photograph?

03:26PM   18   A.  It's right at the rear of 56 Grimes.

03:26PM   19   Q.  Okay.  So, you have marked an area.  It's a second entry

03:26PM   20   point on -- at 56 Grimes?

03:26PM   21   A.  Yes.

03:26PM   22   Q.  Toward the back end of the building?

03:26PM   23   A.  Yes.

03:26PM   24          MR. LYNCH:  Judge, does that clarify it?  I mean, is

03:26PM   25   that the question that you wanted to ask?

03:26PM   1          THE COURT:  That's one of them.  If you go in the

03:27PM   2   side door on Milburn, in the front of the building, that gave

03:27PM   3   you entry into a stairway that we've seen video on, correct?

03:27PM   4          THE WITNESS:  That's correct.

03:27PM   5          THE COURT:  But you could not get into the first

03:27PM   6   floor bar area through that door?

03:27PM   7          THE WITNESS:  You could.

03:27PM   8          THE COURT:  You could?

03:27PM   9          THE WITNESS:  Yes.

03:27PM  10          THE COURT:  So, is there a door depicted in the bar

03:27PM  11   area showing that door?

03:27PM  12          MR. LYNCH:  We're going to get to that one too.

03:27PM  13          THE COURT:  All right.

03:27PM  14   BY MR. LYNCH:

03:27PM  15   Q.  If we -- why don't we go back to -- I'm going to have

03:28PM  16   pulled up Exhibit 1, slide 31.  Okay.  Stop it right there.

03:28PM  17       DO you see the -- this is a video you previously spoke

03:28PM  18   about, correct?

03:28PM  19   A.  Correct.

03:28PM  20   Q.  Your entry?

03:28PM  21   A.  Yes.

03:28PM  22   Q.  Right before you opened that door --

03:28PM  23       Can you go back right to the beginning, Mr. Glaberson and

03:28PM  24   hit pause?  Right pause right there.

03:28PM  25       -- do you see what's depicted in the screen in front of

| | | |
|---|---|---|
| 03:28PM | 1 | you? |
| 03:28PM | 2 | A.   I do. |
| 03:28PM | 3 | Q.   And what's depicted? |
| 03:28PM | 4 | A.   That is a door that -- |
| 03:28PM | 5 | Q.   Well, strike that.  Is this a stairwell that you made |
| 03:29PM | 6 | entry into? |
| 03:29PM | 7 | A.   Yes. |
| 03:29PM | 8 | Q.   And the -- which door did you make entry into the |
| 03:29PM | 9 | stairwell from? |
| 03:29PM | 10 | A.   The side door of 56 Grimes. |
| 03:29PM | 11 | Q.   Is it to the left of the stairwell? |
| 03:29PM | 12 | A.   Yes. |
| 03:29PM | 13 | Q.   Looking down?  Okay.  There's another door depicted at |
| 03:29PM | 14 | the bottom of the stairwell, correct? |
| 03:29PM | 15 | A.   Correct. |
| 03:29PM | 16 | Q.   Do you know where that doorway goes to? |
| 03:29PM | 17 | A.   Into the bar area. |
| 03:29PM | 18 | Q.   Now, if we can go to slide 49?  Do you see what's |
| 03:30PM | 19 | depicted on the screen in front of you? |
| 03:30PM | 20 | A.   I do. |
| 03:30PM | 21 | Q.   Is this a video clip? |
| 03:30PM | 22 | A.   It is. |
| 03:30PM | 23 | Q.   And what's the time on this video clip? |
| 03:30PM | 24 | A.   Eight forty-five oh eight p.m. |
| 03:30PM | 25 | Q.   And what's depicted in this clip? |

| | | |
|---|---|---|
| 03:30PM | 1 | A.  Showing officers entering the rear door from the lower |
| 03:30PM | 2 | half of 56 Grimes.  That's the stairwell that leads to the |
| 03:30PM | 3 | upper. |
| 03:31PM | 4 | Q.  So, when we looked at that area within that red box on |
| 03:31PM | 5 | the previous slide? |
| 03:31PM | 6 | A.  Yes. |
| 03:31PM | 7 | Q.  That's the entry point from a different vantage point? |
| 03:31PM | 8 | A.  That's correct. |
| 03:31PM | 9 | Q.  Now, if we can go to slide -- so, this is approximately |
| 03:31PM | 10 | 8:45:08, correct? |
| 03:31PM | 11 | A.  That's correct. |
| 03:31PM | 12 | Q.  Now, what observations did you make of the lower part of |
| 03:31PM | 13 | 56 Grimes, I guess, the first floor? |
| 03:31PM | 14 | A.  First floor was a bar, like an entertaining area as it |
| 03:31PM | 15 | appeared to me, and there was also multiple entry points into |
| 03:32PM | 16 | the second half of or the upper half of 56 Grimes. |
| 03:32PM | 17 | Q.  What happened after you had conducted your search of the |
| 03:32PM | 18 | first floor?  What did you do next? |
| 03:32PM | 19 | A.  I then traveled back up into the second floor. |
| 03:32PM | 20 | Q.  If we can show slide 53 first?  Now, do you see what's |
| 03:32PM | 21 | depicted on the screen in front of you? |
| 03:32PM | 22 | A.  I do. |
| 03:32PM | 23 | Q.  What's depicted? |
| 03:32PM | 24 | A.  It's us in the lower of 56 Grimes.  Specifically, in the |
| 03:33PM | 25 | circle, that's me on the phone. |

03:33PM  1  Q.  And what's the time on this image?

03:33PM  2  A.  Eight forty-six thirty-five p.m.

03:33PM  3  Q.  And this is while you're still conducting the search of

03:33PM  4  the lower?

03:33PM  5  A.  That's correct.

03:33PM  6  Q.  Do you recall who you called that time?

03:33PM  7  A.  I don't.

03:33PM  8  Q.  Do you see this is slide number 564?  It shows records.

03:33PM  9  This from Exhibit 14, which is already in evidence.  Do you

03:33PM  10  see what's depicted on the screen in front of you?

03:34PM  11  A.  I do.

03:34PM  12  Q.  And is this -- do you recognize these records?

03:34PM  13  A.  I do.

03:34PM  14  Q.  And what do you recognize them to be?

03:34PM  15  A.  Those are my phone records.

03:34PM  16  Q.  And you previously testified -- is the -- did you

03:34PM  17  determine that there was a time difference of an hour between

03:34PM  18  your records and the actual eastern time?

03:34PM  19  A.  Yes.

03:34PM  20  Q.  And off by one hour?

03:34PM  21  A.  That's correct.

03:34PM  22  Q.  Okay.  So, if depicted in this zoomed-out box was a call

03:34PM  23  at 7:46, that was actually 8:46?

03:34PM  24  A.  That's correct.

03:34PM  25  Q.  And at 8:46, who did you call?

03:34PM 1   A.  Lieutenant Doug Kopp with the Buffalo Police Department.

03:34PM 2   Q.  Do you recall why you called Doug Kopp at 8:46?

03:34PM 3   A.  I don't.

03:34PM 4   Q.  What was -- was Doug Kopp working with you that day?

03:35PM 5   A.  He was.

03:35PM 6   Q.  And what was he doing, as far as you know?

03:35PM 7   A.  At that time, I believe he was back in the downtown area

03:35PM 8   of Buffalo.

03:35PM 9   Q.  Was he part of your investigation team that day?

03:35PM 10  A.  He was.

03:35PM 11  Q.  And you don't recall what his role was that day?

03:35PM 12  A.  No.  He supervised a group of narcotics guys from Buffalo

03:35PM 13  Police Department.

03:35PM 14  Q.  Okay.  Now, the next phone call you made was 8:54,

03:35PM 15  correct?

03:35PM 16  A.  That's correct.

03:35PM 17  Q.  And who did you call?  The last four digits of that are

03:35PM 18  3977.

03:35PM 19  A.  That's Pat McMahon.

03:35PM 20  Q.  Do you recall why you called Pat McMahon?

03:36PM 21  A.  I don't.

03:36PM 22  Q.  And then you called at 8 -- approximately 9 o'clock?

03:36PM 23  A.  Yes.  I called Pat again.

03:36PM 24  Q.  Do you recall why you called Pat at that point?

03:36PM 25  A.  I don't.

03:36PM 1    Q.  Now, what was Pat doing that day?

03:36PM 2    A.  He was drafting search warrants.

03:36PM 3    Q.  And what do you mean drafting search warrants?

03:36PM 4    A.  He was in charge of typing search warrants and --

03:37PM 5    Q.  What time did you obtain the -- how many search warrants

03:37PM 6    did you obtain this day?

03:37PM 7    A.  Several.

03:37PM 8    Q.  Okay.  In the evening hours, how many did you obtain?

03:37PM 9    A.  In the evening hours, at least two.

03:37PM 10   Q.  Do you know what time the first one was?

03:37PM 11   A.  I don't.

03:37PM 12   Q.  Okay.  Showing you what's been marked as Government

03:37PM 13   Exhibit Number 8, do you recognize what Government Exhibit

03:37PM 14   Number 8 is?

03:37PM 15   A.  I do.

03:38PM 16   Q.  What is it?

03:38PM 17   A.  It's a search warrant application for 56 Grimes in the

03:38PM 18   lower front.

03:38PM 19   Q.  And is that a fair and accurate record of the search

03:38PM 20   warrant?

03:38PM 21           THE COURT:  It's already in evidence.

03:38PM 22           MR. LYNCH:  It's already in evidence.  I was just

03:38PM 23   looking for my exhibit list, Judge.  Thank you.

03:38PM 24   BY MR. LYNCH:

03:38PM 25   Q.  So, what time was this search warrant signed?

03:38PM  1   A.  Signed at 8:32 p.m.

03:38PM  2   Q.  Now I'm going to show you Government Exhibit 9 and ask

03:38PM  3   you (inaudible)?

03:38PM  4   A.  This is a search warrant for 56 Grimes, the upper rear,

03:38PM  5   attic, and garage.

03:38PM  6   Q.  And what time was this warrant signed?

03:39PM  7   A.  At 9:48 p.m.

03:39PM  8   Q.  Could your conversation with Pat McMahon have related to

03:39PM  9   that warrant?

03:39PM  10  A.  Yes.

03:39PM  11  Q.  And why would you have had to call Pat McMahon to discuss

03:39PM  12  those warrants -- the second warrant?

03:39PM  13  A.  To give him specific details about what was occurring at

03:39PM  14  56 Grimes, the layout, et cetera.

03:39PM  15  Q.  Because -- was Pat McMahon ever at the scene of 56 Grimes

03:39PM  16  that day?

03:39PM  17  A.  No.

03:39PM  18  Q.  So, any information Detective McMahon would have put in a

03:40PM  19  warrant would have come from somebody else?

03:40PM  20  A.  That's correct.

03:40PM  21  Q.  Now, did you see on the screen in front of you the call

03:40PM  22  at 9:11?  It says 8:11, but at 9:11 p.m., to last four digits

03:40PM  23  are 4308?

03:40PM  24  A.  Yes.

03:40PM  25  Q.  And who was that?

03:40PM   1   A.   That was an evidence tech, Lee Richard, with the

03:40PM   2   sheriff's office.

03:40PM   3   Q.   And what was your purpose for calling Lee Richard?

03:40PM   4   A.   More than likely to come and document the scene or take

03:40PM   5   evidence.

03:40PM   6   Q.   And then, another phone call at 9:16 p.m. to 7192?

03:41PM   7   A.   Yes.

03:41PM   8   Q.   And whose phone is that?

03:41PM   9   A.   That was Deputy Paul McMahon.

03:41PM  10   Q.   And was Paul McMahon working that day?

03:41PM  11   A.   He was.

03:41PM  12   Q.   And what was he doing?

03:41PM  13   A.   He was with Pat McMahon.

03:41PM  14   Q.   So, he was working on the warrants?

03:41PM  15   A.   That's correct.

03:41PM  16   Q.   And then you had an incoming call at approximately 9:57

03:41PM  17   p.m. from a 9611 number?

03:41PM  18   A.   That's correct.

03:41PM  19   Q.   And do you recognize the -- those numbers?

03:41PM  20   A.   That's from Tim Carney.

03:41PM  21   Q.   And this was -- he was at the scene, correct?

03:41PM  22   A.   That's correct.

03:41PM  23   Q.   And 9:57, that was after the second warrant was signed?

03:41PM  24   A.   That's correct.

03:41PM  25   Q.   Now, why did -- so, did you talk to Pat McMahon about

03:42PM   1   getting the second warrant?

03:42PM   2   A.   I did.

03:42PM   3   Q.   So, would that explain, then, your phone calls with him?

03:42PM   4   A.   Yes.

03:42PM   5   Q.   Why did you have Pat McMahon get a second warrant?

03:42PM   6   A.   Because we were -- we had listed -- identified the -- in

03:42PM   7   the first warrant, the lower front of 56 Grimes.  And after

03:42PM   8   making entry, we determined that we needed a warrant for the

03:42PM   9   upstairs based upon our assertion that the entire property

03:42PM   10   was connected.

03:43PM   11   Q.   So, there was no -- this place wasn't divided into lower

03:43PM   12   front or lower rear or anything like that?

03:43PM   13   A.   No.

03:43PM   14   Q.   Did you determine it was one premises?

03:43PM   15   A.   We did.

03:43PM   16        MR. LYNCH:   Just one second, Judge.

03:43PM   17   BY MR. LYNCH:

03:43PM   18   Q.   Now, we can go to slide 61 on Exhibit 1?  You can stop it

03:56PM   19   right there.

03:56PM   20        Do you see the time that's depicted on this video

03:56PM   21   surveillance clip?

03:56PM   22   A.   I do.

03:56PM   23   Q.   What time is that?

03:56PM   24   A.   It's 8:47:27 p.m.

03:56PM   25   Q.   And what's depicted on the screen in front of you?

03:56PM  1   A.  It shows myself travelling to the upstairs second floor

03:56PM  2   of 56 Grimes.

03:56PM  3   Q.  And what doorway have you entered the stairwell from?

03:56PM  4   A.  From the first doorway in the bar area.

03:57PM  5   Q.  Okay.  So, you've entered from the lower --

03:57PM  6   A.  That's correct.

03:57PM  7   Q.  -- bar area?  And where -- when you enter 56 Grimes

03:57PM  8   through the front door, where is this door to the stairwell

03:57PM  9   located?

03:57PM  10  A.  If you're coming through the front door of 56 Grimes,

03:57PM  11  it's on the right-hand side.

03:57PM  12  Q.  Okay.  And when you come in, where is the bar located

03:57PM  13  when you enter in?

03:57PM  14  A.  To your left.

03:57PM  15  Q.  Okay.  So, bar to your left.  Over to your right is this

03:57PM  16  door that takes you to the stairwell?

03:57PM  17  A.  That's correct.

03:57PM  18  Q.  Now, you've already made -- you've already conducted your

03:57PM  19  protective sweep of the second floor, correct?

03:57PM  20  A.  That's correct.

03:57PM  21  Q.  What was your purpose for going back up to the second

03:57PM  22  floor at this point?

03:58PM  23  A.  Mistakes are often made by guys missing something, could

03:58PM  24  be just to get the lay of the land or see what we're dealing

03:58PM  25  with up on the second floor.

03:58PM   1   Q.  Now, did you include -- did you have Pat McMahon include

03:58PM   2   any information that you observed in plain view in that

03:58PM   3   second warrant?

03:58PM   4   A.  Yes.

03:58PM   5   Q.  And, specifically, what did you have him include?

03:58PM   6   A.  The mail located in the garbage.

03:58PM   7         MR. HARRINGTON:  I'm sorry.  I couldn't hear that.

03:58PM   8         THE WITNESS:  The mail located in the garbage.

03:58PM   9   BY MR. LYNCH:

03:58PM  10   Q.  Now, when you had made entry into the first floor area,

03:58PM  11   did you make any observations regarding the surveillance

03:58PM  12   system?

03:58PM  13   A.  Yes.

03:58PM  14   Q.  Okay.  And what you were you able to observe?

03:58PM  15   A.  We observed a very high-tech surveillance system that

03:59PM  16   included a bunch of cameras.

03:59PM  17         THE COURT:  Before you get into that, I need some

03:59PM  18   clarification.  I'm looking at Government Exhibit 8, which is

03:59PM  19   the first search warrant for 56 Grimes.

03:59PM  20         MR. LYNCH:  Judge, may I approach the witness with

03:59PM  21   the exhibit?

03:59PM  22         THE COURT:  And as I read the search warrant, unless

03:59PM  23   there's been some redaction on my copy, that's search warrant

03:59PM  24   says there is -- authorized to search 56 Grimes Street

03:59PM  25   Buffalo, New York, described as a two-and-one-half story,

04:00PM    1   multiple-residence building.  It doesn't indicate lower front

04:00PM    2   or lower or first or second floor.

04:00PM    3        THE WITNESS:  It says lower front right after 56

04:00PM    4   Grimes Street.

04:00PM    5        THE COURT:  So, that's been deleted from mine?

04:00PM    6        MR. LYNCH:  Are you on page 3?

04:00PM    7        THE COURT:  I'm on page 4.  Page 3 is the application

04:00PM    8   that references lower front, but the search warrant itself

04:00PM    9   does not.

04:00PM   10        MR. LYNCH:  I just want to make sure we have the

04:00PM   11   right page, Judge.

04:00PM   12        THE COURT:  Government Exhibit 8.

04:00PM   13        MR. LYNCH:  Correct.

04:00PM   14        THE COURT:  Page 4 of the search warrant granted by

04:00PM   15   Judge Case on February 19th, 2020 at 8:32 p.m., the third

04:01PM   16   paragraph down, starting with 56 Grimes Street.

04:01PM   17        MR. LYNCH:  Okay.  So, I just want to make sure --

04:01PM   18   I'm referring to the page of the exhibit.  So, it's one, two,

04:01PM   19   three, four, five, page six of the exhibit, but it does say

04:01PM   20   page 4 at the top.  That's where I was getting confused,

04:01PM   21   Judge.

04:01PM   22        THE COURT:  Yeah.  It says search warrant.

04:01PM   23        MR. LYNCH:  Yeah.  So, Detective McMahon is going to

04:01PM   24   be able to explain the reason why that's whited out.

04:02PM   25        THE COURT:  So, it's whited out?

| | | |
|---|---|---|
| 04:02PM | 1 | MR. LYNCH:  Yeah. |
| 04:02PM | 2 | THE COURT:  Because I'm looking here and thinking |
| 04:02PM | 3 | this authorizes the search of the whole building. |
| 04:02PM | 4 | MR. LYNCH:  Right.  No.  Detective McMahon is going |
| 04:02PM | 5 | to explain that.  He'll explain what happened with him and |
| 04:02PM | 6 | Judge Case. |
| 04:02PM | 7 | THE COURT:  All right. |
| 04:02PM | 8 | MR. LYNCH:  So, the application had it for the lower |
| 04:02PM | 9 | front, Judge, if you go back to the first page of the |
| 04:02PM | 10 | application.  So, it would be page 3 of Government Exhibit |
| 04:02PM | 11 | Number 8, Judge, but Detective McMahon will explain the |
| 04:02PM | 12 | discrepancy between the application and the search warrant. |
| 04:03PM | 13 | He can do that -- |
| 04:03PM | 14 | THE COURT:  I agree it's the search warrant that |
| 04:03PM | 15 | prevails. |
| 04:03PM | 16 | MR. LYNCH:  Correct.  But we all agree, Judge, the |
| 04:03PM | 17 | first warrant said lower front.  We all agree on that. |
| 04:03PM | 18 | THE COURT:  All right. |
| 04:03PM | 19 | MR. LYNCH:  Okay. |
| 04:03PM | 20 | BY MR. LYNCH: |
| 04:03PM | 21 | Q.  If we can go back to slide 31, Exhibit 1.  And now, you |
| 04:03PM | 22 | said you were going back up to the second floor to just get |
| 04:04PM | 23 | the lay of the land you said? |
| 04:04PM | 24 | A.  That's correct. |
| 04:04PM | 25 | Q.  Now, approximately how long were you up there, if you |

04:04PM   1   recall?

04:04PM   2   A.   I believe it was about six minutes.

04:04PM   3   Q.   I want to have you view -- can we pull up slide 63 from

04:04PM   4   Exhibit 1?  Stop it right there.

04:04PM   5        What time is the video stopped at?

04:04PM   6   A.   Eight fifty-three twenty-four p.m.

04:04PM   7   Q.   So, approximately six minutes after you went up the

04:04PM   8   stairs?

04:04PM   9   A.   That's correct.

04:04PM   10  Q.   And what's depicted in the video at this point?

04:04PM   11  A.   Departing the second floor.

04:04PM   12  Q.   And it was soon after this that you made a call or right

04:05PM   13  around the same time you made a call to Pat McMahon?

04:05PM   14  A.   That's correct.

04:05PM   15  Q.   Now, had you already observed the mail in the garbage

04:05PM   16  before you went up the second time?

04:05PM   17  A.   Yes.

04:05PM   18  Q.   Now, we can go to the next exhibit, slide 64 and then 65,

04:05PM   19  66.  Okay.  Now, stop it right there.

04:05PM   20       Do you see the time depicted in this surveillance video?

04:06PM   21  A.   I do.

04:06PM   22  Q.   This is Exhibit 1, slide 66.  Now, there's been an

04:06PM   23  overlay put on this, correct?

04:06PM   24  A.   Yes.

04:06PM   25  Q.   At the top?

04:06PM    1    A.   Yes.

04:06PM    2    Q.   And it shows some of your phone records?

04:06PM    3    A.   It does.

04:06PM    4    Q.   And what -- at 8:54, who were you calling?

04:06PM    5    A.   It shows an incoming call.

04:06PM    6    Q.   So, an incoming call to what number?

04:06PM    7    A.   To my number.

04:06PM    8    Q.   Okay.  So, these are Pat McMahon's calls?

04:06PM    9    A.   Yes.

04:06PM   10    Q.   And then you continue to play it.  Now, I'm going to have

04:07PM   11    you stop it right there.

04:07PM   12         There's a person to the bottom right of this video.  Who

04:07PM   13    is that?

04:07PM   14    A.   Looks like Special Agent TJ Webb.

04:07PM   15    Q.   So, he was not part of the entry team to the second

04:07PM   16    floor, the original entry, correct?

04:07PM   17    A.   No, he was not.

04:07PM   18    Q.   But he's now entered the first floor at some point?

04:07PM   19    A.   Yes.

04:07PM   20    Q.   Now, if we can go to slide 67?  You can stop it right

04:07PM   21    there.

04:08PM   22         What's the time depicted on this surveillance video?

04:08PM   23    A.   Eight fifty-five sixteen p.m.

04:08PM   24    Q.   And this is -- what's depicted in this -- what area of

04:08PM   25    the premises is depicted?

04:08PM    1    A.   The bar area.

04:08PM    2    Q.   And the overlay at the top, is this, again, just Pat

04:08PM    3    McMahon's records?

04:08PM    4    A.   Yes.

04:08PM    5    Q.   Showing a call to you?

04:08PM    6    A.   That's correct.

04:08PM    7    Q.   At approximately this time?

04:08PM    8    A.   Yes.

04:08PM    9    Q.   And you said that Pat McMahon was the one who was getting

04:08PM   10    the warrants?

04:08PM   11    A.   He was.

04:08PM   12    Q.   And then, slide 68?  And if you could stop it right

04:08PM   13    there, Mr. Glaberson?

04:08PM   14         And, again, is this -- what's depicted in this video clip?

04:08PM   15    A.   It shows me on the phone in the bar area at 56 Grimes.

04:08PM   16    Q.   Now, if we can go to slide 70?  Can you see what's

04:09PM   17    depicted on the screen in front of you?

04:09PM   18    A.   Yes.

04:09PM   19    Q.   Can you hit pause?  Can we go back to that slide 70?

04:09PM   20    Slide 69.  Do you see what's depicted on the screen in front

04:10PM   21    of you?

04:10PM   22    A.   Yes.  It's myself and Special Agent Webb traveling to the

04:10PM   23    second floor of the apartment.

04:10PM   24    Q.   And what time is this?

04:10PM   25    A.   Eight fifty-six forty-five p.m.

04:10PM    1   Q.  So, this is your second time up -- actually, the third

04:10PM    2   time you've been to the second floor, correct?

04:10PM    3   A.  That's correct.

04:10PM    4   Q.  Second time after you completed the protective sweep?

04:10PM    5   A.  That's correct.

04:10PM    6   Q.  And why are you going to second floor again at this

04:10PM    7   point?

04:10PM    8   A.  Probably to show Special Agent Webb, since we were

04:11PM    9   working together, kind of what we were looking at on the

04:11PM   10   second floor as far as a search was concerned.

04:11PM   11   Q.  Now, you didn't have a warrant yet for the second floor?

04:11PM   12   A.  No.

04:11PM   13   Q.  So, this is the second time you've been up here, correct?

04:11PM   14   A.  That's correct.

04:11PM   15   Q.  Did you -- any -- you had already observed the mail in

04:11PM   16   your first protective sweep, correct?

04:12PM   17   A.  Correct.

04:12PM   18   Q.  And that was included in the warrant, correct?

04:12PM   19   A.  It was.

04:12PM   20   Q.  And then, the surveillance equipment you observed during

04:12PM   21   your search?

04:12PM   22   A.  That's correct.

04:12PM   23   Q.  Now, while you were up there for that, the, I guess, the

04:12PM   24   second time you went up, did you conduct any search of the

04:12PM   25   premises?

04:12PM    1    A.  I did.

04:12PM    2    Q.  Okay.  And so, this is when you weren't with Special

04:12PM    3    Agent Webb, it was the time around 8:46?

04:12PM    4    A.  The time --

04:12PM    5    Q.  I'm sorry.  Go ahead.

04:12PM    6    A.  The time that I was up there for approximately six

04:13PM    7    minutes.

04:13PM    8    Q.  So, from about 8:47 to about 8:53 I guess?

04:13PM    9    A.  That's correct.

04:13PM   10    Q.  All right.  And why did you conduct a search of some of

04:13PM   11    the contents of the second floor between 8:47 and 8:53?

04:13PM   12    A.  I would attribute it to a lapse in judgment on my part.

04:13PM   13    It had been a long day.  We conducted several searches, was

04:13PM   14    kind of in that mode.  And, again, it was a mistake on my

04:13PM   15    part.

04:13PM   16    Q.  Did you observe anything during the second search that

04:13PM   17    you put in the search warrant, the second search warrant?

04:13PM   18    A.  No.

04:14PM   19         MR. LYNCH:  If I can have one second, Judge?

04:14PM   20    BY MR. LYNCH:

04:14PM   21    Q.  And when you obtained the second warrant, was that for

04:15PM   22    the -- strike that.  We'll get into that with Pat McMahon.

04:15PM   23         MR. LYNCH:  No other questions, Judge, for Chief

04:15PM   24    Granville.

04:15PM   25         THE COURT:  Chief Granville, you've just testified

| | | |
|---|---|---|
| 04:15PM | 1 | that you and Special Agent Webb went up to the second floor of |
| 04:15PM | 2 | 56 Grimes Street on February the 19th, 2020, and conducted |
| 04:16PM | 3 | some kind of search on the second floor or in the second floor |
| 04:16PM | 4 | at 8:47 through 8:53 p.m., correct? |
| 04:16PM | 5 | THE WITNESS:  That was myself, Judge. |
| 04:16PM | 6 | THE COURT:  Webb wasn't with you? |
| 04:16PM | 7 | THE WITNESS:  No, he was not. |
| 04:16PM | 8 | THE COURT:  This is after you had talked to McMahon |
| 04:16PM | 9 | about getting a second warrant, correct, when you were shown |
| 04:16PM | 10 | the video with you on the phone? |
| 04:16PM | 11 | THE WITNESS:  I believe I talked to Detective McMahon |
| 04:16PM | 12 | after the second -- after I went up there a second time. |
| 04:16PM | 13 | THE COURT:  I thought the video depicted time periods |
| 04:16PM | 14 | of prior to 9 -- the search warrant is signed by Judge Case at |
| 04:17PM | 15 | 9:48 p.m.  I thought the video showed you talking to McMahon, |
| 04:17PM | 16 | or you said it was McMahon, while you were down on the first |
| 04:17PM | 17 | floor somewhere around 8:48 or 8:46? |
| 04:17PM | 18 | MR. LYNCH:  So, he called -- just so I think the |
| 04:17PM | 19 | record is clear, Judge, he called Pat McMahon at 8:54 p.m. |
| 04:17PM | 20 | THE COURT:  Okay, which is still before the 9:48 |
| 04:18PM | 21 | warrant. |
| 04:18PM | 22 | MR. LYNCH:  Correct.  And -- but if we can go back to |
| 04:18PM | 23 | slide 61?  Okay, Judge.  This is slide 61, Exhibit Number 1, |
| 04:18PM | 24 | if we can play this clip.  Stop right there. |
| 04:18PM | 25 | |

| | | |
|---|---|---|
| 04:18PM | 1 | BY MR. LYNCH: |
| 04:18PM | 2 | Q.  Now, Chief Granville, what -- where have you entered the |
| 04:18PM | 3 | stairwell from? |
| 04:18PM | 4 | A.  From the lower bar area. |
| 04:18PM | 5 | Q.  Okay.  And what time is depicted in this surveillance |
| 04:18PM | 6 | video? |
| 04:18PM | 7 | A.  Eight forty-seven twenty-eight p.m. |
| 04:18PM | 8 | Q.  Okay.  And you're -- is anybody else accompanying you up |
| 04:18PM | 9 | the stairs? |
| 04:18PM | 10 | A.  No. |
| 04:18PM | 11 | Q.  Okay.  So -- and you were -- it's clear that you went up |
| 04:19PM | 12 | and you were up on the second floor for around six minutes, |
| 04:19PM | 13 | correct? |
| 04:19PM | 14 | A.  That's correct. |
| 04:19PM | 15 | Q.  And you exited around 8:53? |
| 04:19PM | 16 | A.  That's correct. |
| 04:19PM | 17 | Q.  And then you called Pat McMahon at 8:54? |
| 04:19PM | 18 | A.  That's correct. |
| 04:19PM | 19 | Q.  And while you were up in the second floor of 56 Grimes, |
| 04:19PM | 20 | did you search through some drawers and some plastic bags? |
| 04:19PM | 21 | A.  Yes. |
| 04:19PM | 22 | Q.  And you acknowledge you didn't have a warrant for the |
| 04:19PM | 23 | second floor at that point? |
| 04:19PM | 24 | A.  That's correct. |
| 04:19PM | 25 | Q.  Did you include any information that you observed during |

04:19PM  1    this second entry in your warrant for the upper area of 56

04:19PM  2    Grimes?

04:19PM  3    A.   No.

04:19PM  4    Q.   And is the piece of mail you observed you observed during

04:20PM  5    the protective sweep?

04:20PM  6    A.   I did.

04:20PM  7            THE COURT:  Why did you go up there then?

04:20PM  8            THE WITNESS:  Sir, I wish I could explain it.  I'm

04:20PM  9    not sure.  Maybe nervous energy, again, trying to make sure

04:20PM  10   none of my guys made any mistakes as far as bodies contained

04:20PM  11   up there.

04:20PM  12           THE COURT:  Well, you had done a safety sweep up

04:20PM  13   there?

04:20PM  14           THE WITNESS:  That's correct.

04:20PM  15           THE COURT:  Nobody was up there.  Then you're

04:20PM  16   realizing that, oh, this is the second floor, and our search

04:20PM  17   warrant is for the first floor.  So, you're now on notice that

04:20PM  18   you don't have a search warrant for the second floor.  And you

04:20PM  19   know this is all before 8:47 p.m.  You don't recall why you

04:20PM  20   went up there?

04:20PM  21           THE WITNESS:  No, sir.

04:20PM  22           THE COURT:  Okay.

04:21PM  23   BY MR. LYNCH:

04:21PM  24   Q.   Now, once you had executed -- once you had gone down and

04:21PM  25   entered the building through the lower front door and you

04:21PM    1    searched that lower -- that first floor area, what was your

04:21PM    2    determination as to the accuracy of the description of lower

04:21PM    3    front for that warrant?

04:21PM    4    A.   It was very inaccurate.   There wasn't a lower front.

04:21PM    5    There was simply a lower that contained an entry and exit

04:21PM    6    point up that the second floor of 56 Grimes.

04:21PM    7    Q.   So, what did you determine as to the accurate description

04:21PM    8    of the 56 Grimes?

04:21PM    9    A.   We believed it to be all one property.

04:21PM   10            MR. LYNCH:   No other questions.

04:21PM   11            THE COURT:   When you went up there at 8:47 through

04:22PM   12    8:53, even though you don't recall why you went up there, do

04:22PM   13    you know what you were looking for?

04:22PM   14            THE WITNESS:   No.   I had to be walking through the

04:22PM   15    apartment.

04:22PM   16            THE COURT:   But you had to go up a flight of stairs.

04:22PM   17            THE WITNESS:   That's correct.

04:22PM   18            THE COURT:   At that time, while you're walking up the

04:22PM   19    stairs, do you recall what it is you hoped to find or what are

04:22PM   20    you looking for?   Why are you -- I guess he already answered

04:22PM   21    the question why are you going there, but do you know what you

04:22PM   22    were going to be looking for?

04:22PM   23            THE WITNESS:   No, sir.

04:22PM   24            THE COURT:   Okay.   Mr. Harrington or Mr. Thompson?

04:22PM   25

| | | |
|---|---|---|
| 04:22PM | 1 | CROSS-EXAMINATION |
| 04:22PM | 2 | |
| 04:23PM | 3 | BY MR. HARRINGTON: |
| 04:23PM | 4 | Q.  Chief Granville, I want to clarify something right away |
| 04:24PM | 5 | that you just testified about.  You went up to do the |
| 04:24PM | 6 | protective sweep, right? |
| 04:24PM | 7 | A.  That's correct. |
| 04:24PM | 8 | Q.  Somehow or other, you found mail, and you made a note of |
| 04:24PM | 9 | whose name was on the mail while you were looking for |
| 04:24PM | 10 | individuals upstairs, correct? |
| 04:24PM | 11 | A.  That's correct. |
| 04:24PM | 12 | Q.  You didn't make a note of anything else that you saw up |
| 04:24PM | 13 | there at that time? |
| 04:24PM | 14 | A.  I don't recall. |
| 04:24PM | 15 | Q.  Okay.  And, at a later point in time, the Judge just |
| 04:24PM | 16 | asked you questions about going into the property at 8:47 and |
| 02:13PM | 17 | being up there for six minutes.  That was yourself again, |
| 02:13PM | 18 | right? |
| 02:13PM | 19 | A.  That's correct. |
| 02:13PM | 20 | Q.  And you told Mr. Lynch you didn't fine anything else -- |
| 02:13PM | 21 | anything in there that you used in the search warrant; is |
| 02:13PM | 22 | that right? |
| 02:13PM | 23 | A.  That's correct. |
| 02:13PM | 24 | Q.  But you went through the garbage bag? |
| 02:13PM | 25 | A.  That's correct. |

02:13PM  1    Q.  What were you looking for in a garbage bag?

02:13PM  2    A.  I don't recall.

02:13PM  3    Q.  What else did you look in?

02:13PM  4    A.  I know I looked in a couple of drawers, maybe some

02:13PM  5    cabinets.

02:13PM  6    Q.  You opened the drawers up, right?

02:13PM  7    A.  Yes, sir.

02:13PM  8    Q.  Moved things around?

02:13PM  9    A.  In the drawers themselves?

02:13PM  10   Q.  Yes.

02:13PM  11   A.  I don't recall.

02:13PM  12   Q.  Right.  Did you know that --  did you realize that there

02:13PM  13   were two separate apartments upstairs?

02:13PM  14   A.  No, sir.

02:13PM  15   Q.  You never knew that there were two separate apartments

02:15PM  16   with locked doors?

02:15PM  17   A.  No, sir.

02:15PM  18   Q.  Was the attic door locked?

02:15PM  19   A.  I don't recall.

02:15PM  20   Q.  Do you remember using the pry bar or the other bashing

02:15PM  21   instrument to get in the attic for the protective sweep?

02:15PM  22   A.  I don't recall.

02:15PM  23   Q.  You said somebody went up in the attic.  Who went up in

02:15PM  24   the attic?

02:15PM  25   A.  There were other agents and law enforcement personnel

02:15PM  1  that went up in the attic.

02:15PM  2  Q.  Did they report to you that they found guns and drugs up

02:15PM  3  there in the attic in the protective sweep?

02:15PM  4  A.  No, sir.

02:15PM  5  Q.  Now, what Mr. Lynch didn't ask you is, after you went up

02:15PM  6  the second time, for reasons that you can't recall, or don't

02:15PM  7  understand, you went back up with Webb, right?

02:16PM  8  A.  That's correct.

02:16PM  9  Q.  How long were you up there with Webb?

02:16PM  10  A.  I don't recall, sir.

02:16PM  11  Q.  What discussion did you have with Webb before you went

02:16PM  12  up?

02:16PM  13  A.  I don't recall the contents of our conversation.

02:16PM  14  Q.  Whose idea was it to go up there the second time?

02:16PM  15  A.  Again, sir, I don't recall.

02:16PM  16  Q.  And how long were you up there with Webb?

02:16PM  17  A.  I don't recall.

02:16PM  18  Q.  Have you watched the video from start to finish?

02:16PM  19  A.  I have.

02:16PM  20  Q.  Did you -- did Webb look around for anything up in the

02:16PM  21  second floor or the attic when you were up there with him?

02:16PM  22  A.  I didn't observe -- I don't recall observing him looking

02:16PM  23  around.

02:16PM  24  Q.  Did you look around some more when you were up there?

02:16PM  25  A.  No, sir.

02:16PM  1    Q.  All right.  What were you doing there with Webb?

02:17PM  2    A.  Like I had said, I believe I was showing him the layout

02:17PM  3    of the second floor apartment and how it, you know, the

02:17PM  4    entire property had connected.

02:17PM  5    Q.  And this search warrant, the first one for 56 Grimes,

02:17PM  6    McMahon applied for that to Judge Case, right?

02:17PM  7    A.  That's correct.

02:17PM  8    Q.  And then, the second search warrant, the amended search

02:17PM  9    warrant, that was made to Judge Case; is that right?

02:17PM  10   A.  That's correct.

02:17PM  11   Q.  And DJ Webb works where?

02:17PM  12   A.  It's TJ Webb.

02:17PM  13   Q.  TJ.  Sorry.  You're DJ.  I'm sorry.

02:17PM  14   A.  It's okay.  He's a special agent with Homeland Security

02:17PM  15   Investigations.

02:17PM  16   Q.  Okay.  And he's filed a number of applications for search

02:17PM  17   warrants in this case, the case of United States v.

02:18PM  18   Washington and Burgin; is that right?

02:18PM  19   A.  Yes, sir.

02:18PM  20   Q.  And he was with you that day on the surveillance, too,

02:18PM  21   correct?

02:18PM  22   A.  Yes, sir.

02:18PM  23   Q.  And did he make any applications to Judge Schroeder or

02:18PM  24   any other federal judge that night for a search of 56 Grimes?

02:18PM  25   A.  Not that I'm aware of, sir.

02:18PM   1   Q.  Did he provide you any information based upon his going

02:18PM   2   upstairs that helped with the second search warrant for 56

02:18PM   3   Grimes?

02:18PM   4   A.  Not that I recall.

02:18PM   5   Q.  Did you discuss with him after you came back downstairs

02:18PM   6   what it is that you saw up there?

02:18PM   7   A.  I don't recall.

02:18PM   8   Q.  And you don't remember how long you were up there; is

02:18PM   9   that right?

02:18PM   10  A.  You are referring to the third time?

02:18PM   11  Q.  I'm sorry.  The second time.  When you went up with Webb,

02:18PM   12  how long were you up there?

02:19PM   13  A.  I don't recall.

02:19PM   14  Q.  Okay.  Do you recall that the surveillance camera was

02:19PM   15  turned off that night?

02:19PM   16  A.  I know at some point it was.

02:19PM   17  Q.  Okay.  Did you turn it off?

02:19PM   18  A.  No, sir.

02:19PM   19  Q.  Did you order somebody to turn it off?

02:19PM   20  A.  I don't recall.

02:19PM   21  Q.  Do you remember an agent or officer alerting that there

02:19PM   22  was a camera upstairs?

02:19PM   23  A.  I remember at some point.

02:19PM   24  Q.  When you saw the video, did you see somebody pointing at

02:19PM   25  it and then turning it to the side and then the filming

02:19PM    1   stopped?

02:19PM    2   A.   Sir, I don't recall that.

02:19PM    3   Q.   Okay.  That was right around 9 o'clock, right after you

02:19PM    4   and Webb had gone up there; is that right?

02:19PM    5   A.   I would have to look at the video, but yes.

02:19PM    6   Q.   And why would you turn the video off?

02:19PM    7   A.   For the officer safety purposes in case somebody was

02:19PM    8   remote monitoring the video.

02:19PM    9   Q.   Okay.  But you already -- the officers are -- already

02:20PM   10   been on the video in the half hour that you were already

02:20PM   11   there executing the warrant; isn't that right?

02:20PM   12   A.   They were.

02:20PM   13   Q.   In fact, the video showed you go through the garbage bag;

02:20PM   14   is that right?

02:20PM   15   A.   That's correct.

02:20PM   16   Q.   Would you have gone through the garbage bag if you had

02:20PM   17   known there was a video?

02:20PM   18   A.   I don't believe I would have changed anything I had done

02:20PM   19   that night.

02:20PM   20   Q.   I'd like to ask you some questions now about your

02:21PM   21   involvement in this investigation earlier in the day.  You

02:21PM   22   indicated that you had made an arrest of somebody and that

02:21PM   23   there were several search warrants for this person, and that

02:21PM   24   person was in custody and, apparently, agreed to cooperate

02:21PM   25   with you; is that right?

02:22PM    1    A.  That's correct.

02:22PM    2    Q.  And that led to some context with -- contacts with a

02:22PM    3    person you later determined to be Rodney Pierce; is that

02:22PM    4    right?

02:22PM    5    A.  Yes, sir.

02:22PM    6    Q.  And Rodney is David Burgin's nephew; is that right?

02:22PM    7    A.  That's what was reported to us.  Yes.

02:22PM    8    Q.  You didn't know that beforehand, though, did you?

02:22PM    9    A.  We knew he had a nickname of Nephew, but I didn't know if

02:22PM   10    that was actually, like, a blood relative.

02:22PM   11    Q.  Did you provide to Mr. Lynch the text and the recordings

02:22PM   12    of any phone calls that were made in your investigation of

02:23PM   13    this confidential informant as they related to Rodney Pierce?

02:23PM   14    A.  Yes.

02:23PM   15    Q.  Did you give him all of them?

02:23PM   16    A.  Yes.

02:23PM   17    Q.  And did you have any decision making in turning the

02:23PM   18    recordings over to the defense in this case?

02:23PM   19    A.  No, sir.

02:23PM   20    Q.  That was Mr. Lynch's determination as far as you know?

02:23PM   21    A.  As far as I know, yes.

02:23PM   22    Q.  You provide it to him and what he does with it, he does

02:23PM   23    with it; is that right; would that be fair to say?

02:23PM   24    A.  Yes, sir.

02:23PM   25    Q.  Now, you testified that when these calls were -- and

02:25PM    1   texts were made, you were either observing or participating

02:25PM    2   with the confidential informant; would that be fair to say?

02:25PM    3   A.   Yes, sir.

02:25PM    4   Q.   Okay.  Was there anybody else involved in that, any other

02:25PM    5   agents?

02:25PM    6   A.   I don't recall.

02:25PM    7   Q.   Okay.  At the point in time that was happening, was --

02:25PM    8   did the confidential informant have his lawyer with him?

02:25PM    9   A.   He did not.

02:25PM   10   Q.   Your -- the call logs indicated that some time later that

02:25PM   11   day you got a call from Tom Eoannou; is that right?

02:25PM   12   A.   That's correct.

02:25PM   13   Q.   He's a local criminal defense lawyer.  You know him, do

02:26PM   14   you not?

02:26PM   15   A.   I do.

02:26PM   16   Q.   At some point in time, he became the lawyer for this

02:26PM   17   confidential informant; would that be fair to say as far as

02:26PM   18   you know?

02:26PM   19   A.   That's correct.

02:26PM   20   Q.   Okay.  But he was not present or aware of anything that

02:26PM   21   was going on when you were doing your undercover

02:26PM   22   investigation?

02:26PM   23   A.   He was not present.  No.

02:26PM   24   Q.   What other agents or deputies or detectives were with you

02:26PM   25   while -- during the time that these phone calls are going on

02:26PM    1    with Mr. Pierce?

02:26PM    2    A.   I don't recall.

02:26PM    3    Q.   Were there others?  No?  I'm sorry?

02:27PM    4    A.   I'm sorry.  I missed the question.

02:27PM    5    Q.   Were there any others there?  Whether you can recall them

02:27PM    6    or not, were there any others there?

02:27PM    7    A.   They were present in the -- in our office.  I don't

02:27PM    8    recall whether they were in the room with us with the

02:27PM    9    confidential informant.

02:27PM   10    Q.   Were you doing this, like, in a private, separate room or

02:27PM   11    office?

02:27PM   12    A.   In a, like, an interview room.

02:27PM   13    Q.   Now, during the time that these calls were made, did the

02:27PM   14    confidential informant agree to do that?

02:27PM   15    A.   Yes, sir.

02:27PM   16    Q.   And that was probably something related to him that he

02:28PM   17    might be able to help himself if he helped you?

02:28PM   18    A.   That's correct.

02:28PM   19    Q.   That's a common tactic or procedure that you use in your

02:28PM   20    business; is that right?

02:28PM   21    A.   It is.

02:28PM   22    Q.   Now, were you -- how were you recording his conversation?

02:28PM   23    A.   On this particular occasion, I don't recall whether it

02:28PM   24    was a recording device or maybe an app on a phone.  I don't

02:29PM   25    recall.

02:29PM   1   Q.  And did you keep that device?  How did you store the

02:29PM   2   recording?

02:29PM   3   A.  Depends on how the -- they were actually recorded,

02:29PM   4   whether it was the recording device or an app on a phone,

02:29PM   5   whether we had kept them.

02:29PM   6   Q.  You testified that -- could you put up (inaudible)?  Can

02:30PM   7   you see on the screen Government's Exhibit 3 that's in

02:30PM   8   evidence?  You identified that as a transcript of the first

02:30PM   9   call that confidential informant and Mr. Pierce had; is that

02:30PM   10  right?

02:30PM   11  A.  Yes.

02:30PM   12  Q.  And who is it that translated and transcribed the phone

02:30PM   13  call?

02:30PM   14  A.  I don't know.

02:31PM   15  Q.  You told Judge Schroeder when we were here on August

02:31PM   16  23rd, 2022, that this was a fair and accurate transcription

02:31PM   17  of the phone call; is that right?

02:31PM   18  A.  That's right.

02:31PM   19  Q.  And did you compare the transcript and listen to the

02:31PM   20  recording at the same time?

02:31PM   21  A.  I listened to the recording and then went through the

02:31PM   22  transcript.  Yes.

02:31PM   23  Q.  At the same time?

02:31PM   24  A.  Not at the same time, but in close proximity.

02:31PM   25  Q.  But you don't know who prepared the transcript?

02:31PM    1    A.  No, sir.

02:31PM    2    Q.  Was it you?

02:31PM    3    A.  No.

02:31PM    4    Q.  No?

02:31PM    5    A.  No.

02:31PM    6    Q.  Did Mr. Lynch tell you he did it?

02:31PM    7    A.  No.

02:31PM    8    Q.  Well, when it was given to you, didn't you ask who

02:32PM    9    prepared it?

02:32PM   10    A.  I didn't ask who personally prepared it.  No.

02:32PM   11    Q.  Did you notice any errors in it?

02:32PM   12    A.  I didn't.

02:32PM   13    Q.  Did not?

02:32PM   14    A.  No.

02:32PM   15    Q.  Now, when is the first time that you listened to it and

02:32PM   16    saw the transcript?

02:32PM   17    A.  I don't recall, sir.

02:32PM   18    Q.  Was it right after Mr. Burgin was arrested?

02:32PM   19    A.  No.

02:32PM   20    Q.  Was it within the last few months before the last

02:32PM   21    suppression hearing?

02:32PM   22    A.  Yes.

02:32PM   23    Q.  So, well over two years after this happened; is that

02:32PM   24    right?

02:32PM   25    A.  That's correct.

02:32PM   1    Q.   Okay.  So, did you listen to the recording before you

02:32PM   2    read the transcript?  Whether you did it on the same day or

02:32PM   3    not, did you listen to the recording?

02:32PM   4    A.   The recordings, yes.

02:32PM   5    Q.   How far apart from when it was transcribed?

02:33PM   6    A.   Months apart.

02:33PM   7    Q.   Now, you testified that you made certain assumptions

02:33PM   8    based upon this recording based upon your years of experience

02:33PM   9    and expertise; is that right?

02:33PM   10   A.   That's correct.

02:33PM   11   Q.   And you told us that there was code language in these

02:33PM   12   recordings and this was something that was setting up a deal

02:33PM   13   to buy more cocaine; is that right?

02:33PM   14   A.   That's correct.

02:33PM   15   Q.   And you were able to divine that from what you saw and

02:33PM   16   heard -- saw in the transcript and heard in the -- in

02:33PM   17   listening to the conversation; is that right?

02:34PM   18   A.   Along with the conversation with the confidential

02:34PM   19   informant, yes.

02:34PM   20   Q.   Okay.  Now, in those conversations, are drugs ever

02:34PM   21   mentioned?

02:34PM   22   A.   No, sir.

02:34PM   23   Q.   Is weight ever mentioned, of any kind, of any substance?

02:34PM   24   A.   No, sir.

02:34PM   25   Q.   Is money ever mentioned?

02:34PM   1   A.  No, sir.

02:34PM   2   Q.  And you said that it was accurate and you relied on it in

02:38PM   3   making your expert opinion regarding this particular -- these

02:38PM   4   particular phone calls; that, on the sixth line, on

02:38PM   5   Government Exhibit 3, the first page of recording 6, it says

02:38PM   6   CI.  Okay.  What you hit me something for free.  You see

02:39PM   7   that?

02:39PM   8   A.  I do.

02:39PM   9   Q.  Okay.  That meant something to you that this CI was

02:39PM  10   asking to be fronted some drugs; is that right?

02:39PM  11   A.  That's correct.

02:39PM  12   Q.  And the day that you arrested the CI, you had just seized

02:39PM  13   a large quantity of drugs from his -- some place, his

02:39PM  14   residence or some place else that you had a search warrant

02:39PM  15   that was tied to him; is that right?

02:39PM  16   A.  That's correct.

02:39PM  17   Q.  Now, if the proper translation of this was -- that he

02:39PM  18   said, hit me when you're free, it would be a different

02:40PM  19   context to that, would there not?

02:40PM  20   A.  Yes, sir.

02:40PM  21   Q.  You indicated that the confidential informant told you

02:40PM  22   some information regarding David Burgin; is that right?

02:40PM  23   A.  That's correct.

02:40PM  24   Q.  And he told you some information about Rodney Pierce; is

02:40PM  25   that right?

| | | |
|---|---|---|
| 02:40PM | 1 | A.   That's correct. |
| 02:41PM | 2 | Q.   Those related to drug dealings; is that right? |
| 02:41PM | 3 | A.   Yes. |
| 02:41PM | 4 | Q.   Was Mr. Pierce ever arrested for any of the things that |
| 02:41PM | 5 | the confidential informant told you about historically? |
| 02:41PM | 6 | A.   You're referring to the -- prior to this day? |
| 02:41PM | 7 | Q.   Yes. |
| 02:41PM | 8 | A.   Not that I'm aware of. |
| 02:41PM | 9 | Q.   Okay.  Was Mr. Burgin ever arrested for anything that the |
| 02:41PM | 10 | confidential informant told you about? |
| 02:41PM | 11 | A.   Historically? |
| 02:41PM | 12 | Q.   Right. |
| 02:41PM | 13 | A.   Not that I'm aware of. |
| 02:41PM | 14 | Q.   In fact, you checked Mr. Burgin's record, didn't you? |
| 02:41PM | 15 | A.   Yes, sir. |
| 02:41PM | 16 | Q.   He'd never been arrested, had he? |
| 02:41PM | 17 | A.   No. |
| 02:41PM | 18 | Q.   Never been charged with anything, right? |
| 02:41PM | 19 | A.   Not that I'm aware of. |
| 02:41PM | 20 | Q.   Never convicted of anything; drugs, or anything? |
| 02:42PM | 21 | A.   Not that I'm aware of. |
| 02:42PM | 22 | Q.   Now, throughout the transcripts, there's the name or |
| 02:42PM | 23 | nickname Unc used; is that right? |
| 02:42PM | 24 | A.   That's correct. |
| 02:42PM | 25 | Q.   And who is Unc? |

02:42PM   1   A.   The Unc was identified as Mr. Burgin.

02:42PM   2   Q.   Who identified him as Mr. Burgin?

02:42PM   3   A.   The confidential informant.

02:42PM   4   Q.   So, every time the name Unc was said, it was Mr. Burgin

02:42PM   5   in these phone calls?

02:42PM   6   A.   In these phone conversations, yes.

02:42PM   7   Q.   And you mentioned before the name uncle came up with the

02:42PM   8   confidential informant; is that right -- nephew.  I'm sorry.

02:42PM   9   Not uncle, nephew; is that right?

02:43PM  10   A.   That's correct.

02:43PM  11   Q.   Isn't it true that if you listen to these phone calls and

02:43PM  12   have an accurate translation of them that Rodney Pierce is

02:43PM  13   calling the CI Unc and the CI calls Rodney nephew?  You don't

02:43PM  14   know?

02:43PM  15   A.   I don't.

02:43PM  16   Q.   And you knew, did you not, that the interpretation that

02:43PM  17   you made with respect to these calls is something that would

02:43PM  18   be relied on by Mr. Lynch in his presentation to the Judge;

02:43PM  19   did you not?

02:43PM  20   A.   I did.

02:43PM  21   Q.   And you knew that the Judge would rely on what you've

02:43PM  22   testified to and what your representations about these calls

02:44PM  23   would be; did you not?

02:44PM  24   A.   Yes.

02:44PM  25   Q.   Now, there's a determination made on the same day that

02:44PM   1    you used the CI to talk with Mr. Pierce, that you just

02:44PM   2    testified about and we have seen videos about, that led to

02:44PM   3    the searches of 56 Grimes Street; is that fair to say?

02:45PM   4    A.  That's correct.

02:45PM   5    Q.  Okay.  Did you ever ask the CI for any information about

02:45PM   6    56 Grimes?

02:45PM   7    A.  I don't recall.

02:45PM   8    Q.  Did you ever ask him have you ever been there?

02:45PM   9    A.  I don't recall.

02:45PM  10    Q.  Ever ask him what it looked like inside?

02:45PM  11    A.  I don't recall.

02:45PM  12    Q.  Ever ask him if he knew anybody that had been there?

02:45PM  13    A.  I don't recall the contents of our conversation, the

02:45PM  14    entire conversation.

02:46PM  15    Q.  Now, at any point in time after this particular day, up

02:46PM  16    until now, did you ever sit down with the CI and review the

02:46PM  17    recordings we've just been talking about with Mr. Pierce?

02:46PM  18    A.  No, sir.

02:46PM  19    Q.  You didn't ask him to translate it, did you?

02:46PM  20    A.  No, sir.

02:46PM  21    Q.  I have a few more questions about that in a few minutes,

02:46PM  22    but I'd like to go through some other things with you right

02:47PM  23    now.  We are now approaching three years from when this

02:47PM  24    particular case started; is that fair to say?

02:47PM  25    A.  Yes, sir.

02:47PM  1  Q.  And what did you review to assist you in testifying back

02:47PM  2  in -- let's start with back in August.  What did you review?

02:47PM  3  A.  The videos and search warrants.

02:47PM  4  Q.  Okay.  Anything else?

02:47PM  5  A.  Nothing that's coming to mind.

02:47PM  6  Q.  Did you meet with anybody, talk with anybody?

02:47PM  7  A.  Yes.

02:47PM  8  Q.  Who did you meet with?

02:47PM  9  A.  Mr. Lynch and Mr. Glaberson.

02:47PM  10  Q.  Anybody else?

02:48PM  11  A.  No.

02:48PM  12  Q.  Did you talk to any of the other detectives, agents,

02:48PM  13  deputies that were involved with you on this particular day

02:48PM  14  regarding this case?

02:48PM  15  A.  Yes, sir.

02:48PM  16  Q.  Who have you talked to?

02:48PM  17  A.  Probably just about everybody involved.

02:48PM  18  Q.  Okay.  And when did that happen?

02:48PM  19  A.  Over the course of the last couple of years.

02:48PM  20  Q.  Did you ever have a joint meeting with people to talk

02:48PM  21  about this case?

02:48PM  22  A.  No, sir.

02:48PM  23  Q.  Now, you were chief back when this investigation

02:48PM  24  happened?

02:48PM  25  A.  Yes, sir.

| | | |
|---|---|---|
| 02:48PM | 1 | Q.  Okay.  And you were in charge of this particular |
| 02:49PM | 2 | investigation, arrest, and directing the search warrants; is |
| 02:49PM | 3 | that right? |
| 02:49PM | 4 | A.  I was. |
| 02:49PM | 5 | Q.  Can you tell me, in the sheriff's department, what |
| 02:49PM | 6 | procedures do you have for keeping records of your |
| 02:49PM | 7 | investigation? |
| 02:49PM | 8 | A.  As far as, like, police reports, et cetera? |
| 02:49PM | 9 | Q.  Anything, Police reports, anything, memoranda. |
| 02:49PM | 10 | A.  It would depend on the investigation itself. |
| 02:49PM | 11 | Q.  Okay.  Well, you're aware of something like an FBI 302. |
| 02:50PM | 12 | You've probably seen those working with the FBI, have you |
| 02:50PM | 13 | not? |
| 02:50PM | 14 | A.  Yes, sir. |
| 02:50PM | 15 | Q.  Those are memos that the agents make on most things that |
| 02:50PM | 16 | they do; is that right? |
| 02:50PM | 17 | A.  Yes, sir. |
| 02:50PM | 18 | Q.  Does the sheriff's department have some set form like |
| 02:50PM | 19 | that that you keep? |
| 02:50PM | 20 | A.  We have what's called a confidential report. |
| 02:50PM | 21 | Q.  What does that mean? |
| 02:50PM | 22 | A.  Just a simple memo. |
| 02:50PM | 23 | Q.  All right.  And was one made in this case? |
| 02:50PM | 24 | A.  I don't believe so. |
| 02:50PM | 25 | Q.  Now, you knew, did you not, that many times, these cases |

02:50PM  1   take a long time before they get to suppression hearings and

02:50PM  2   trial; is that right?

02:50PM  3   A.  Yes, sir.

02:50PM  4   Q.  Would it be fair to say that you have either been

02:50PM  5   involved in or supervised probably hundred of cases since

02:50PM  6   February of 2020?

02:51PM  7   A.  Yes, sir.

02:51PM  8   Q.  In fact, all of the drug cases that come through your

02:51PM  9   department you, at least, have to be made aware of them; is

02:51PM  10  that right?

02:51PM  11  A.  Yes.

02:51PM  12  Q.  Okay.  So, what did you do to prepare yourself to come to

02:51PM  13  testify?  You said that you read the search warrants, right,

02:51PM  14  and you looked at the video from 56 Grimes; is that right?

02:51PM  15  A.  That's correct.

02:51PM  16  Q.  And 56 Grimes only covers certain events that happened

02:51PM  17  right at the place, right?

02:51PM  18  A.  That's correct.

02:51PM  19  Q.  This investigation, as far as Mr. Burgin goes, covers

02:51PM  20  more things.  It covers the Pierce conversation with the

02:52PM  21  confidential informant, it covers going to the Auto Zone, it

02:52PM  22  covers traveling back and forth to 65 Grimes, talk covers

02:52PM  23  arresting Mr. Burgin, arresting Mr. Pierce, many things,

02:52PM  24  right?

02:52PM  25  A.  Yes, sir.

02:52PM   1   Q.  So, are you relying just on your memory of those events?

02:52PM   2   A.  No, just along with meeting with Mr. Lynch and

02:52PM   3   Mr. Glaberson, being refreshed of certain events, yes.

02:52PM   4   Q.  Okay.  What did they refresh your memory with?

02:52PM   5   A.  Certain, like, property receipts and previous testimony,

02:52PM   6   et cetera.

02:52PM   7   Q.  Okay.  Testimony like the Grand Jury; is that right?

02:53PM   8   A.  Yes, sir.

02:53PM   9   Q.  Okay.  Did you testify in the Grand Jury?

02:53PM  10   A.  I did not.

02:53PM  11   Q.  Is Day a detective?

02:53PM  12   A.  Detective.

02:53PM  13   Q.  Detective.  He testified that he never makes notes or

02:53PM  14   memoranda in his cases.  Is that the policy of your office?

02:53PM  15   A.  He's specifically assigned to Homeland Security

02:53PM  16   Investigations as a TFO.

02:53PM  17   Q.  Okay.  Does he make memoranda for them?

02:54PM  18   A.  I don't know.

02:54PM  19   Q.  Do you know if he made a memorandum for them for this

02:54PM  20   investigation?

02:54PM  21   A.  I don't know.

02:54PM  22   Q.  And Agent Webb is with Homeland Security; is that right?

02:54PM  23   A.  That's correct.

02:54PM  24   Q.  Did he ever provide you with any memoranda that he had

02:54PM  25   from his work on this case?

| | | |
|---|---|---|
| 02:54PM | 1 | A.  No. |
| 02:54PM | 2 | Q.  Did you ever ask him for it? |
| 02:54PM | 3 | A.  No, sir. |
| 02:54PM | 4 | Q.  Do you know if he prepared it? |
| 02:54PM | 5 | A.  I don't know. |
| 02:54PM | 6 | Q.  Do you know what his policy -- their policy is?  Is it |
| 02:54PM | 7 | like the FBI or DEA or other agencies, federal agencies, |
| 02:54PM | 8 | where they normally make memoranda? |
| 02:54PM | 9 | A.  I would imagine it is, but I don't know. |
| 02:54PM | 10 | Q.  Do you know if Agent Day follows those prescriptions |
| 02:54PM | 11 | while he's assigned to the Homeland Security? |
| 02:54PM | 12 | A.  I don't know. |
| 02:55PM | 13 | Q.  Do you direct the detectives and deputies that work for |
| 02:55PM | 14 | you not to prepare notes or memoranda of what happened on |
| 02:55PM | 15 | their investigations? |
| 02:55PM | 16 | A.  No. |
| 02:55PM | 17 | Q.  And the confidential memo that you mentioned from the |
| 02:55PM | 18 | sheriff's department, does that have a name or a number or |
| 02:55PM | 19 | some identifying -- |
| 02:55PM | 20 | A.  It's generally a confidential report associated with a |
| 02:55PM | 21 | case number. |
| 02:55PM | 22 | Q.  Okay.  And you said all it is, is a brief summary of the |
| 02:55PM | 23 | case? |
| 02:55PM | 24 | A.  That's correct. |
| 02:55PM | 25 | Q.  What would be contained in that, in one of them? |

02:55PM   1   A.  It could be the debrief of the confidential informant,

02:55PM   2   could be an interview, could be a search warrant, could be an

02:55PM   3   operations plan.

02:55PM   4   Q.  Okay.  So, let's hypothetically just say the confidential

02:55PM   5   informant that participated in this case, right, he helped

02:56PM   6   you with this case.  I don't know if he helped you with other

02:56PM   7   cases.  I don't know, maybe yes, maybe no, but with respect

02:56PM   8   to this case, was a memoranda made about his cooperation?

02:56PM   9   A.  I don't know.  And in this particular case, it went from

02:56PM  10   his case to ultimately, you know, there being cases made

02:56PM  11   against other individuals which were ultimately prosecuted

02:56PM  12   federally.  So, the federal government would have been

02:56PM  13   responsible for making those reports.  We would have turned

02:56PM  14   over -- we would have relayed any information to them that we

02:56PM  15   had based upon our investigation, but that would have been

02:56PM  16   it.

02:56PM  17   Q.  How do you relay the information from you now that they

02:56PM  18   can use?

02:56PM  19   A.  Could be an in-person conversation, could be a

02:57PM  20   memorandum, could be a police report, it could be anything.

02:57PM  21   Q.  Okay.  So, in this particular case, this confidential

02:57PM  22   informant's cooperation led to at least charges against other

02:57PM  23   individuals; is that right?

02:57PM  24   A.  That's correct.

02:57PM  25   Q.  And, indirectly, a charge against Mr. Burgin, right?

02:57PM  1    A.  That's correct.

02:57PM  2    Q.  Okay.  And you were aware, are you not, that, just like

02:57PM  3    in the state system, in the federal system, US attorneys or

02:57PM  4    somebody that cooperates who has to plead guilty to a charge,

02:57PM  5    they make a recommendation for a lenient sentence from the

02:57PM  6    judge, do they not?

02:57PM  7    A.  That's correct.

02:57PM  8    Q.  Okay.  And so, they're going to want to reach out to

02:57PM  9    anybody that can tell them how much the confidential

02:57PM  10   informant did, whether they were honest, whether they were

02:57PM  11   helpful, whether cases were made, whole series of things,

02:58PM  12   correct?

02:58PM  13   A.  Yes, sir.

02:58PM  14   Q.  All right.  So, if Mr. Lynch is -- has this confidential

02:58PM  15   informant, he's going to be sentenced by, say, Judge Arcara,

02:58PM  16   right, Mr. Lynch has to file what they call a 5K

02:58PM  17   recommendation to the judge.  He wants to know what DJ

02:58PM  18   Granville has to say about this guy, right?

02:58PM  19   A.  That's correct.

02:58PM  20   Q.  Okay.  And so, how does he get that information from him?

02:58PM  21   A.  Are you referring to this particular case?

02:58PM  22   Q.  Just hypothetical.  I'm just using him as an example.

02:58PM  23   What would you give him?

02:58PM  24   A.  I would give him a -- it could be a simple email in

02:58PM  25   relation to who has been arrested, what's been recovered, the

03:00PM   1   outcomes, et cetera.

03:00PM   2   Q.  All off the top of your head?

03:01PM   3   A.  No.  I have to refer to some reports or talk to some

03:01PM   4   other agents if he cooperated with somebody else.

03:01PM   5   Q.  Okay.  So, we're back here.  What reports are there that

03:01PM   6   you made with respect to this particular confidential

03:01PM   7   informant with respect to the Rodney Pierce transaction that

03:01PM   8   happened on February 19th?

03:01PM   9   A.  I don't know that there are any.

03:01PM  10   Q.  Did you ever talk to Mr. Lynch or any other Assistant

03:01PM  11   United States Attorney and make a statement or provide

03:01PM  12   information regarding this confidential informant and how

03:01PM  13   much they had done for you -- he had done for you?

03:01PM  14   A.  Yes.  The confidential informant met with Mr. Lynch.

03:01PM  15   Q.  That wasn't my question.  My question was, did you ever

03:01PM  16   provide any information to Mr. Lynch or somebody else about

03:02PM  17   what this guy had done for you other than talk to him?

03:02PM  18   A.  I don't recall if I did or didn't.

03:02PM  19   Q.  When you became a detective -- well, let's go back to

03:02PM  20   being a deputy.  When you become a deputy in the sheriff's

03:02PM  21   department, do you receive any training about making notes,

03:02PM  22   memoranda, records of what it is, arrests, and things that

03:02PM  23   you do?

03:02PM  24   A.  Yes.

03:02PM  25   Q.  And what's the policy in the sheriff's department about

GRANVILLE -- BY MR. HARRINGTON -- 12/19/2022

78

| | | |
|---|---|---|
| 03:02PM | 1 | these? |
| 03:02PM | 2 | A.   Properly documenting things? |
| 03:02PM | 3 | Q.   Yeah. |
| 03:02PM | 4 | A.   I don't know that there is a policy, but police reports |
| 03:26PM | 5 | are done for every arrest. |
| 03:28PM | 6 | Q.   What do you mean by a police report? |
| 03:28PM | 7 | A.   Police report, just a quick summary of events that took |
| 03:28PM | 8 | place as it relates to a state arrest in this case. |
| 03:28PM | 9 | Q.   Okay.  Usually like a paragraph, maybe two paragraphs |
| 03:28PM | 10 | long; is that right? |
| 03:28PM | 11 | A.   That's correct. |
| 03:28PM | 12 | Q.   No real specific details of what people did; is that |
| 03:28PM | 13 | right? |
| 03:28PM | 14 | A.   Sometimes they're done that way, but, in most cases, no. |
| 03:28PM | 15 | Q.   In this case, you're not aware of any being done? |
| 03:28PM | 16 | A.   No, sir. |
| 03:28PM | 17 | Q.   Did you receive any training with respect to making |
| 03:29PM | 18 | applications for search warrants? |
| 03:29PM | 19 | A.   Not at the academy.  Later on. |
| 03:29PM | 20 | Q.   Okay.  And where did you receive training? |
| 03:29PM | 21 | A.   We might have went through a class hosted by DCJS in |
| 03:29PM | 22 | relation to applications and search warrants. |
| 03:29PM | 23 | Q.   When was that? |
| 03:29PM | 24 | A.   This would have been maybe in 2003 or '04. |
| 03:29PM | 25 | Q.   Okay.  And where was that that was done? |

03:29PM    1    A.   It would have been at ECC.

03:29PM    2    Q.   And how long did that last?

03:29PM    3    A.   Couple of weeks.

03:29PM    4    Q.   Just on search warrants?

03:29PM    5    A.   Investigative techniques.

03:29PM    6    Q.   Okay.  And how much time was spent in terms of preparing

03:29PM    7    search warrants and applications?

03:29PM    8    A.   I don't recall.

03:30PM    9    Q.   And I take it that you didn't start off as chief, right?

03:30PM   10    You testified before you worked your way up to being chief,

03:30PM   11    right?

03:30PM   12    A.   I did.

03:30PM   13    Q.   When is the first time that you made an application for a

03:30PM   14    search warrant?

03:30PM   15    A.   Probably 20 plus years ago.

03:30PM   16    Q.   And how many applications have you made since then?

03:30PM   17    A.   A lot.

03:30PM   18    Q.   How many?  Hundred?

03:30PM   19    A.   More than a hundred.

03:30PM   20    Q.   Obviously you don't keep track of the number, correct?

03:30PM   21    A.   I don't.

03:30PM   22    Q.   And, in this particular case, there were a number of

03:30PM   23    warrants, for example, on the same day; is that right?

03:30PM   24    A.   There was.

03:30PM   25    Q.   Okay.  So, in addition to preparing them, I take it that

03:30PM  1   you supervised the detectives that work for you as chief; is

03:30PM  2   that right?

03:30PM  3   A.  I do.

03:30PM  4   Q.  Do you review all the search warrant applications that

03:30PM  5   they prepared?

03:31PM  6   A.  I don't.

03:31PM  7   Q.  Do you review any of them?

03:31PM  8   A.  Some.

03:31PM  9   Q.  Okay.  What would cause you to review a search warrant

03:31PM  10  application?

03:31PM  11  A.  It would depend.  If it's a very complex case, that would

03:31PM  12  be something I would take a look at.  If I just have the

03:31PM  13  time, I would try to take a look at them, but if, you know,

03:31PM  14  time doesn't always permit.

03:31PM  15  Q.  Have you trained any detectives or deputies how to

03:31PM  16  prepare a search warrant application and a warrant?

03:31PM  17  A.  I have.

03:31PM  18  Q.  Okay.  And when did you do that?

03:31PM  19  A.  Just over the course of years, new detectives get made

03:32PM  20  and you show them how -- the best way you know how it's done.

03:32PM  21  Q.  Is that a formal process or is that just kind of a *ad hoc*

03:32PM  22  as things come up?

03:32PM  23  A.  It's very informal.

03:32PM  24  Q.  Is there anybody else in your section of the sheriff's

03:32PM  25  department that specializes in search warrants?

03:32PM  1    A.  There's other senior detectives and detectives that have

03:32PM  2    been around for a long time that know what they're doing that

03:32PM  3    guys will attach themselves to to learn the process.

03:32PM  4    Q.  And I take it you did the same thing when you were

03:32PM  5    working your way up; is that right?

03:32PM  6    A.  That's correct.

03:32PM  7    Q.  Is there any training within your department for

03:32PM  8    preparing an inventory of a search?

03:33PM  9    A.  I don't believe so.

03:33PM  10   Q.  No?

03:33PM  11   A.  No.

03:33PM  12   Q.  What is an inventory?

03:33PM  13   A.  The items taken or seized from a property, vehicle, et

03:33PM  14   cetera.

03:33PM  15   Q.  And would that be -- those would happen with search

03:33PM  16   warrants, is that right?

03:33PM  17   A.  Those are often filed with the search warrant returns,

03:33PM  18   but those are placed in a file.

03:33PM  19   Q.  And an inventory would be prepared just on a search

03:33PM  20   incident to an arrest were there's no search warrant; is that

03:34PM  21   right?

03:34PM  22   A.  That's correct.

03:34PM  23   Q.  Now -- so, in this particular case, a search warrant

03:34PM  24   inventory was prepared; is that right?

03:34PM  25   A.  I believe so.

03:34PM 1    Q.  And who did that?

03:34PM 2    A.  I don't recall.

03:34PM 3    Q.  Did you direct somebody to do it?

03:34PM 4    A.  I don't recall if I did or didn't.

03:34PM 5    Q.  Is there a standard form that's used in the sheriff's

03:34PM 6    department for that?

03:34PM 7    A.  There is.

03:34PM 8    Q.  Now, have you read the Criminal Procedure Law, New York

03:34PM 9    State Criminal Procedure Law, Section 690 and all the

03:34PM 10   sections in there about how to go about -- what the law

03:34PM 11   requires for search warrants?

03:35PM 12   A.  I previously have.  Yes.

03:35PM 13   Q.  Right.  I suspect you don't read it every day; would that

03:35PM 14   be fair to say?

03:35PM 15   A.  I don't.

03:35PM 16   Q.  And you're generally familiar with it, though, are you

03:35PM 17   not, given your experience?

03:35PM 18   A.  I think so.  Yes.

03:35PM 19   Q.  And again, the Criminal Procedure Law in New York has

03:35PM 20   some very specific requirements; does it not?

03:35PM 21   A.  It does.

03:35PM 22   Q.  Including one of those is that you have to file a search

03:35PM 23   warrant with the Court; is that right?

03:35PM 24   A.  That's correct.

03:35PM 25   Q.  Does your department file all the search warrants with

03:35PM    1   the court for the clerk's office?

03:35PM    2   A.  Are you referring to the returns?

03:35PM    3   Q.  I'm referring to the search warrant itself and the

03:35PM    4   application.  The original.  Do you file that with the Erie

03:35PM    5   County Clerk's Office or a judge?

03:35PM    6   A.  Not all of them, no.

03:35PM    7   Q.  What -- which did you do and which don't you?

03:36PM    8   A.  We file a return with -- when the original is signed.

03:36PM    9   So, if we were to go see whatever judge, the original is

03:36PM   10   signed.  We burn a copy for the judge themselves.  Once that

03:36PM   11   search warrant is executed and completed, that original

03:36PM   12   search warrant, along with a property receipt, or whatever is

03:36PM   13   of evidentiary value is recovered, is returned to the judge.

03:36PM   14   Q.  Okay.  The return would be another term really for an

03:36PM   15   inventory; would that be fair to say?

03:36PM   16   A.  Yes.

03:36PM   17   Q.  Some say inventory, some say returns, right?

03:36PM   18   A.  That's correct.

03:36PM   19   Q.  And do you file them with the judge or the clerk?

03:36PM   20   A.  We file them with the judge.

03:36PM   21   Q.  And what happens if you don't find anything in the search

03:37PM   22   warrant?  Do you file those?

03:37PM   23   A.  A return?  Yes.

03:37PM   24   Q.  You file a return with judges where you don't find

03:37PM   25   anything?

03:37PM  1   A.  We have.  Yes.

03:37PM  2   Q.  Do you do it all the time?

03:37PM  3   A.  Personally, yes.  I would hope that all my detectives and

03:37PM  4   deputies do too.

03:37PM  5   Q.  Do they file all the warrants where things have been

03:37PM  6   found?

03:37PM  7   A.  Yes.

03:37PM  8   Q.  Do you know what the time requirement is for them to file

03:37PM  9   those?

03:37PM  10  A.  I know it's within a reasonable period of time.

03:37PM  11  Q.  Do you know when this -- when -- if and when the search

03:37PM  12  warrants for 56 Grimes were filed?

03:37PM  13  A.  No, sir.

03:37PM  14  Q.  Do you have anything to do with that process?

03:37PM  15  A.  No, sir.

03:37PM  16  Q.  Did you tell somebody to do that?

03:37PM  17  A.  I don't recall.

03:37PM  18  Q.  Okay.  Now, how do you go about getting a judge to sign a

03:38PM  19  warrant?  You get a case where you believe you got probable

03:38PM  20  cause.  You put together your paperwork, right, and you have

03:38PM  21  to go to a judge to get a search warrant signed?

03:38PM  22  A.  That's correct.

03:38PM  23  Q.  What's your process for that?

03:38PM  24  A.  Oftentimes, if it's after hours, we try to rely on the

03:38PM  25  judges that we know will answer the phone.

03:38PM  1   Q.   And what about during the day?

03:38PM  2   A.   During the day, if were dealing with an ADA that's

03:38PM  3   involved in the case, we'll rely on them to line up the

03:38PM  4   judges, but, oftentimes, we'll just start calling the phones.

03:38PM  5   Q.   Okay.   And what kind of judges do you go to?

03:38PM  6   A.   We go to -- it could be a city court judge, Erie County

03:39PM  7   Court Judge, New York State Supreme Court Judge.

03:39PM  8   Q.   Do you know what the Criminal Procedure Law Section 690

03:39PM  9   says about who the judges are that handle search warrants?

03:39PM  10         MR. LYNCH:   Judge, I'm going to object to relevance

03:39PM  11  on what it relates to this case, what New York law is or isn't

03:39PM  12  doesn't apply.   Federal law does.   So, I'm not sure -- if we

03:39PM  13  want to refer to this case, fine, but all these other cases

03:39PM  14  have no relevance to this suppression hearing.

03:39PM  15         THE COURT:   Yes.   I'm well aware of United States

03:39PM  16  Supreme Court case as well as Second Circuit Court of Appeals

03:40PM  17  cases that say when dealing with the issue of the validity of

03:40PM  18  a search warrant, be it probable cause or staleness,

03:40PM  19  broadness, whatever, under the Fourth Amendment, the federal

03:40PM  20  law applies.

03:40PM  21         MR. HARRINGTON:   Judge, that's not the purpose of

03:40PM  22  asking the question.   The purpose of asking the question is a

03:40PM  23  lead into the behavior that occurred in this particular case

03:40PM  24  with respect to the judge and everybody else.   That's why I'm

03:40PM  25  asking him what he knows.

03:40PM   1                THE COURT:  All right, then.  Let's get to that.

03:40PM   2      BY MR. HARRINGTON:

03:40PM   3      Q.  So, while a local judge is a primary judge, superior

03:40PM   4      judges can act, can they not?  You understand that?

03:40PM   5      A.  Yes.

03:40PM   6      Q.  Is that right?  Okay.  And you go to county courts, Erie

03:40PM   7      County Court Judges, do you not?

03:40PM   8      A.  Yes.

03:40PM   9      Q.  And you go to supreme court judges that handle criminal

03:40PM  10      cases; do you not?

03:41PM  11      A.  Yes.

03:41PM  12      Q.  Now, in this particular case, this case happens in the

03:41PM  13      City of Buffalo, right?

03:41PM  14      A.  That's correct.

03:41PM  15      Q.  And your office is in the City of Buffalo; is that right?

03:41PM  16      A.  That's correct.

03:41PM  17      Q.  And you were getting warrants in the evening after the

03:41PM  18      courts are closed; is that right?

03:41PM  19      A.  That's correct.

03:41PM  20      Q.  You didn't go to any of the 14 city court judges, did

03:41PM  21      you?

03:41PM  22      A.  No, sir.

03:41PM  23      Q.  Okay.  And you went to Judge Case, right?

03:41PM  24      A.  That's correct.

03:41PM  25      Q.  Okay.  And without giving his address, Judge Case lived,

03:41PM  1  at that time, in a suburb outside of the city, did he not?

03:41PM  2  A.  That's correct.

03:41PM  3  Q.  Do you know the procedures within the Eighth Judicial

03:41PM  4  District for superior court judges for who it is that's

03:42PM  5  supposed to handle search warrants at a given time?

03:42PM  6          MR. LYNCH:  Objection, Judge.  Relevance.

03:42PM  7          THE COURT:  Overruled.

03:42PM  8          THE WITNESS:  No, sir.

03:42PM  9  BY MR. HARRINGTON:

03:42PM  10  Q.  You never learned that; is that right?

03:42PM  11  A.  No, sir.

03:42PM  12  Q.  No one ever told you in all your training that within a

03:42PM  13  particular month, there's a judge that's assigned to criminal

03:42PM  14  special term, search warrants are supposed to go to that

03:42PM  15  judge during that month?

03:42PM  16          MR. LYNCH:  Object to the form of the question.

03:42PM  17          MR. HARRINGTON:  He can answer if he knows it.

03:42PM  18          THE COURT:  He can answer it yes or no.  Overruled.

03:42PM  19          THE WITNESS:  I'm aware there are on-call judges.

03:42PM  20  Yes.

03:42PM  21  BY MR. HARRINGTON:

03:42PM  22  Q.  Okay.  And do you get notification of who is on call at a

03:42PM  23  particular time?

03:42PM  24  A.  Sometimes.  Sometimes we do, and sometimes we don't.

03:42PM  25  Q.  Now, there's a procedure in New York where you can bring

03:43PM  1  a confidential informant to the judge and the judge can swear

03:43PM  2  the informant, and the judge records an interview the judge

03:43PM  3  has with the informant.  That can be used as the basis for

03:43PM  4  the facts and the reliability of the information; is that

03:43PM  5  right?

03:43PM  6  A.  Yes, sir.

03:43PM  7  Q.  Okay.  And have you done that before?

03:43PM  8  A.  Yes.

03:43PM  9  Q.  Many times, I assume?

03:43PM  10  A.  Yes.

03:43PM  11  Q.  All right.  And are there occasions where judges actually

03:43PM  12  come to your office to interview informants?

03:43PM  13  A.  Yes.

03:43PM  14  Q.  Judge Case one of those?

03:43PM  15  A.  He has, yes.

03:43PM  16  Q.  Judge Case signed both of the warrants on this case for

03:44PM  17  56 Grimes; did he not?

03:44PM  18  A.  Yes.

03:44PM  19  Q.  When you -- I believe you testified that under

03:44PM  20  Mr. Lynch's questioning that when you go to execute a search

03:44PM  21  warrant, there are a number of things that you may bring with

03:44PM  22  you to assist you in doing that; is that right?

03:45PM  23  A.  Equipment you mean?

03:45PM  24  Q.  Yes.

03:45PM  25  A.  Yes.

03:45PM   1   Q.   Okay.  And you mentioned that the officers probably will

03:45PM   2   wear vests or something to protect themselves; is that right?

03:45PM   3   A.   Yes, sir.

03:45PM   4   Q.   And you bring various devices to either pry open or smash

03:45PM   5   in a door; is that right?

03:45PM   6   A.   Yes, sir.

03:45PM   7   Q.   Okay.  And did you -- do Erie County Sheriffs deputies

03:45PM   8   and detectives wear body cameras?

03:45PM   9   A.   They do now.  Back during this incident, no.  Deputies

03:45PM  10   are assigned body cameras.  The detectives generally don't

03:45PM  11   wear them.

03:45PM  12   Q.   Back in 2019, were they wearing them or did they have

03:46PM  13   them available?

03:46PM  14   A.   I don't recall.

03:46PM  15   Q.   To the best of your knowledge, was anybody wearing one

03:46PM  16   that night?

03:46PM  17   A.   I don't believe so.

03:46PM  18   Q.   Now, in addition to planning the search warrant, you plan

03:46PM  19   the actual search; do you not?

03:46PM  20   A.   The search of the place?

03:46PM  21   Q.   Yes.  Wherever you got the warrant for, you plan how to

03:46PM  22   go about doing it, do you not?

03:46PM  23   A.   We do.

03:46PM  24   Q.   And that's usually called staging, would that be fair to

03:46PM  25   say?

03:46PM   1   A.  Well, that's -- you're referring to the actual execution

03:46PM   2   of the warrant?

03:46PM   3   Q.  Yes.  Right.

03:46PM   4   A.  Yes.

03:46PM   5   Q.  I'm sorry.

03:47PM   6   A.  That's correct.

03:47PM   7   Q.  Okay.  Was the staging done in this particular case?

03:47PM   8   A.  I don't recall.

03:47PM   9   Q.  So, by the way you testified, I infer that you had worked

03:47PM  10   with the other deputies, agents, and detectives that were

03:47PM  11   with you.  You knew them all, correct?

03:47PM  12   A.  That's correct.

03:47PM  13   Q.  Okay.  And had you participated in a search warrant with

03:47PM  14   them before?

03:47PM  15   A.  Yes.

03:47PM  16   Q.  There's a certain amount of knowledge that all of you

03:47PM  17   gain by working with each other; would that be fair to say?

03:47PM  18   A.  Yes, sir.

03:47PM  19   Q.  Now, on this particular case, was there any investigation

03:47PM  20   of 56 Grimes Street Buffalo, New York, done before you went

03:48PM  21   to execute the warrant?

03:48PM  22   A.  There was, but not the day of the event.

03:48PM  23   Q.  Well, you testified before that you were at 56 Grimes

03:48PM  24   Street several times.  Whether you went in there are not, you

03:48PM  25   were there near it, correct?

| | | |
|---|---|---|
| 03:48PM | 1 | A.  That's correct. |
| 03:48PM | 2 | Q.  Okay.  And you went back to 56 Grimes after Rodney |
| 03:48PM | 3 | Pierce -- one of those times after Rodney Pierce was |
| 03:48PM | 4 | arrested.  You went back there; did you not? |
| 03:48PM | 5 | A.  That's correct. |
| 03:48PM | 6 | Q.  And I -- at that point in time, were you thinking about |
| 03:48PM | 7 | trying to get a search warrant at 56 Grimes when you went |
| 03:48PM | 8 | back? |
| 03:48PM | 9 | A.  We weren't thinking about getting a search warrant for |
| 03:48PM | 10 | Grimes until we actually arrested Mr. Pierce. |
| 03:49PM | 11 | Q.  Okay.  And after that, you were thinking about it; is |
| 03:49PM | 12 | that right? |
| 03:49PM | 13 | A.  That's correct. |
| 03:49PM | 14 | Q.  And so, you go back to 56 Grimes and you stay there for |
| 03:49PM | 15 | some period of time; do you not? |
| 03:49PM | 16 | A.  That's correct. |
| 03:49PM | 17 | Q.  And then, it takes several hours before mister -- or at |
| 03:49PM | 18 | least an hour and a half before -- from when Mr. Pierce is |
| 03:49PM | 19 | arrested until you get the first search warrant; is that |
| 03:49PM | 20 | right? |
| 03:49PM | 21 | A.  That's correct. |
| 03:49PM | 22 | Q.  Okay.  Were you there that whole time from the arrest |
| 03:49PM | 23 | there? |
| 03:49PM | 24 | A.  No, sir. |
| 03:49PM | 25 | Q.  All right.  Did you have anybody watching 56 Grimes? |

03:49PM   1   A.  We did.

03:49PM   2   Q.  And who did you have watching?

03:49PM   3   A.  I don't recall.  I remember we had deputies staged over

03:49PM   4   there until we actually had the warrant signed.

03:49PM   5   Q.  Was any further determination made about 56 Grimes from

03:50PM   6   the time Mr. Pierce was arrested until the time that you

03:50PM   7   executed the warrant?  I'm just talking about the layout of

03:50PM   8   the place, what it was like, anything like that?

03:50PM   9   A.  Not that I recall, sir.

03:50PM  10   Q.  Okay.  And you testified that Mr. Pierce went in the

03:50PM  11   front door, is that right, left by the front door?

03:50PM  12   A.  That's correct.

03:50PM  13   Q.  And that's the door that's right on the sidewalk facing

03:50PM  14   the front of the building, right?

03:50PM  15   A.  That's correct.

03:50PM  16   Q.  And you testified a little while ago that you saw the

03:50PM  17   person you identified as Mr. Burgin, he went in the front

03:50PM  18   door; is that right?

03:50PM  19   A.  That's correct.

03:50PM  20   Q.  And he later left by that same front door; is that right?

03:50PM  21   A.  That's correct.

03:50PM  22   Q.  Okay.  And yet, you did not enter that building when you

03:50PM  23   had a search warrant for the lower front of the building, by

03:51PM  24   going in the main front door; is that right?

03:51PM  25   A.  That's correct.

03:51PM  1   Q.  Now, you went in.  Did somebody suggest to you that you

03:51PM  2   go in the side front door?

03:51PM  3   A.  Yes.

03:51PM  4   Q.  Who?

03:51PM  5   A.  Special Agent Webb.

03:51PM  6   Q.  Why?  What did he say to you?

03:51PM  7   A.  It was his opinion that that's where they had come and

03:51PM  8   gone from.  And, again, it was a dark night, you know, we

03:51PM  9   were unsure of the, you know, the specific door of the

03:51PM  10  comings and goings.

03:51PM  11  Q.  Where who had come and gone?

03:51PM  12  A.  Individuals from that residence.

03:51PM  13  Q.  Who?

03:51PM  14  A.  Mr. Pierce, Mr. Burgin.

03:51PM  15  Q.  You didn't see Mr. Burgin come, did you?

03:51PM  16  A.  No, sir.

03:51PM  17  Q.  And you saw Mr. Pierce go in the front door and come out

03:51PM  18  the front door.  You guys were on surveillance, is that

03:52PM  19  right?

03:52PM  20  A.  That's correct.

03:52PM  21  Q.  While you were on surveillance, you didn't see anybody go

03:52PM  22  in the side door, did you?

03:52PM  23  A.  From my vantage point, no.  I believed them to be coming

03:52PM  24  from the front of the building.

03:52PM  25  Q.  All right.  And you had Webb with you and you had Day

03:52PM   1   with you, didn't you?

03:52PM   2   A.   That's correct.

03:52PM   3   Q.   And who had the best view?

03:52PM   4   A.   I don't know.

03:52PM   5   Q.   Okay.  Now, Webb tells you, go in the side front door.

03:52PM   6   That's where they came from.  Whether he's right or wrong,

03:52PM   7   that's what he said to you; is that right?

03:52PM   8   A.   He said, it's that door.  It's that door.

03:53PM   9   Q.   Yeah.  Okay.  Did he indicate to you in any way that he

03:53PM  10   knew where that door led to?

03:53PM  11   A.   No, sir.

03:53PM  12   Q.   Now, you go off and do your, what you call a, protective

03:53PM  13   sweep.  You come back down and then you and the other

03:53PM  14   officers go in the front door, the main front door; is that

03:53PM  15   right?

03:53PM  16   A.   That's correct.

03:53PM  17   Q.   Okay.  Had anybody else gone in that front door before

03:53PM  18   you?

03:53PM  19   A.   No.

03:53PM  20   Q.   So, nobody did a protective sweep of the lower floor

03:53PM  21   which is where you thought things were; is that right?

03:53PM  22   A.   That's correct.

03:53PM  23   Q.   Before you obtained the search warrant for 56 Grimes, was

03:53PM  24   there any kind of investigation about the done, such as

03:54PM  25   getting records, utility records, city records, building

03:54PM   1   permit records, anything?

03:54PM   2            MR. LYNCH:  Can we take a short break, Judge?

03:54PM   3            THE COURT:  All right.  It's 23 minutes to 1.  We

03:54PM   4   have been going non-stop, probably wise to have a break for

03:54PM   5   personal reasons and purposes.  I would like to finish up with

03:55PM   6   this witness before we take a longer break.  So, we'll be back

03:55PM   7   at 1 o'clock.

03:55PM   8            MR. LYNCH:  Or even shorter, Judge.  I'm talking

03:55PM   9   five, ten minutes maybe.  That's it.

03:55PM  10            THE COURT:  Well, we'll be back at 1 o'clock.

03:55PM  11            MR. LYNCH:  Okay.  All right.

03:55PM  12   (A recess was taken from 12:42 p.m. to 1:00 p.m.)

03:55PM  13            THE CLERK:  We're back on the record.

03:55PM  14            MR. LYNCH:  Thank you, Judge.

03:55PM  15            THE COURT:  Mr. Harrington?

03:56PM  16   BY MR. HARRINGTON:

03:56PM  17   Q.  Chief Granville, you testified that, over the years, you

03:56PM  18   had received information about Mr. Burgin; is that right?

03:56PM  19   A.  That's correct.

03:56PM  20   Q.  And this particular case was, I think you said, a joint

03:56PM  21   investigation of the Erie County Sheriff's Department and

03:56PM  22   Buffalo Police Department, Department of Homeland Security,

03:56PM  23   the FBI, anybody else?  DEA in there too?

03:56PM  24   A.  I don't recall if they were involved, but --

03:56PM  25   Q.  Okay.  And what year did you start investigating

03:56PM 1    Mr. Burgin?

03:56PM 2    A.  The year I first heard about Mr. Burgin would have been

03:57PM 3    15 plus years ago, if not longer.

03:57PM 4    Q.  All right.  And had you heard his name various times over

03:57PM 5    the years in that 15 years?

03:57PM 6    A.  Yes, sir.

03:57PM 7    Q.  Did you participate in any investigations of him during

03:57PM 8    that time?

03:57PM 9    A.  Yes.

03:57PM 10   Q.  Did your investigations ever lead you to 56 Grimes?

03:57PM 11   A.  No.

03:57PM 12   Q.  Until that day, did you have any idea that Mr. Burgin had

04:09PM 13   any relationship whatsoever to 56 Grimes?

04:10PM 14   A.  I had heard it previously from other law enforcement, but

04:10PM 15   never from the confidential informants.

04:10PM 16   Q.  Okay.  And with all of these agencies that are involved,

04:10PM 17   did anybody else investigate 56 Grimes that you're aware of?

04:10PM 18   A.  I don't know.

04:10PM 19   Q.  You said you heard some other things about 56 Grimes of

04:10PM 20   what it was used for; is that right?

04:10PM 21   A.  That's correct.

04:10PM 22   Q.  And what were those uses?

04:10PM 23   A.  That I personally heard, it was an after-hours club.

04:10PM 24   Q.  Anything else?

04:10PM 25   A.  No.

04:10PM   1   Q.  And do you know the history of the building at all?

04:10PM   2   A.  No, sir.

04:10PM   3   Q.  Did you know that it had been a bar; a regular,

04:10PM   4   neighborhood bar?

04:10PM   5   A.  No, sir.

04:11PM   6   Q.  Do you know what business or factory was across the

04:11PM   7   street from 56 Burgin?

04:11PM   8   A.  Fifty-six Grimes?

04:11PM   9         THE COURT:  Fifty-six Grimes?

04:11PM   10         MR. HARRINGTON:  Yes.

04:11PM   11         THE WITNESS:  No, sir.

04:11PM   12   BY MR. HARRINGTON:

04:11PM   13   Q.  Okay.  And the DVR that was taken from 56 Grimes, do you

04:11PM   14   know what the memory cycle was on that?

04:11PM   15   A.  No, sir.

04:12PM   16   Q.  Did anybody ever go through the whole DVR, not just for

04:12PM   17   the day that Mr. Burgin was arrested, but for 10 days, 30

04:12PM   18   days before that it was stored data?

04:12PM   19   A.  I don't know.

04:12PM   20   Q.  Did you do it?

04:12PM   21   A.  No, sir.

04:12PM   22   Q.  Did you direct anybody else to do it?

04:12PM   23   A.  I don't believe so.

04:12PM   24   Q.  Did Webb or anybody else direct anybody to do that?

04:12PM   25   A.  I don't know.

04:12PM   1    Q.  Do you know what happened with the DVR after it was

04:12PM   2    seized?

04:12PM   3    A.  No, sir.

04:12PM   4    Q.  Do you know when it was seized?

04:12PM   5    A.  Believe it was seized that day.

04:12PM   6    Q.  Are you sure about that?

04:12PM   7    A.  I'm not positive.  No.

04:12PM   8    Q.  Now, in Buffalo, New York, what time do bars close?

04:13PM   9    A.  Believe the rule is 4 a.m.

04:13PM   10   Q.  So, an after-hours bar in Buffalo is like, 4 a.m. to 6

04:13PM   11   a.m.; is that right?

04:13PM   12   A.  Yes, but not every bar closes at 4 a.m.

04:13PM   13   Q.  Do you know whether 56 Grimes was ever operated by

04:13PM   14   Mr. Burgin or his family as a bar?

04:13PM   15   A.  I don't know.

04:13PM   16   Q.  Did you ever hear anything about them renting the place

04:13PM   17   out to other people to use for holiday and other important

04:13PM   18   events?

04:13PM   19   A.  I don't recall.

04:13PM   20   Q.  Did you ever hear about them offering it for free to

04:13PM   21   people who couldn't afford to pay for a party?

04:14PM   22   A.  No.

04:14PM   23   Q.  When you went in that night, you got a good look at what

04:14PM   24   this place was like, didn't you?

04:14PM   25   A.  Yes, sir.

GRANVILLE -- BY MR. HARRINGTON -- 12/19/2022

04:14PM   1   Q.  You were in there a long time, and you went all over the

04:14PM   2   place, didn't you?

04:14PM   3   A.  That's correct.

04:14PM   4   Q.  And based on what's shown on the video, and I take it

04:14PM   5   your experience, this was a very, very clean establishment;

04:14PM   6   was it not?

04:14PM   7   A.  From what I recall, yes.

04:14PM   8   Q.  Barstools were upside down on the bar; were they not?

04:15PM   9   A.  Yes, sir.

04:15PM  10   Q.  Place was all clean, nothing lying around, no garbage,

04:15PM  11   nothing downstairs now I'm talking about; is that right?

04:15PM  12   A.  Correct.

04:15PM  13   Q.  And when you went upstairs, you saw kitchen items; did

04:15PM  14   you not?

04:15PM  15   A.  Yes, sir.

04:15PM  16   Q.  And you were in a kitchen, weren't you?

04:15PM  17   A.  Yes, sir.

04:15PM  18   Q.  I think you said when you went in the door of the

04:15PM  19   upstairs, you walked right into a kitchen; is that right?

04:15PM  20   A.  No.

04:15PM  21   Q.  No?  Okay.  Where was the kitchen after you went

04:15PM  22   upstairs?

04:15PM  23   A.  The kitchen was located towards the back of the property.

04:15PM  24   Q.  All right.  And what was the room that you walked into

04:16PM  25   when you went up the stairs?

04:16PM   1    A.  I believe it was an open area, but I don't recall

04:16PM   2    exactly.

04:16PM   3    Q.  When you went up the first time to do the protective

04:16PM   4    sweep, did you go to the front or the back; you, yourself?

04:16PM   5    A.  I believe I went to the back.

04:16PM   6    Q.  Did you go to the front at any time?

04:16PM   7    A.  I don't recall.

04:16PM   8    Q.  How did you know there was nobody up there?  Were

04:16PM   9    officers yelling anything to you?

04:16PM   10   A.  Yes.

04:16PM   11   Q.  Did they use the word clear or something else?

04:16PM   12   A.  Yes, sir.

04:16PM   13   Q.  And now the upstairs is not that big a place; isn't that

04:16PM   14   right?

04:16PM   15   A.  It's not huge, no.

04:17PM   16   Q.  Okay.  So, it should take about 30 seconds to a minute to

04:17PM   17   go through the whole place to look for people; should it not?

04:17PM   18   A.  It depends.  You have to clear, you know, every space

04:17PM   19   that someone can hide in.

04:17PM   20   Q.  Were you looking for people?

04:17PM   21   A.  Yes.

04:17PM   22   Q.  Where?

04:17PM   23   A.  In the entire property.

04:17PM   24   Q.  You, yourself, where on the second floor were you looking

04:17PM   25   for people?

04:17PM    1   A.  I believe I went towards the back of the residence, the

04:17PM    2   property.

04:17PM    3   Q.  And you had identified a bill that you said was in the

04:17PM    4   garbage; is that right?

04:17PM    5   A.  That's correct.

04:17PM    6   Q.  You didn't suspect there were any people in that garbage

04:17PM    7   can, did you?

04:17PM    8   A.  No, sir.

04:17PM    9   Q.  So, did you have an intention to look for anything of

04:17PM   10   identification of anybody when you were doing this protective

04:17PM   11   sweep?

04:17PM   12   A.  No.  It was a bill that had caught my eye, and I looked

04:18PM   13   at it.

04:18PM   14   Q.  And you're telling us you did not open that garbage; is

04:18PM   15   that right?

04:18PM   16   A.  No, I didn't.

04:18PM   17   Q.  You didn't move anything around?

04:18PM   18   A.  Ultimately, yes.

04:18PM   19   Q.  When did you move stuff around?

04:18PM   20   A.  I don't recall.

04:18PM   21   Q.  I want to ask you a few questions, if I could, about

04:20PM   22   Judge Case and this particular case.  How many search

04:20PM   23   warrants have you obtained from Judge Case, say, in the last

04:20PM   24   10 years?

04:20PM   25   A.  I don't know.  A lot.

04:26PM 1    Q.  And is he the judge that you go to most often?

04:26PM 2    A.  During certain time periods, he was answering the phone

04:26PM 3    the most so, yes.

04:26PM 4    Q.  And did he ever refuse you to see you?

04:26PM 5    A.  Yes.

04:26PM 6    Q.  Did he ever turn you down for a search warrant?

04:26PM 7    A.  I don't recall.

04:26PM 8    Q.  Now, at one point in time, Judge Case's wife was running

04:31PM 9    for Erie County Sheriff, was she not?

04:31PM 10   A.  That's correct.

04:31PM 11   Q.  Do you know her?

04:31PM 12   A.  I do.

04:31PM 13          MR. LYNCH:  Objection, Judge.  Relevance.

04:31PM 14          THE COURT:  Yeah.  What's the relevance?

04:32PM 15          MR. HARRINGTON:  I'll go on, Judge.

04:32PM 16   BY MR. HARRINGTON:

04:32PM 17   Q.  Has Judge Case ever been to your office on Elm Street?

04:32PM 18   A.  Yes, sir.

04:32PM 19   Q.  How many times?

04:32PM 20   A.  I don't recall.

04:32PM 21   Q.  More than five?

04:32PM 22   A.  Yes.

04:32PM 23   Q.  You had Judge Case's phone number in your phone, did you

04:32PM 24   not?

04:32PM 25   A.  Yes.

04:32PM    1    Q.  Do you have all the judges' numbers in your phone?

04:32PM    2    A.  I don't know if I have all, but I have a lot.

04:32PM    3    Q.  When you first called Judge Case, what did you say to

04:32PM    4    him?

04:32PM    5    A.  I don't recall the contents of the conversation, but it

04:33PM    6    would have probably been something like, are you available

04:33PM    7    for us.

04:33PM    8    Q.  Did you give him any information, details?

04:33PM    9    A.  I don't recall.

04:33PM   10    Q.  Did you tell him who was coming?

04:33PM   11    A.  Probably.  I don't recall if I did, though.

04:33PM   12    Q.  Did you tell him where the premises was?

04:33PM   13    A.  I don't recall.

04:33PM   14    Q.  Any details about the search?

04:33PM   15    A.  I don't recall.

04:33PM   16    Q.  Did you tell him how long it would take to get there?

04:34PM   17    A.  I don't recall.

04:34PM   18    Q.  Now, that evening, Judge Case signed two warrants,

04:34PM   19    correct?

04:34PM   20    A.  That's correct.

04:34PM   21    Q.  And they related to Mr. Burgin, right?

04:34PM   22    A.  That's correct.

04:34PM   23    Q.  In fact, his name appeared in the search warrant

04:34PM   24    application, did it not?

04:34PM   25    A.  That's correct.

04:34PM    1    Q.   And in the first search warrant, there was also a request

04:34PM    2    to search the Toyota Tundra that Mr. Burgin had been driving

04:35PM    3    that day; is that right?

04:35PM    4    A.   That's correct.

04:35PM    5    Q.   And were you aware that there had been a supposedly a

04:35PM    6    positive dog sniff on the handle of that vehicle?

04:35PM    7    A.   Yes.

04:35PM    8    Q.   And an affidavit was provided by Galbraith to the judge

04:35PM    9    about that; is that right?

04:35PM   10    A.   That's correct.

04:35PM   11    Q.   And no drugs were found in that Tundra, were they?

04:35PM   12    A.   No.

04:35PM   13    Q.   Now, do you recall back on July the 9th of 2019 that

04:35PM   14    Mr. Burgin was stopped right outside this building in the

04:35PM   15    City Hall traffic circle?

04:35PM   16    A.   I do recall that.

04:35PM   17    Q.   You were there, were you not?

04:35PM   18    A.   I was.

04:35PM   19    Q.   You talked to Mr. Burgin, didn't you?

04:35PM   20    A.   I believe I did.

04:35PM   21    Q.   He was taken into custody by Webb, wasn't he?

04:35PM   22    A.   I don't recall who took him into custody.

04:36PM   23    Q.   Do you know how long he was held in custody?

04:36PM   24    A.   I don't recall.

04:36PM   25         MR. LYNCH:   Objection, Judge.  Relevance to this.

04:36PM   1   The hearing that we're here for today, we're here for the 56

04:36PM   2   Grimes warrant.

04:36PM   3              MR. HARRINGTON:  I'll get there.

04:36PM   4              THE COURT:  Overruled.  I want to see just what this

04:36PM   5   is leading to.

04:36PM   6   BY MR. HARRINGTON:

04:36PM   7   Q.  Do you know how long he was held in custody?

04:36PM   8   A.  I don't, sir.

04:36PM   9   Q.  He wasn't arrested that day, was he?

04:36PM   10   A.  No, sir.

04:36PM   11   Q.  He wasn't charged with anything, correct?

04:36PM   12   A.  That's correct.

04:36PM   13   Q.  Do you know if anything was seized from him that day?

04:36PM   14   A.  I don't know.

04:36PM   15   Q.  And do you know whether there was a search warrant

04:36PM   16   applied for for the vehicle he was driving that day?

04:36PM   17   A.  I believe there was.

04:36PM   18   Q.  And who did that?  Do you know?

04:36PM   19   A.  I don't recall.

04:36PM   20   Q.  Do you know Buffalo Police Detective Raymond Krug?

04:37PM   21   A.  I do.

04:37PM   22   Q.  Does he work with you on cases?

04:37PM   23   A.  We've worked together in the past.  Yes.

04:37PM   24   Q.  And he went to Judge Case and got a search warrant for

04:37PM   25   the vehicle that Mr. Burgin was driving that day, did he not?

04:37PM    1    A.  I don't recall.

04:37PM    2    Q.  Do you know whether there was a dog sniff done of the

04:37PM    3    vehicle he was driving that day?

04:37PM    4    A.  I don't recall.

04:37PM    5    Q.  Were you there when the drug sniff was done?

04:37PM    6    A.  I can't remember.

04:37PM    7    Q.  You were standing right there with Mr. Burgin, weren't

04:37PM    8    you?

04:37PM    9    A.  Yeah, but was the dog sniff done right outside here or

04:38PM   10    was it done somewhere else?

04:38PM   11    Q.  Here.

04:38PM   12    A.  I don't recall.

04:38PM   13    Q.  And no drugs were found in that vehicle, were they?

04:38PM   14    A.  No, sir.

04:38PM   15    Q.  And that warrant application went to Judge Case too,

04:38PM   16    didn't it?

04:38PM   17    A.  This is the first I'm hearing of that, but if you're

04:38PM   18    saying so, yes.

04:38PM   19    Q.  Did you have anything to do with selecting Judge Case

04:38PM   20    then?

04:38PM   21    A.  I don't recall if I did or didn't, but this was another

04:39PM   22    agency that was applying for the warrant, so I would --

04:39PM   23    that's not something I would typically get involved with.

04:39PM   24    Q.  Well, would it be fair to say that you can't say I worked

04:39PM   25    with other agencies, but when it's convenient for you, it's

04:39PM   1   their investigation, but when it's not convenient, it's a

04:39PM   2   joint investigation?

04:39PM   3            MR. LYNCH:   Object to the form of that question,

04:39PM   4   Judge.

04:39PM   5            THE COURT:   Sustained.

04:39PM   6   BY MR. HARRINGTON:

04:39PM   7   Q.   You were part of the investigation that day; were you

04:39PM   8   not?

04:39PM   9   A.   I was, yes.

04:39PM   10   Q.   Okay.   And you were working together with Webb and Krug

04:39PM   11   and other law enforcement officers; were you not?

04:39PM   12   A.   That's correct.

04:39PM   13   Q.   There were quite a number of you, weren't there?

04:41PM   14   A.   Yes, there were.

04:41PM   15   Q.   And so, somebody decided that Krug was the one that was

04:41PM   16   going to go try to get the search warrant, right?

04:42PM   17   A.   That's correct.

04:42PM   18   Q.   But it was part of the same investigation that you and

04:42PM   19   Webb were part of; was it not?

04:42PM   20   A.    It is, but what happened here is a Buffalo Police car

04:42PM   21   stopped the vehicle and therefor, a Buffalo Police detective

04:42PM   22   was going to apply for a search warrant.   That circumstance,

04:42PM   23   that's not something we would rely on interagency cooperation

04:42PM   24   for.   That's something that agency is handling.

04:42PM   25   Q.   All right.   Based on that stop, are you aware that an

04:43PM  1    application was made to Judge Schroeder to do a cell --

04:43PM  2    search of cell phones that were taken from Mr. Burgin's

04:43PM  3    vehicle that day, the vehicle he was driving?

04:43PM  4    A.  I don't recall that.

04:43PM  5    Q.  When Mr. Burgin was stopped that day, you didn't know who

04:43PM  6    he was, did you?

04:43PM  7    A.  No.

04:43PM  8    Q.  You said, who the fuck are you, right?

04:43PM  9    A.  I don't recall what I said.

04:43PM  10   Q.  Is that something you might say?

04:43PM  11   A.  In my life?  Yes.

04:43PM  12   Q.  Okay.  And you were expecting somebody else to be driving

04:44PM  13   that car, weren't you?

04:44PM  14        MR. LYNCH:  Judge, I object to this line of

04:44PM  15   questioning.  Again, this is --

04:44PM  16        THE COURT:  Yeah, we're getting kind of far afield

04:44PM  17   from the issue here in this case.

04:44PM  18   BY MR. HARRINGTON:

04:44PM  19   Q.  Now, based on what we read in the search warrants for 56

04:44PM  20   Grimes, Judge Case was never told that nothing was found in

04:44PM  21   the vehicle that Mr. Burgin was stopped in on July the 9th,

04:44PM  22   was he, of 2019?

04:44PM  23   A.  I don't believe so.

04:44PM  24   Q.  Can you tell me when was it decided you were going to

04:45PM  25   seek the search warrant; the actual decision made to get one?

04:45PM    1            THE COURT:  Are we talking about for 56 Grimes?

04:45PM    2            MR. HARRINGTON:  For 56 Grimes.  The first one.

04:45PM    3            THE WITNESS:  It would have been after Rodney Pierce

04:45PM    4    was arrested.

04:45PM    5    BY MR. HARRINGTON:

04:45PM    6    Q.  Okay.  Even before you saw Mr. Burgin?

04:45PM    7    A.  I should say this.  It was decided once we arrested

04:45PM    8    Mr. Pierce that we were going to work our -- try to work --

04:45PM    9    attempt to work our way back to 56 Grimes.

04:45PM   10    Q.  So, let's take a minute.  Mr. Pierce goes to the Auto

04:45PM   11    Zone the first time, right?

04:45PM   12    A.  That's correct.

04:45PM   13    Q.  Are you on surveillance then?

04:45PM   14    A.  Yes, sir.

04:45PM   15    Q.  And where did you come from?

04:45PM   16    A.  We've come from, prior to the Auto Zone, from downtown.

04:46PM   17    Q.  Okay.  Do you know what time that was?

04:46PM   18    A.  Off the top of my head, I don't recall.

04:46PM   19    Q.  Was he supposed to meet the confidential informant at

04:46PM   20    5:30?

04:46PM   21    A.  I don't recall the times.

04:46PM   22    Q.  But, in any event, you go to the Auto Zone or near it,

04:46PM   23    correct?

04:46PM   24    A.  That's correct.

04:46PM   25    Q.  And where do you park?

04:46PM   1    A.  I don't recall.

04:46PM   2    Q.  Were you across the street in the service station, the

04:46PM   3    Valero?

04:46PM   4    A.  I don't recall, sir, exactly where I was parked.

04:46PM   5    Q.  But you were there and you saw this white Caravan which

04:46PM   6    you believed to be Mr. Pierce; is that right?

04:47PM   7    A.  That's correct.

04:47PM   8    Q.  And you knew at that time that Mr. Pierce was driving

04:47PM   9    with a suspended license, didn't you?

04:47PM  10    A.  That's correct.

04:47PM  11    Q.  And, in New York State, that's a misdemeanor, is it not?

04:47PM  12    A.  Yes, sir.

04:47PM  13    Q.  And somebody can be arrested for a misdemeanor and taken

04:47PM  14    into custody, can they not?

04:47PM  15    A.  Yes, sir.

04:47PM  16    Q.  So, he could have been stopped for a traffic violation,

04:47PM  17    his car impounded, and inventory search been done; is that

04:47PM  18    right?

04:47PM  19    A.  That's correct.

04:47PM  20    Q.  That was decided not to be done; is that right?

04:47PM  21    A.  At that very moment?

04:47PM  22    Q.  Yeah.

04:47PM  23    A.  That's correct.

04:47PM  24    Q.  Was that ever discussed that you might do that?

04:47PM  25    A.  I don't recall.

04:47PM   1   Q.   Did -- when you saw Mr. -- who you believed to be

04:48PM   2   Mr. Pierce there, right, he, apparently, according to other

04:48PM   3   testimony, backed into a parking spot at the Auto Zone; is

04:48PM   4   that right?

04:48PM   5   A.   That's correct.

04:48PM   6   Q.   How long was he there?

04:48PM   7   A.   Couple of minutes.

04:48PM   8   Q.   And his purpose in being there, as you understood it, was

04:48PM   9   to make this drug transaction; is that right?

04:48PM   10   A.   That's correct.

04:48PM   11   Q.   And, can you tell me, at any point in time, was it ever

04:48PM   12   considered that the confidential informant was actually going

04:48PM   13   to go there to see Mr. Pierce that day?

04:48PM   14   A.   It was.

04:48PM   15   Q.   Okay.  And when was that?

04:48PM   16   A.   It was considered during the course of these phone calls

04:48PM   17   whether we were going to put the confidential informant on

04:48PM   18   scene and we decided not to.

04:48PM   19   Q.   When did you decide not to?

04:49PM   20   A.   When the informant made it clear that it wasn't going to

04:49PM   21   be a, what we call, dry meet, which means a meet to discuss a

04:49PM   22   drugs transaction or purpose or whatever, when he informed us

04:49PM   23   that, in fact, Mr. Pierce was going to arrive with a large

04:49PM   24   quantity of cocaine, we decided there was no need for -- to

04:49PM   25   enter the informant into the equation.

04:49PM    1    Q.   Okay.  And his telling you this is based upon these

04:49PM    2    recordings that we have; is that right?

04:49PM    3    A.   Based upon the recordings and prior interaction.

04:50PM    4    Q.   How many interactions before?

04:50PM    5    A.   With Mr. Pierce?  It was only once or more.

04:50PM    6    Q.   Just once; is that right?

04:50PM    7    A.   That's correct.

04:50PM    8    Q.   And based upon this once, he's going to front him a large

04:50PM    9    amount of cocaine; is that right?  That's what you believed?

04:50PM   10    A.   That's correct.

04:50PM   11    Q.   Now -- but before you went from Elm Street to the Auto

04:50PM   12    Zone, by then it had been determined that the confidential

04:50PM   13    informant was not going to be on the scene and meet

04:50PM   14    Mr. Pierce, correct?

04:50PM   15    A.   That's correct.

04:50PM   16    Q.   So, you went there for the purpose of arresting

04:50PM   17    Mr. Pierce, right?

04:50PM   18    A.   That's correct.

04:50PM   19    Q.   And whether that was for the traffic violation or the

04:51PM   20    drug investigation, you were going there for the purpose of

04:51PM   21    arresting him, correct?

04:51PM   22    A.   That's correct.

04:51PM   23    Q.   And you believed that he had the drugs with him, based

04:51PM   24    upon whatever the informant told you, your interpretation of

04:51PM   25    these phone calls, you believed that; did you not?

04:51PM   1    A.   That's correct.

04:51PM   2    Q.   Okay.  And so, there comes a time later that Mr. Pierce

04:51PM   3    returns to the Auto Zone and officers and agents arrest him

04:51PM   4    in the parking lot, correct?

04:51PM   5    A.   That's correct.

04:51PM   6    Q.   And you find a black bag, small black bag, that has drugs

04:51PM   7    in it; is that right?

04:51PM   8    A.   That's correct.

04:51PM   9    Q.   Okay.  And other people have testified, and I think you

04:52PM  10    did on your direct testimony, that in between his first

04:52PM  11    appearance at Auto Zone and his arrest, he went to 56 Grimes;

04:52PM  12    is that right?

04:52PM  13    A.   That's correct.

04:52PM  14    Q.   And you and Day and Webb saw him get out of his -- the

04:52PM  15    Caravan and walk into 56 Grimes carrying a small black bag;

04:52PM  16    is that right?

04:52PM  17    A.   That's correct.

04:52PM  18    Q.   And you saw him come out of 56 Grimes carrying the same

04:52PM  19    small bag, correct?

04:52PM  20    A.   That's correct.

04:52PM  21    Q.   And that bag had the drugs in it when he was arrested; is

04:52PM  22    that right?

04:52PM  23    A.   That's correct.

04:52PM  24    Q.   After Pierce was arrested, you determined you were going

04:53PM  25    to try to get a search warrant.  When is the first time you

04:53PM   1   assigned that task to McMahon?

04:53PM   2   A.  It would have probably have been shortly thereafter,

04:53PM   3   after we arrested Pierce.

04:54PM   4   Q.  And how did you tell him to do it?

04:54PM   5   A.  I don't recall.

04:54PM   6   Q.  Does your phone log indicate that you called him?

04:54PM   7   A.  I don't recall if it was a phone conversation or an in-

04:54PM   8   person conversation.

04:54PM   9   Q.  In any event, after Mr. Burgin was arrested, right, you

04:54PM  10   participated in that arrest, too, right?

04:54PM  11   A.  Yes, sir.

04:54PM  12   Q.  Okay.  We'll come back to that in a minute, but he was

04:54PM  13   taken some place in custody.  Where was he taken?

04:54PM  14   A.  Mr. Pierce?

04:54PM  15   Q.  Mr. Burgin, when he was arrested.

04:54PM  16   A.  He was taken back to our office at 45 Elm.

04:54PM  17   Q.  Where was Pierce taken when he was arrested?

04:58PM  18   A.  Same place.

04:58PM  19   Q.  Was the CI there too?

04:58PM  20   A.  No.

04:58PM  21   Q.  So, when Mr. Burgin is taken back to your office, I

04:59PM  22   assume there was some discussion with McMahon then about the

04:59PM  23   search warrant; was there not?

04:59PM  24   A.  I don't recall, but I would imagine so.

04:59PM  25   Q.  Who gave Pat McMahon the details that are in that short

04:59PM    1    paragraph that supposedly is probable cause for this search

04:59PM    2    warrant, do you know?

04:59PM    3            THE COURT:  By this search warrant, we're talking

04:59PM    4    about Government Exhibit --

04:59PM    5            MR. HARRINGTON:  Search warrant number 1 for Grimes.

04:59PM    6            THE COURT:  Government Exhibit 8?

04:59PM    7            MR. HARRINGTON:  Yes.  Excuse me.

04:59PM    8            THE WITNESS:  Is that relating to the arrest of

04:59PM    9    Mr. Pierce?

04:59PM   10            MR. HARRINGTON:  No.

04:59PM   11    BY MR. HARRINGTON:

04:59PM   12    Q.  The first search warrant for Grimes, Government Exhibit

04:59PM   13    8, right, the one with the whited out --

04:59PM   14    A.  Okay.

04:59PM   15    Q.  That's what I'm talking about.  In that search warrant

04:59PM   16    application, we can show it to you if you want, there's a

05:00PM   17    paragraph that has information about the probable cause for

05:00PM   18    the arrest.  Do you want to see that?

05:00PM   19    A.  Sure.

05:00PM   20    Q.  Let me show you.  Can you pull it up?

05:02PM   21    A.  I see it.

05:02PM   22    Q.  Okay.  And I have given you a copy of the Government

05:02PM   23    Exhibit Number 8, correct?  And this is the third page.  And

05:02PM   24    at the bottom of the third page, there's a paragraph with the

05:02PM   25    number 2; is that right?

05:02PM    1    A.   Yes.

05:02PM    2    Q.   Okay.  And that's the -- are they -- that contains the

05:02PM    3    allegations of fact that were made by -- in McMahon's

05:03PM    4    application, correct?

05:03PM    5    A.   That's correct.

05:03PM    6    Q.   Now, do you know who it is that gave -- we can go through

05:03PM    7    it line by line, each of this --

05:03PM    8    A.   I see all the information.  I'm not sure where that would

05:03PM    9    have came from.

05:03PM    10    Q.   Did you give any of this information to him?

05:03PM    11    A.   I don't recall.

05:03PM    12    Q.   Did McMahon show you the search warrant application

05:04PM    13    before it was taken to Judge Case?

05:04PM    14    A.   I don't recall.

05:04PM    15    Q.   In these search warrant applications, I don't mean to

05:05PM    16    diminish the information in them, but they're -- most of the

05:05PM    17    information in these are just standard information that's

05:05PM    18    used in cases; is that right?

05:05PM    19    A.   A lot is boilerplate.

05:05PM    20    Q.   Right.  So, you don't go back and type all that out

05:05PM    21    again.  You use the format.  It doesn't mean that you're not

05:05PM    22    attesting to the accuracy of that, but just -- you don't go

05:05PM    23    back and type individual paragraphs over and over again,

05:05PM    24    correct?

05:05PM    25    A.   That's correct.

05:05PM    1    Q.  And so, the paragraph, like number 2, is the important

05:05PM    2    paragraph in terms of the judge's analysis of whether there's

05:05PM    3    probable cause alleged; is that right?

05:05PM    4    A.  That's correct.

05:05PM    5    Q.  Do you know if anybody else assisted McMahon in preparing

05:05PM    6    this search warrant application?

05:05PM    7    A.  I know Paul McMahon was helping him.

05:06PM    8    Q.  Is Paul related to him?

05:06PM    9    A.  Yes.

05:06PM   10    Q.  What is their relationship?

05:06PM   11    A.  Twin brothers.

05:06PM   12    Q.  Twin brothers?  What's his position?

05:06PM   13    A.  He's a deputy assigned to DEA.

05:06PM   14    Q.  Sheriff's deputy, but assigned to Drug Enforcement

05:06PM   15    Administration?

05:06PM   16    A.  That's correct.

05:06PM   17    Q.  And did anybody else besides the two McMahon brothers go

05:06PM   18    to see Judge Case?

05:06PM   19    A.  I don't believe so.

05:06PM   20    Q.  Did you speak with Paul McMahon about this application?

05:06PM   21    A.  I don't recall.

05:06PM   22    Q.  Do you know who -- which of the two of them or both of

05:06PM   23    them or anybody else actually drafted this?

05:06PM   24    A.  I think Pat McMahon drafted it.

05:07PM   25    Q.  Pat drafted it?

| | | |
|---|---|---|
| 05:07PM | 1 | A.  That's correct. |
| 05:07PM | 2 | Q.  So, do you recall what time you got back to 45 Elm Street |
| 05:07PM | 3 | after Mr. Burgin was arrested? |
| 05:07PM | 4 | A.  I don't, sir. |
| 05:07PM | 5 | Q.  You took a while after you got back before the search |
| 05:07PM | 6 | warrant application was complete, is that right, would that |
| 05:07PM | 7 | be fair to say? |
| 05:07PM | 8 | A.  Yes. |
| 05:07PM | 9 | Q.  And did you have any other phone calls with Judge Case |
| 05:07PM | 10 | that evening before the warrant was signed or the warrant was |
| 05:08PM | 11 | taken to him to be signed? |
| 05:08PM | 12 | A.  I don't recall.  If it's not in my phone records, I |
| 05:08PM | 13 | didn't. |
| 05:08PM | 14 | Q.  On the first page of the warrant itself -- |
| 05:08PM | 15 | THE COURT:  Government Exhibit 8. |
| 05:08PM | 16 | MR. HARRINGTON:  Yes.  I'm getting there, Judge. |
| 05:08PM | 17 | BY MR. HARRINGTON: |
| 05:08PM | 18 | Q.  -- of Exhibit 8, Government Exhibit 8, on the first page |
| 05:09PM | 19 | of the search warrant itself, which would be the -- looks |
| 05:09PM | 20 | like the seventh page back, Judge Case asked you a few |
| 05:09PM | 21 | questions about the missing lower front and there.  Do you |
| 05:09PM | 22 | recall those questions? |
| 05:09PM | 23 | A.  Judge Schroeder? |
| 05:10PM | 24 | Q.  Sorry.  Yes.  Judge Schroeder.  Thank you. |
| 05:10PM | 25 | A.  I do. |

| | | |
|---|---|---|
| 05:10PM | 1 | Q.  Anyway, the -- after that, it says that 56 Grimes Street |
| 05:10PM | 2 | is a two-and-a-half story, multiple-residence building. |
| 05:10PM | 3 | A.  That's correct. |
| 05:10PM | 4 | Q.  Do you know where that information came from that went to |
| 05:10PM | 5 | McMahon for that? |
| 05:10PM | 6 | A.  I don't. |
| 05:10PM | 7 | Q.  You were upstairs on the second floor of this building at |
| 05:10PM | 8 | 56, right, and you at least went into at least one part of it |
| 05:10PM | 9 | where there was a kitchen, which would lead you to believe |
| 05:10PM | 10 | that that was a residence, did it not? |
| 05:10PM | 11 | A.  That's correct. |
| 05:10PM | 12 | Q.  And you can't recall whether there was a second residence |
| 05:10PM | 13 | in the front part of the building? |
| 05:11PM | 14 | A.  No, sir. |
| 05:11PM | 15 | Q.  There was no residence in the attic was area? |
| 05:11PM | 16 |         MR. LYNCH:  Judge, I object to the form of the |
| 05:11PM | 17 | question.  He's asking about a warrant that was signed before |
| 05:11PM | 18 | they entered the residence. |
| 05:11PM | 19 |         THE COURT:  Signed before what? |
| 05:11PM | 20 |         MR. LYNCH:  Before they went in the residence. |
| 05:11PM | 21 |         MR. HARRINGTON:  I'm going back to it, Judge. |
| 05:11PM | 22 |         THE COURT:  You're asking about Government Exhibit 8? |
| 05:11PM | 23 |         MR. HARRINGTON:  Yes, and I'm looking for the source |
| 05:11PM | 24 | of who said this was a multiple-dwelling. |
| 05:11PM | 25 |         THE COURT:  Right. |

05:11PM  1          MR. HARRINGTON:  It's in the application.

05:11PM  2          THE COURT:  Yes.

05:11PM  3          MR. HARRINGTON:  I'm asking if he knows, because he

05:11PM  4  testified before it wasn't a multiple-residence building.

05:11PM  5          THE COURT:  Overruled.

05:11PM  6          MR. LYNCH:  That's fine.

05:11PM  7          THE COURT:  You may answer.  If you know.

05:11PM  8          THE WITNESS:  I don't know, sir.

05:11PM  9  BY MR. HARRINGTON:

05:11PM  10  Q.  Now, did you participate in any way of the whiting out of

05:12PM  11  lower front on Government Exhibit 8, the search warrant?

05:12PM  12  A.  No, sir.

05:12PM  13  Q.  When did you first learn of it?

05:12PM  14  A.  Prior to the hearings that were scheduled.

05:12PM  15  Q.  On the evening that the warrants were signed on February

05:12PM  16  the 19th, did you find out about it that night?

05:12PM  17  A.  No, sir.

05:12PM  18  Q.  Did you find out at some point in time before you

05:12PM  19  testified here that there had been a problem with the first

05:12PM  20  warrant and the way that they were trying to amend it?  Did

05:12PM  21  McMahon report that to you?

05:12PM  22  A.  I don't recall.

05:12PM  23  Q.  After Mr. Burgin was arrested, you indicated that you had

05:14PM  24  surveillance on the building until the search warrant was

05:14PM  25  executed, correct?

05:14PM    1    A.   That's correct.

05:14PM    2    Q.   Did you receive any reports of anybody going in and out

05:14PM    3    of the building during that period of time?

05:15PM    4    A.   I don't believe so.

05:15PM    5    Q.   You testified early in your testimony today that when you

05:15PM    6    looked at a photograph of the side of 56 Grimes that there

05:15PM    7    was a light on on the second floor that you identified as the

05:15PM    8    landing, apparently, to the second floor; is that right?

05:15PM    9    A.   That's correct.

05:15PM   10    Q.   Was that light on the whole time that you had surveilled

05:15PM   11    56 Grimes?

05:15PM   12    A.   To the best of my recollection, yes.

05:15PM   13    Q.   Were any other lights on at any time that you were there

05:15PM   14    that you saw?

05:15PM   15    A.   I don't recall.

05:15PM   16    Q.   Did the persons doing surveillance report to you that

05:15PM   17    there was any activity of any kind, lights on and off, people

05:15PM   18    talking, nothing?

05:15PM   19    A.   Nothing.

05:15PM   20    Q.   Did they report anything about any new cars coming or

05:16PM   21    being parked?

05:16PM   22    A.   Not that I recall.

05:16PM   23    Q.   Now, can you tell me when you went upstairs to do this

05:16PM   24    protective sweep, you went into the -- some room on the

05:16PM   25    second floor, and you knew that it was a -- somebody's living

05:16PM    1    quarters; is that right?

05:16PM    2    A.  In the front area of the building?

05:16PM    3    Q.  No.  On the second floor, when you went in the door, got

05:16PM    4    to the top of the stairs, right, you pry open a door, right?

05:16PM    5    A.  That's correct.

05:16PM    6    Q.  And that would lead you to believe the door was locked,

05:16PM    7    right?

05:17PM    8    A.  That's correct.

05:17PM    9    Q.  And you get in there and you see indicia of somebody

05:17PM   10    living there, do you not?

05:17PM   11    A.  I remember the kitchen with some clothing there.

05:17PM   12    Q.  Did you see a TV, go in the bedroom?

05:17PM   13    A.  I believe there was.

05:17PM   14    Q.  Did you see a big screen TV?

05:17PM   15    A.  I don't recall if it was a big screen.  I believe there

05:17PM   16    was a TV, though.

05:17PM   17    Q.  But it clearly appeared to be a residence; is that right?

05:17PM   18    A.  I remember -- yeah.  Somebody had --

05:17PM   19    Q.  And you had no knowledge then that that residence was

05:17PM   20    connected to the bar downstairs, did you, other than being in

05:17PM   21    the same building?

05:17PM   22    A.  No, other than the two access points, no.

05:17PM   23    Q.  And assuming there's a separate apartment in the front of

05:17PM   24    the building, you had no information that that apartment was

05:17PM   25    connected to the bar downstairs; is that right?

05:18PM    1    A.   That's correct.

05:18PM    2    Q.   Okay.   When you do search warrants for buildings that

05:18PM    3    have multiple residences, are you authorized to go into all

05:18PM    4    of the apartments in a building for a protective sweep?

05:18PM    5    A.   I would rely on that based upon officer safety.

05:18PM    6    Q.   You believe that you can?

05:18PM    7    A.   I believe so, yes, if we believe it to be interconnected,

05:18PM    8    yes.

05:18PM    9    Q.   Well, in this particular case, you didn't know one way or

05:18PM   10    the other whether things were interconnected when you went in

05:18PM   11    there, did you?

05:18PM   12    A.   When we made entry in?

05:18PM   13    Q.   Yeah.

05:18PM   14    A.   No.   We knew we were going into a door.   That's all we

05:18PM   15    knew.

05:18PM   16    Q.   Right.   And, in fact, the door you were going into, you

05:18PM   17    thought you were going into the lower, didn't you?

05:18PM   18    A.   That's correct.

05:18PM   19    Q.   You said you made a judgment decision right away that we

05:18PM   20    should go upstairs, right?

05:18PM   21    A.   That's correct.

05:18PM   22    Q.   Even though there's a door to the left of you that led

05:19PM   23    into the lower front, right?

05:19PM   24    A.   That's -- I didn't know that that led to the lower front.

05:19PM   25    There was a door there.   Yes.

05:19PM    1   Q.  So, the only basis that you had for searching those

05:19PM    2   premises that day was the information that you had obtained

05:20PM    3   that day, correct?

05:20PM    4   A.  That's correct.

05:20PM    5   Q.  And some vague information that you had otherwise that

05:20PM    6   the place was used as an after-hours joint, right?

05:20PM    7   A.  That's correct.

05:20PM    8   Q.  In the search warrant application, again, going back to

05:21PM    9   Government Exhibit Number 8, for 56 Grimes, the factual part

05:21PM   10   on page 4, Officer McMahon, whichever one who wrote it,

05:21PM   11   signed by Patrick, not by Paul, right?  No matter who wrote

05:22PM   12   it, anybody can attest to it if they believe the

05:22PM   13   truthfulness.  You understand that, correct?

05:22PM   14   A.  Correct.

05:22PM   15   Q.  But it says that Pierce was observed carrying a black bag

05:22PM   16   into the building.  Do you see that?

05:22PM   17   A.  That's in the previous page.  Correct.

05:22PM   18   Q.  It's on paragraph 2 at the bottom?

05:22PM   19   A.  Page 3.  Yes.

05:22PM   20   Q.  It doesn't say anything about him carrying anything out

05:22PM   21   of the building, does it?

05:22PM   22   A.  No.

05:23PM   23   Q.  Now, on the Government Exhibit Number 8, again, going to

05:23PM   24   the McMahon's application, it says at the top it was an in

05:23PM   25   camera hearing.  Do you see that?

05:23PM    1    A.  That's correct.

05:23PM    2    Q.  And this was not an in camera warrant, was it?

05:24PM    3    A.  There was no informant.

05:24PM    4    Q.  Do you know if Judge Case placed either of the McMahons

05:24PM    5    under oath and took more information from them?

05:24PM    6    A.  I would hope that he did.  I believe he did.

05:24PM    7    Q.  How do you know that?

05:24PM    8    A.  Because I've testified previously with Judge Case and he

05:24PM    9    oftentimes does that.

05:24PM   10    Q.  Where he has a question about a warrant or information on

05:24PM   11    it and takes more testimony from you; is that right?

05:24PM   12    A.  That's correct.

05:24PM   13    Q.  And you don't know whether that was done or not done

05:24PM   14    here?

05:24PM   15    A.  I don't.

05:24PM   16    Q.  In the search warrant application, there's nothing in

05:25PM   17    there about Mr. Pierce's interaction with the confidential

05:25PM   18    informant that day; would that be fair to say?

05:25PM   19    A.  I don't see any.

05:25PM   20    Q.  When the search warrants themselves are done, I take it

05:25PM   21    that the officers that are applying type a proposed search

05:26PM   22    warrant to give to the judge, correct?

05:26PM   23    A.  That's correct.

05:26PM   24    Q.  You fill in the details of who should do it, where you're

05:26PM   25    going, that kind of thing, right?

| 05:26PM | 1 | A.   That's correct. |
| 05:26PM | 2 | Q.   And if the judge has to change it, the judge would change |
| 05:26PM | 3 | it, presumably in writing, and the affiant, being you or |
| 05:26PM | 4 | other detectives, and the judge would initial it; is that |
| 05:26PM | 5 | right? |
| 05:26PM | 6 | A.   That's correct. |
| 12:30PM | 7 | Q.   There's an application to search the Tundra that |
| 12:30PM | 8 | Mr. Burgin was driving, correct? |
| 12:30PM | 9 | A.   That's correct. |
| 12:30PM | 10 | Q.   And now, an hour and a half or so later, McMahon returns |
| 12:30PM | 11 | to Judge Case and Government Exhibit Number 9 is the second |
| 12:31PM | 12 | search warrant.  That does not tell Judge Case that nothing |
| 12:31PM | 13 | was found in the car of the first search warrant, does it? |
| 12:31PM | 14 | I'll get a copy for you here. |
| 12:31PM | 15 | A.   No.  It would be in the -- that written paragraph. |
| 12:31PM | 16 | Q.   Sorry? |
| 12:31PM | 17 | THE COURT:  I should point out that Government |
| 12:32PM | 18 | Exhibit 9 is not in evidence. |
| 12:32PM | 19 | MR. HARRINGTON:  I offer it in evidence, Judge. |
| 12:32PM | 20 | THE COURT:  Well. |
| 12:32PM | 21 | MR. LYNCH:  Well, if he offers it, that's fine or if |
| 12:32PM | 22 | he offers it, we'll agree to it. |
| 12:32PM | 23 | THE COURT:  There being no objection, Government |
| 12:32PM | 24 | Exhibit Number 9 is now in evidence. |
| 12:32PM | 25 | (Government Exhibit Number 9 was received in evidence.) |

| 12:32PM | 1 | THE WITNESS:  No, sir. |
| 12:32PM | 2 | BY MR. HARRINGTON: |
| 12:32PM | 3 | Q.  And there is, at the bottom of the first page of the |
| 12:32PM | 4 | application, more information that's written there about 56 |
| 12:32PM | 5 | Grimes that at least supplements what was in the first |
| 12:32PM | 6 | application; is that right? |
| 12:32PM | 7 | A.  That's correct. |
| 12:32PM | 8 | Q.  And it relies on things that supposedly were seen in the |
| 12:32PM | 9 | second floor of 56 Grimes, right? |
| 12:32PM | 10 | A.  That's correct. |
| 12:32PM | 11 | Q.  And that was during your protective sweep; is that right? |
| 12:32PM | 12 | A.  That's correct. |
| 12:32PM | 13 | Q.  Now, how did McMahon get that specific information? |
| 12:32PM | 14 | A.  Probably from me. |
| 12:33PM | 15 | Q.  Is this one of the phone calls you said you had with him? |
| 12:33PM | 16 | A.  Yes, sir. |
| 12:33PM | 17 | Q.  Do you remember actually telling him that? |
| 12:33PM | 18 | A.  No.  I don't recall the contents of the conversation. |
| 12:33PM | 19 | Q.  Do you know what time it was that McMahon prepared this? |
| 12:33PM | 20 | A.  No, sir. |
| 12:33PM | 21 | Q.  And the only things that you say that were found in the |
| 12:33PM | 22 | protective sweep are electronic storage devices, right? |
| 12:33PM | 23 | A.  That's correct. |
| 12:33PM | 24 | Q.  Among other things, correct? |
| 12:33PM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 12:33PM | 1 | Q.  And is it illegal to have electronic storage devices? |
| 12:33PM | 2 | A.  No, sir. |
| 12:33PM | 3 | Q.  And material identifying David Burgin in plain view; is |
| 12:33PM | 4 | that right? |
| 12:33PM | 5 | A.  That's correct. |
| 12:33PM | 6 | Q.  That's this envelope you're talking about? |
| 12:33PM | 7 | A.  That's correct. |
| 12:33PM | 8 | Q.  Nothing illegal about that envelope, right, or him having |
| 12:33PM | 9 | mail there? |
| 12:33PM | 10 | A.  No, sir. |
| 12:34PM | 11 | Q.  And a DVR surveillance system at 56 Grimes, right? |
| 12:34PM | 12 | A.  That's correct. |
| 12:34PM | 13 | Q.  And nothing illegal about that? |
| 12:34PM | 14 | A.  No, sir. |
| 12:34PM | 15 | Q.  And the downstairs of 56 Grimes, by experience, looks |
| 12:34PM | 16 | like people came there and -- to the bar, did it not? |
| 12:34PM | 17 | A.  It was a bar.  Yes. |
| 12:34PM | 18 | Q.  Can you tell me, and perhaps you don't know, Exhibit 8 |
| 12:34PM | 19 | you testified to has the -- is a photocopy.  It's not the |
| 12:34PM | 20 | original.  It has missing lower front on there; is that |
| 12:35PM | 21 | right? |
| 12:35PM | 22 | A.  That's correct. |
| 12:35PM | 23 | Q.  And I think you testified it was whited out, right?  Do |
| 12:35PM | 24 | you know who whited it out? |
| 12:35PM | 25 | A.  I don't. |

12:35PM    1    Q.  Do you know how that came to happen?

12:35PM    2    A.  I believe it was when we were making the amendment and

12:35PM    3    the additional application and there was a change.

12:35PM    4    Q.  Do you know if you are allowed to change a court order or

12:35PM    5    a search warrant signed by a judge?

12:35PM    6    A.  Well, this would have been in presence -- the judge would

12:35PM    7    have made that change.  It would have been in his presence.

12:35PM    8    Q.  Do you know if he has the authority to do that?

12:36PM    9    A.  I don't.

12:36PM   10    Q.  Now, you included in the search warrant application the

12:36PM   11    attic and the detached garage; is that right?

12:36PM   12         MR. LYNCH:  Objection, Your Honor.  This witness

12:36PM   13    hasn't testified he got the warrant.

12:36PM   14         THE COURT:  No, but he did testify he supplied the

12:36PM   15    information to McMahon for the warrant.

12:36PM   16         MR. LYNCH:  I think he said he thinks he did but,

12:36PM   17    okay.  That's fine.

12:36PM   18         THE COURT:  You were specifically asked on cross-

12:36PM   19    examination how McMahon was able to put in the detail for the

12:36PM   20    second warrant and he said he believed he gave him the

12:36PM   21    information.

12:37PM   22         THE WITNESS:  It includes the upper rear, attic, and

12:37PM   23    detached garage.

12:37PM   24    BY MR. HARRINGTON:

12:37PM   25    Q.  Right.  That's what the search was for.  And that's what

12:37PM   1   you requested, correct?

12:37PM   2   A.   Correct.

12:37PM   3   Q.   But there's no information that you gave to McMahon about

12:37PM   4   anything in the attic in the search warrant application, is

12:37PM   5   there?

12:37PM   6   A.   No, sir.

12:37PM   7   Q.   There's nothing in there about the garage, correct?

12:37PM   8   A.   No, sir.

12:37PM   9   Q.   And, yet, you asked for those to be able to search those,

12:37PM  10   right?

12:37PM  11   A.   That's correct.

12:37PM  12   Q.   And the only way you could access the attic was through

12:37PM  13   the apartment on the second floor; isn't that right?

12:37PM  14   A.   I don't recall if there was access from that stairwell in

12:37PM  15   the back.

12:37PM  16   Q.   But in the either of these search warrants, there's no

12:37PM  17   allegations that there were drugs in the premises, is there?

12:37PM  18   A.   Well, that's what we're looking for, is cocaine.

12:38PM  19   Q.   No.   My question is, there's no allegation saying that

12:38PM  20   there are drugs in the premises.   Based upon your

12:38PM  21   investigation and informant, anything, there's nothing in

12:38PM  22   there that says there are drugs or guns or any illegal

12:38PM  23   contraband in the premises; isn't that correct?

12:38PM  24   A.   That's correct.

12:40PM  25   Q.   Chief Granville, from the time that you first entered 56

12:40PM    1    Grimes executing the first search warrant, until the time

12:40PM    2    that you finished your work there, that either you or the

12:40PM    3    other officers (inaudible) did people remain in the premises

12:40PM    4    that whole time?

12:40PM    5    A.   Yes.

12:41PM    6    Q.   And the video shows that there are officers in the middle

12:41PM    7    or front by the bar in there for almost the continuous period

12:41PM    8    of time, at least that the camera was operating; is that

12:41PM    9    right?

12:41PM   10    A.   That's correct.

12:41PM   11    Q.   Chief Granville, I'm showing you Exhibit 10, and that's

12:41PM   12    the first page, Bates number 00001.  That appears to be a

12:42PM   13    door locked with keys in; is that right?

12:42PM   14    A.   That's correct.

12:42PM   15    Q.   You identified that as -- which door is that to the

12:42PM   16    premises; do you know?

12:42PM   17    A.   I don't.

12:42PM   18    Q.   Whose keys are those?

12:42PM   19    A.   I don't recall.

12:42PM   20    Q.   Do you know when the picture was taken?

12:42PM   21    A.   It would have been taken that night.

12:42PM   22    Q.   Who was doing all the photographing that night?

12:42PM   23    A.   Detective Tim Carney.

12:42PM   24    Q.   And the entire time that you were there that night it was

12:42PM   25    dark; isn't that correct?

| | | |
|---|---|---|
| 12:42PM | 1 | A.  That's correct. |
| 12:42PM | 2 | Q.  Even from the first time that you followed Pierce there, |
| 12:43PM | 3 | it was dark, right? |
| 12:43PM | 4 | A.  That's correct. |
| 12:44PM | 5 | Q.  I'm showing you Government Exhibit 1, slide 17. |
| 12:44PM | 6 | MR. LYNCH:  Government Exhibit 10, photo 17. |
| 12:44PM | 7 | BY MR. HARRINGTON: |
| 12:44PM | 8 | Q.  Exhibit 10, photo 17.  Do you see that? |
| 12:44PM | 9 | A.  I do. |
| 12:44PM | 10 | Q.  Do you recognize that? |
| 12:44PM | 11 | A.  I do. |
| 12:44PM | 12 | Q.  What is that? |
| 12:44PM | 13 | A.  That's the bar located at 56 Grimes.  That's, like, a |
| 12:44PM | 14 | rear room. |
| 12:44PM | 15 | Q.  So, you indicated that it was, like, all just one room, |
| 12:44PM | 16 | right, when you testified earlier? |
| 12:44PM | 17 | A.  It's the back of the bar. |
| 12:44PM | 18 | Q.  It's like a dining room or something like that attached |
| 12:44PM | 19 | to the bar; would that be fair to say? |
| 12:44PM | 20 | A.  Yes, sir. |
| 12:44PM | 21 | Q.  It appears to have some musical speakers or something |
| 12:44PM | 22 | there in the corner; is that right? |
| 12:44PM | 23 | A.  Yes. |
| 12:44PM | 24 | Q.  But I just want to be clear, the front room is separated |
| 12:45PM | 25 | by this entryway that's shown in the right to the left part |

12:45PM   1   of the photograph; would that be fair to say?

12:45PM   2   A.   That's correct.

12:45PM   3   Q.   When you first entered to do the protective sweep or

12:45PM   4   decided to do the protective sweep, you said that the place

12:45PM   5   was dark; is that right?

12:45PM   6   A.   The?

12:45PM   7   Q.   The stairway?

12:45PM   8   A.   The stairway?

12:45PM   9   Q.   Yeah.

12:45PM   10  A.   No.

12:45PM   11  Q.   It was lit?

12:45PM   12  A.   Yes.

12:45PM   13  Q.   Okay.  And the film shows the detectives, you, using your

12:45PM   14  flashlights; is that right?

12:45PM   15  A.   Yes.  Some of them had flashlights.  Yes.

12:45PM   16  Q.   They were on, were they not?

12:45PM   17  A.   Some of them, yeah.

12:46PM   18  Q.   I'm showing you Government Exhibit 10, slide 51.  Do you

12:46PM   19  see that?

12:46PM   20  A.   Yes.

12:46PM   21  Q.   Do you recognize that?

12:46PM   22  A.   I do.

12:46PM   23  Q.   Where was that?

12:46PM   24  A.   It's the second floor kitchen of 56 Grimes.

12:46PM   25  Q.   And is that -- that's upstairs; is that right?

12:46PM   1    A.   Yes.

12:46PM   2    Q.   Is that part of the kitchen?

12:46PM   3    A.   It is.

12:46PM   4    Q.   Showing you Government Exhibit 10, exhibit -- Bates

12:47PM   5    number 57, slide number 57, do you recognize that?

12:47PM   6    A.   I do.

12:47PM   7    Q.   Is that the envelope that you said that you saw in the

12:47PM   8    kitchen?

12:47PM   9    A.   Yes.

12:47PM   10   Q.   And that was at the top of a trash bag; is that right?

12:47PM   11   A.   That's correct.

12:47PM   12   Q.   And you looked at that, right?

12:47PM   13   A.   That's correct.

12:47PM   14   Q.   Did you have to use your flashlight to look at it?

12:47PM   15   A.   I don't recall.

12:47PM   16   Q.   Did you have the lights on?

12:47PM   17   A.   It would have been illuminated somehow, whether by

12:47PM   18   flashlight or lights.

12:47PM   19   Q.   Okay.  And that has Mr. Burgin's name on it; does it not?

12:47PM   20   A.   It does.

12:47PM   21   Q.   And what's the address on it?

12:47PM   22   A.   Seventy-nine Brunswick Boulevard, Buffalo, New York.

12:48PM   23   Q.   Showing you Government Exhibit 10, slide 97.  Do you see

12:48PM   24   that?

12:48PM   25   A.   I do.

| | | |
|---|---|---|
| 12:48PM | 1 | Q.  What is that? |
| 12:48PM | 2 | A.  It's a Western Union receipt for David Burgin. |
| 12:48PM | 3 | Q.  And where was that found? |
| 12:48PM | 4 | A.  I don't recall. |
| 12:49PM | 5 | Q.  Was that found by you on the protective sweep or on the |
| 12:49PM | 6 | search warrant? |
| 12:49PM | 7 | A.  The search warrant. |
| 12:49PM | 8 | Q.  How do you know? |
| 12:49PM | 9 | A.  The only thing found with the protective sweep was the |
| 12:49PM | 10 | National Fuel bill. |
| 12:49PM | 11 | Q.  Showing you Government Exhibit 8 -- 10, Exhibit 104.  Do |
| 12:49PM | 12 | you recognize that? |
| 12:49PM | 13 | A.  It's a piece of mail. |
| 12:49PM | 14 | Q.  Have you ever seen it before? |
| 12:50PM | 15 | A.  I don't recall. |
| 12:50PM | 16 | Q.  Do you know where that would have been if it was at 56 |
| 12:50PM | 17 | Grimes Street? |
| 12:50PM | 18 | A.  No, sir. |
| 12:50PM | 19 | Q.  Do you know what it relates to? |
| 12:50PM | 20 | A.  I just see it has Mr. Burgin's name on it.  It says |
| 12:50PM | 21 | Fidelis Management with a PO box in Buffalo. |
| 12:50PM | 22 | Q.  You can tell from that when it was postmarked, if you can |
| 12:50PM | 23 | see? |
| 12:50PM | 24 | A.  I can't.  No. |
| 12:50PM | 25 | Q.  In your investigation of Mr. Burgin, did you ever find |

12:50PM  1   out anything out about Fidelis Management and when it

12:50PM  2   existed?

12:50PM  3   A.  I did not.  No.

12:51PM  4   Q.  Chief Granville, showing you up on the screen -- is from

12:51PM  5   Government Exhibit 8, the inventory which purportedly is for

12:51PM  6   the search the 56 Grimes.  Do you see that?

12:52PM  7   A.  I do.

12:52PM  8   Q.  And it says -- it's got up at the top upper right it

12:52PM  9   says, time, date impounded 2/19/20, 9:48 p.m., correct?

12:52PM  10  A.  That's correct.

12:52PM  11  Q.  Where does that date and time come from?

12:52PM  12  A.  More than likely, the time the search warrant was signed

12:52PM  13  or the time of entry.  Sorry.

12:52PM  14  Q.  So, that time and date has -- or the date maybe but not

12:52PM  15  the time, has nothing to do with when items were seized,

12:52PM  16  would that be fair to say?

12:52PM  17  A.  That's correct.

12:52PM  18  Q.  That's the same time that the search warrant was signed;

12:52PM  19  is that right?

12:52PM  20  A.  That's correct.

12:52PM  21  Q.  Okay.  By the way, how did you learn that the first

12:52PM  22  search warrant was signed?

12:52PM  23  A.  I don't recall.

12:52PM  24  Q.  Do you have any -- in your phone records, is there any

12:53PM  25  message from either of the McMahons saying that the search

| | | |
|---|---|---|
| 12:53PM | 1 | warrant had been signed? |
| 12:53PM | 2 | A.  I don't know, but I'm sure there would have been. |
| 12:53PM | 3 | Q.  Would someone else have been notified other than you? |
| 12:53PM | 4 | A.  It could have happened.  Yes. |
| 12:53PM | 5 | Q.  You don't have any recollection of that now? |
| 12:53PM | 6 | A.  I don't. |
| 12:53PM | 7 | Q.  Were you at the scene ready to go on the search warrant |
| 12:53PM | 8 | when you found out about it? |
| 12:53PM | 9 | A.  The first one? |
| 12:53PM | 10 | Q.  Yeah. |
| 12:53PM | 11 | A.  No. |
| 12:53PM | 12 | Q.  No?  Okay.  So, where were you when you found out? |
| 12:53PM | 13 | A.  I believe we were in our office or in close proximity to |
| 12:53PM | 14 | Grimes, one or the other. |
| 12:53PM | 15 | Q.  Well, the warrant was signed at 8:52, right, you guys |
| 12:53PM | 16 | enter a few minutes later? |
| 12:53PM | 17 | A.  So, would have been in close proximity. |
| 12:53PM | 18 |         MR. LYNCH:  Judge, I think Mr. Harrington misspoke. |
| 12:53PM | 19 | He said the warrant was signed at 8:52. |
| 12:53PM | 20 |         MR. HARRINGTON:  Thirty-two. |
| 12:53PM | 21 | BY MR. HARRINGTON: |
| 12:53PM | 22 | Q.  Right?  The warrant was signed at 8:32, right, for 56 |
| 12:54PM | 23 | Grimes, Exhibit 8, correct? |
| 12:54PM | 24 | A.  Eight thirty-two.  Yes. |
| 12:54PM | 25 | Q.  And the video shows you going in a few minutes later on |

12:54PM   1   this protective sweep, right?

12:54PM   2   A.   Yes.

12:54PM   3   Q.   Okay.  So, are you telling us that you weren't right

12:54PM   4   there ready to go in when you found out about this?

12:54PM   5   A.   We might have been down the street or somewhere very

12:54PM   6   close by.

12:54PM   7   Q.   And when did you find out about the second search warrant

12:54PM   8   having been granted?

12:54PM   9   A.   While on scene at 56 Grimes.  How I found out, I don't

12:54PM  10   recall.

12:54PM  11   Q.   Now, on page 9 of Government Exhibit 8 that we just

12:55PM  12   mentioned a minute ago is the property receipt.  That's the

12:55PM  13   same thing as an inventory or a return on the warrant; is

12:55PM  14   that right?

12:55PM  15   A.   That's correct.

12:55PM  16   Q.   And this was filed with the clerk's office, was it not,

12:55PM  17   if you know?

12:55PM  18   A.   I don't know.  It's filed with the judge.

12:55PM  19   Q.   Now, can you tell me, there are some 27 items listed on

12:55PM  20   the inventory.  Who decided what to seize?

12:55PM  21   A.   It would have been -- it was our warrant.  Between myself

12:55PM  22   and Special Agent Webb, we would have probably decided.  And

12:55PM  23   the fact that it was going to ultimately get charged with the

12:56PM  24   Feds, we would have -- HSI would have been determining what

12:56PM  25   was seized and what wasn't.

12:56PM   1    Q.   So, this had become a federal investigation by that point

12:56PM   2    in time?

12:56PM   3    A.   Yes.

12:56PM   4    Q.   When did that happen?

12:56PM   5    A.   Right after we arrested Rodney Pierce.

12:56PM   6    Q.   But you remained in charge?

12:56PM   7    A.   I was.

12:56PM   8    Q.   Now, are you designated somehow as a federal agent?

12:56PM   9    A.   I am.

12:56PM  10    Q.   How?

12:56PM  11    A.   Deputized with Homeland Security and at that time with

12:56PM  12    the marshals as well.

12:56PM  13    Q.   So, it appears that Adam Day is the one that prepared the

12:56PM  14    inventory; is that right?  His name is at the bottom?

12:56PM  15    A.   That's correct.

12:56PM  16    Q.   And did you designate him to do that?

12:56PM  17    A.   I don't recall if I did.

12:56PM  18    Q.   Do you know where this inventory was prepared?

12:57PM  19    A.   I don't.

12:57PM  20    Q.   Do you have any idea what time you and the other officers

12:57PM  21    left 56 Grimes on February the 19th, 2020?

12:57PM  22    A.   No, sir.

12:57PM  23    Q.   Do you recall agents or officers taking the things that

12:57PM  24    are listed on the inventory and bringing them down to 45 Elm

12:57PM  25    Street in order to prepare the inventory?

12:57PM   1    A.   Yes.

12:57PM   2    Q.   So, the inventory would have been prepared at 45 Elm

12:57PM   3    Street; is that right?

12:57PM   4    A.   That's correct.

12:57PM   5    Q.   And so, do you know how long it took from after the

12:57PM   6    seizure of these items until you left?

12:57PM   7    A.   No, sir.

12:57PM   8    Q.   A number of these -- the items that are taken here come

12:58PM   9    from the attic; do they not?

12:58PM  10    A.   Yes.

12:58PM  11    Q.   And some of them are significant in terms of evidence,

12:58PM  12    including drugs and guns; is that right?

12:58PM  13    A.   That's correct.

12:58PM  14    Q.   You had no knowledge before this warrant was executed

12:58PM  15    that there were drugs and guns in the attic?

12:58PM  16    A.   No, sir.

12:58PM  17    Q.   But you believed that a protective sweep was done of the

12:58PM  18    attic; is that right?

12:58PM  19    A.   I believe so, yes.

12:58PM  20    Q.   Do you know if the attic door --

12:58PM  21         THE COURT:  Let me interrupt you for a moment.  You

12:58PM  22    asked the witness whether a number of the items appearing on

12:58PM  23    the property receipt attached to Government Exhibit 8 --

12:58PM  24         MR. HARRINGTON:  Yes.

12:58PM  25         THE COURT:  -- came from the attic?

| | | |
|---|---|---|
| 12:58PM | 1 | MR. HARRINGTON:  Right. |
| 12:58PM | 2 | THE COURT:  As I understand it, Government Exhibit 8, |
| 12:59PM | 3 | in its original form, pre-Wite Out -- |
| 12:59PM | 4 | MR. HARRINGTON:  Judge, what -- I could -- what |
| 12:59PM | 5 | happened is -- |
| 12:59PM | 6 | THE COURT:  -- for the lower -- |
| 12:59PM | 7 | MR. HARRINGTON:  The inventory was filed for both of |
| 12:59PM | 8 | the warrants.  I -- just for convenient sake -- |
| 12:59PM | 9 | THE COURT:  Okay.  I just wanted to make sure I was |
| 12:59PM | 10 | understanding everything, that this was not a misspoken |
| 12:59PM | 11 | question. |
| 12:59PM | 12 | MR. HARRINGTON:  No.  I should have used mine. |
| 12:59PM | 13 | THE COURT:  That's all right now that you've |
| 12:59PM | 14 | clarified it. |
| 12:59PM | 15 | BY MR. HARRINGTON: |
| 12:59PM | 16 | Q.  But, in any event, a number of the items on here came |
| 12:59PM | 17 | from the attic; is that right? |
| 12:59PM | 18 | A.  That's correct. |
| 01:00PM | 19 | Q.  Do you know how long it took to do the search once you |
| 01:00PM | 20 | found out about the second search warrant having been granted |
| 01:00PM | 21 | for 56 Grimes? |
| 01:00PM | 22 | A.  In terms of time, the length of search? |
| 01:00PM | 23 | Q.  Yeah. |
| 01:00PM | 24 | A.  I don't. |
| 01:00PM | 25 | Q.  Do you know how the items taken were transported to 45 |

01:00PM    1    Elm?

01:00PM    2    A.  I don't.

01:00PM    3    Q.  Were they bagged, just carried hand by hand, put in

01:00PM    4    boxes, any idea?

01:00PM    5    A.  I don't.

01:00PM    6    Q.  It can be important in an investigation where some piece

01:00PM    7    of evidence is found; is that right?

01:00PM    8    A.  Yes.

01:00PM    9    Q.  So, do you know the process for how these places were

01:00PM    10   identified on the property receipt attached to Government

01:00PM    11   Exhibit 8 were made?

01:00PM    12   A.  I don't recall.

01:00PM    13   Q.  How many officers were doing the search then; do you

01:01PM    14   know?

01:01PM    15   A.  A dozen or more.

01:01PM    16   Q.  When officers were seizing items at 56 Grimes that

01:01PM    17   evening, was Carney taking pictures of them?  Say, here, come

01:01PM    18   here, Carney.  I found guns.  Take a picture of it?

01:01PM    19   A.  Yes.

01:01PM    20   Q.  Were all of the items on the inventory photographed at

01:01PM    21   the scene?

01:01PM    22   A.  I don't know.

01:01PM    23   Q.  Do you have a procedure or protocol for doing that?

01:01PM    24   A.  Photographing all items?

01:01PM    25   Q.  Yeah.

| | | |
|---|---|---|
| 01:01PM | 1 | A.  Not -- I mean, it's kind of -- it's not totally of the |
| 01:01PM | 2 | normal for items not to be photographed. |
| 01:01PM | 3 | Q.  I'd ask you to take a look through the inventory and tell |
| 01:02PM | 4 | me if you see the DVR recording system in there. |
| 01:02PM | 5 | A.  I don't see it. |
| 01:02PM | 6 | Q.  Do you know why? |
| 01:02PM | 7 | A.  No. |
| 01:02PM | 8 | Q.  Do you know who it is that recovered it? |
| 01:02PM | 9 | A.  I don't recall. |
| 01:02PM | 10 | Q.  Do you recall telling somebody the next day to go back |
| 01:02PM | 11 | and get it? |
| 01:03PM | 12 | A.  I don't recall. |
| 01:03PM | 13 | Q.  At any point in time, did you leave a copy of the first |
| 01:03PM | 14 | or the second search warrant at the premises? |
| 01:03PM | 15 | A.  I don't believe we did. |
| 01:03PM | 16 | Q.  Did anybody? |
| 01:03PM | 17 | A.  I believe so. |
| 01:03PM | 18 | Q.  Did you give a copy of either warrant to Mr. Burgin? |
| 01:03PM | 19 | A.  I don't recall. |
| 01:03PM | 20 | Q.  Did you give a copy of the warrant to the person who is |
| 01:03PM | 21 | titled on the property? |
| 01:03PM | 22 | A.  We normally do, yes. |
| 01:03PM | 23 | Q.  Did you in this case? |
| 01:03PM | 24 | A.  I don't recall. |
| 01:03PM | 25 | Q.  Did you give a copy of the inventory to Mr. Burgin? |

| | | |
|---|---|---|
| 01:03PM | 1 | A.  I don't recall. |
| 01:03PM | 2 | Q.  Did you give a copy of the inventory to the titled owner |
| 01:03PM | 3 | of the property? |
| 01:03PM | 4 | A.  I don't recall. |
| 01:03PM | 5 | Q.  Can you tell me, when you seize the weapons in the attic, |
| 01:04PM | 6 | has there been DNA testing done on the weapons? |
| 01:04PM | 7 | A.  I don't know. |
| 01:04PM | 8 | Q.  Has there been DNA testing done on the drugs that were |
| 01:04PM | 9 | found? |
| 01:04PM | 10 | MR. LYNCH:  Objection, Judge.  Relevance. |
| 01:04PM | 11 | THE COURT:  Yeah.  We're only concerned with the |
| 01:04PM | 12 | actual execution, the warrant, and the seizure.  Now you're |
| 01:04PM | 13 | getting into evidentiary issues for trial. |
| 01:04PM | 14 | BY MR. HARRINGTON: |
| 01:04PM | 15 | Q.  How many phone accounts did you have on February 18th, |
| 01:04PM | 16 | 2020? |
| 01:04PM | 17 | A.  Two. |
| 01:04PM | 18 | Q.  Okay.  Thank you.  Two? |
| 01:04PM | 19 | A.  Yes. |
| 01:04PM | 20 | Q.  Okay.  And then the exhibits that we've seen, you've |
| 01:05PM | 21 | accounted for those, is that right?  Those are the only two |
| 01:05PM | 22 | that you have; is that right? |
| 01:05PM | 23 | A.  That's correct. |
| 01:05PM | 24 | Q.  No other phones involved, right?  Were they used for a |
| 01:05PM | 25 | different purpose?  By that I mean, either personal or |

01:05PM   1   business or anything?

01:05PM   2   A.   Yes.   But, oftentimes, unfortunately, in my practice,

01:05PM   3   they're intermingled.

01:05PM   4   Q.   Grab the closest one?

01:05PM   5   A.   Normally.

01:05PM   6          MR. HARRINGTON:   Judge, you think we could take a

01:05PM   7   break?   I've got a couple things to organize.

01:06PM   8          THE COURT:   All right.   It's 22 minutes after 2.

01:06PM   9   We'll be back at 20 minutes to 3.

01:06PM  10          MR. LYNCH:   Sounds good.   Thank you, Judge.

01:06PM  11   (A recess was taken from 2:21 p.m. to 2:43 p.m.)

01:06PM  12          THE CLERK:   Back on the record.

01:06PM  13          THE COURT:   Mr. Harrington?

01:06PM  14   BY MR. HARRINGTON:

01:06PM  15   Q.   Chief Granville, I was asking you questions before about

01:06PM  16   the inventory, and you had mentioned early that detective

01:07PM  17   Carney was the photographer that evening; is that right?

01:07PM  18   A.   That's correct.

01:07PM  19   Q.   Can you tell me, did he use a camera that had a date and

01:07PM  20   timestamp on it?

01:07PM  21   A.   I don't know.

01:07PM  22   Q.   Do you have those available?

01:07PM  23   A.   We do now.

01:07PM  24   Q.   Did you have them back then?

01:07PM  25   A.   I don't recall.

01:07PM   1   Q.  Do you know if anybody else took photographs with their

01:07PM   2   cell phone?

01:07PM   3   A.  I don't know.

01:07PM   4   Q.  You indicated that you called Lieutenant Douglas Kopp; is

01:07PM   5   that right?

01:07PM   6   A.  Kopp.

01:07PM   7   Q.  Kopp.  Is he part of this investigation?

01:07PM   8   A.  He was.

01:07PM   9   Q.  And what was his role?

01:07PM  10   A.  He's a lieutenant in narcotics, Buffalo Police.

01:07PM  11   Q.  What was he doing in this?

01:07PM  12   A.  He assisted with, you know, additional manpower.  He

01:08PM  13   assisted with the arrest.

01:08PM  14   Q.  Whose arrest?

01:08PM  15   A.  Pierce.  That's it.

01:08PM  16   Q.  And you called him that night, right?

01:08PM  17   A.  That's correct.

01:08PM  18   Q.  And what was that for; the purpose of that call?

01:08PM  19   A.  I don't recall.  I can surmise that it was for additional

01:08PM  20   bodies.

01:08PM  21   Q.  Now, you said that, according to your phone records, at

01:08PM  22   8:54, you had a phone call with McMahon; is that right?

01:08PM  23   A.  That's correct.

01:08PM  24   Q.  And what was discussed in that call?

01:08PM  25   A.  I don't recall the exact contents, but we would have

01:08PM    1    discussed the second application.

01:08PM    2    Q.   But by 8:54, you had been in the building and you know

01:08PM    3    that the warrant is not for the whole premises, right?

01:09PM    4    A.   That's correct.

01:09PM    5    Q.   Okay.  Do you know where McMahon was?

01:09PM    6    A.   He was in and around Judge Case's house, I believe.

01:09PM    7    Q.   Do you know if he stayed at Judge Case's house while this

01:09PM    8    went on?

01:09PM    9    A.   I don't know.

01:09PM   10    Q.   And then you called him again at 9 o'clock, about 9

01:09PM   11    o'clock, right?

01:09PM   12    A.   That's correct.

01:09PM   13    Q.   And what was that discussion?

01:09PM   14    A.   I don't recall.

01:09PM   15    Q.   Well, you said earlier you gave him some details about

01:09PM   16    what you had seen in the protective sweep; is that right?

01:09PM   17    A.   That's correct.

01:09PM   18    Q.   Was that on the first call or the second call?

01:09PM   19    A.   I don't recall.

01:09PM   20    Q.   Did you tell him about the DVR system?

01:09PM   21    A.   I don't recall.

01:09PM   22    Q.   Well, you identified before it's in the second warrant?

01:09PM   23    A.   It's in the application.  Yeah.

01:10PM   24    Q.   So, were you the only one that told him information that

01:10PM   25    you know of?

01:10PM    1    A.   That I know of, yeah.

01:10PM    2    Q.   And by the time you told him that, the system had already

01:10PM    3    been found; is that right?

01:10PM    4    A.   Yes.

01:10PM    5    Q.   Now, earlier, when you talked about Pierce and the

01:10PM    6    confidential informant, I believe you testified that you left

01:10PM    7    45 Elm and you went to the Auto Zone, right, and there were

01:10PM    8    still some communications going on between the confidential

01:10PM    9    informant and Pierce; is that right?

01:10PM   10    A.   That's correct.

01:10PM   11    Q.   You said somebody was -- the confidential informant is

01:10PM   12    not with you, right?

01:10PM   13    A.   Correct.

01:10PM   14    Q.   He's back at your office, right?

01:10PM   15    A.   That's correct.

01:10PM   16    Q.   Somebody is with him?

01:10PM   17    A.   That's correct.

01:10PM   18    Q.   All right.  So, how are you getting information?

01:10PM   19    A.   Phone calls or on a secure radio channel.

01:11PM   20    Q.   Were you able to hear what the calls were?  Could they

01:11PM   21    forward those to you, what was actually being said?

01:11PM   22    A.   Oh, no.

01:11PM   23    Q.   No?  So, who was providing you with information; one of

01:11PM   24    detectives?

01:11PM   25    A.   Yeah, one of the detectives or deputies.

01:11PM    1    Q.  And what is he telling you, word-for-word what's in the

01:11PM    2    call or just times he?

01:11PM    3    A.  No, just, hey, this is kind of what's going on.  This is

01:11PM    4    what he said, or this is what he didn't say or he answered or

01:11PM    5    he didn't answer and he's going to meet us here, or meet us

01:11PM    6    there, things like that.

01:11PM    7    Q.  So, that's that person's interpretation of what he's

01:11PM    8    hearing?

01:11PM    9    A.  Yes.

01:11PM   10    Q.  When Pierce left the Auto Zone the first time, did you

01:12PM   11    send any information out by phone or any other way to the

01:12PM   12    people back at 45 Elm or any other persons that were working

01:12PM   13    with you on this investigation?

01:12PM   14    A.  Yes.

01:12PM   15    Q.  And who did you -- how did you do that?

01:12PM   16    A.  I would have relayed it both via the radio so other units

01:12PM   17    would know, and by phone, I would imagine.

01:12PM   18    Q.  So, in addition to your phone, you have a separate

01:12PM   19    communication apparatus that you use with the people that you

01:12PM   20    work with; is that right?

01:12PM   21    A.  That's correct.

01:12PM   22    Q.  Just going back to the attic for a minute, there's -- do

01:13PM   23    you know how many doors there were from the second floor at

01:13PM   24    56 Grimes that led to the attic?

01:13PM   25    A.  No, sir.

01:13PM   1   Q.  Do you know if either one or two or whatever however many

01:13PM   2   were locked?

01:13PM   3   A.  I don't know, sir.

01:13PM   4   Q.  Do you know if -- do you have any photos or anything

01:13PM   5   showing doors being pried open?

01:13PM   6   A.  I know the lower -- that lower door that led from the bar

01:13PM   7   up the back stairwell had to be -- I believe that was

01:13PM   8   breached.

01:13PM   9   Q.  Right.  I'm sorry.  My question wasn't precise enough.

01:13PM  10   I'm talking about the attic.

01:13PM  11   A.  Oh, the attic?

01:13PM  12   Q.  Was there anything?

01:13PM  13   A.  I don't recall.

01:13PM  14   Q.  After the execution of the second search warrant, you had

01:14PM  15   a -- there was a call at 10:21 to McMahon.  Do you know what

01:14PM  16   that was about?

01:14PM  17   A.  I don't know.

01:14PM  18   Q.  I'd like to talk to you a little bit about David Burgin's

01:14PM  19   arrest.  When you arrested Rodney Pierce, right, you returned

01:14PM  20   to 56 Grimes right after that, right?

01:14PM  21   A.  That's correct.

01:14PM  22   Q.  And that was still you, Day and Webb?

01:14PM  23   A.  That's correct.

01:14PM  24   Q.  And when you got there, that's when you saw Burgin's

01:14PM  25   Tundra; is that right?

01:14PM   1   A.  That's -- yes.

01:14PM   2   Q.  And you had not seen it when you were there surveilling

01:14PM   3   Rodney, right?

01:15PM   4   A.  No, sir.

01:15PM   5   Q.  And you went back after Pierce was arrested.  Did you

01:15PM   6   intend to arrest David Burgin then?

01:15PM   7   A.  Like, to go up to the building and arrest him?

01:15PM   8   Q.  Yes.

01:15PM   9   A.  No.  I don't believe so.

01:15PM  10   Q.  Okay.  And when was the decision made to arrest him?

01:15PM  11   A.  Well, he was taken into custody leaving 56 Grimes.  He

01:15PM  12   was then transported back to our office and then the federal

01:15PM  13   prosecutors ultimately made the decision to arrest him.

01:15PM  14   Q.  My question was, when was he -- when was the decision

01:15PM  15   made to take him into custody?

01:15PM  16   A.  He was observed leaving 56 Grimes.

01:15PM  17   Q.  Okay.  And so, when you went there, you didn't see him

01:15PM  18   leaving 56 Grimes, correct?

01:15PM  19   A.  No, sir.

01:15PM  20   Q.  You saw his Tundra outside, right?

01:16PM  21   A.  That's correct.

01:16PM  22   Q.  And Webb had told you that was his vehicle, right?

01:16PM  23   A.  That's correct.

01:16PM  24   Q.  Not in his name, but the vehicle Webb said he used,

01:16PM  25   right?

01:16PM    1    A.   That's correct.

01:16PM    2    Q.   Okay.  So, he comes out of 56 Grimes, and you intend to

01:16PM    3    arrest him then; is that right?

01:16PM    4    A.   We intend to have him pulled over a short time later.

01:18PM    5    Q.   All right.  Well, you keep saying take into custody or

01:19PM    6    have him pulled over.  He was arrested right after he left 56

01:19PM    7    Grimes, was he not?

01:19PM    8    A.   He was placed in handcuffs and transported back to our

01:19PM    9    office.

01:19PM   10    Q.   And he wasn't free to go, was he?

01:19PM   11    A.   No, he was not.

01:19PM   12    Q.   You were not going to let him go that day, right?

01:19PM   13    A.   That's not true at all.  We may have let him go later on

01:19PM   14    in the night.  If --

01:19PM   15    Q.   Well, you prepared charges against him that night, didn't

01:19PM   16    you?

01:19PM   17    A.   We did.  That was after we executed the search warrants

01:19PM   18    and upon our investigation and an additional arrest, yes.

01:41PM   19    Q.   So, when you took him into custody, he wasn't really

01:41PM   20    arrested.  That's what you're trying to say?

01:41PM   21    A.   That's correct.  He wasn't under -- he was taken into

01:41PM   22    custody and transported back to our office to determine

01:41PM   23    whether charges were going to be placed or not.

01:41PM   24    Q.   And if you had found nothing in the building, would you

01:41PM   25    have charged him?

01:41PM   1   A. Again, I don't know. That would have been up to the

01:42PM   2   federal government.

01:42PM   3   Q. Because now it had become a federal case; is that right?

01:42PM   4   A. That's correct.

01:42PM   5   Q. But he's taken into custody some time around 6:30, right?

01:42PM   6   A. Whatever time it was that he --

01:42PM   7   Q. And the drugs aren't found until 10 o'clock that night,

01:42PM   8   right?

01:42PM   9   A. That's correct.

01:42PM   10   Q. So, he's at least held there for four hours awaiting what

01:42PM   11   happens with the search warrant; is that right?

01:42PM   12   A. That's correct.

01:42PM   13   Q. Because before that, you didn't have probable cause to

01:42PM   14   arrest him, did you?

01:42PM   15   A. Well, I wouldn't say that. Based upon our telephone

01:42PM   16   conversations with Pierce and our debrief of the confidential

01:42PM   17   informant, and the evidence that we recovered, I'm not sure

01:42PM   18   that we wouldn't have had probable cause to arrest him.

01:42PM   19   Q. What had David Pierce -- David Burgin done that day that

01:42PM   20   would have given you probable cause?

01:42PM   21   A. Well, that's -- to us, that was -- remained to be seen

01:43PM   22   based upon telephone records, et cetera. I'm not saying he

01:43PM   23   was going to be arrested that night.

01:43PM   24   Q. What did you tell him after he was arrested, after he was

01:43PM   25   taken into custody, as you say?

| | | |
|---|---|---|
| 01:43PM | 1 | A.  Mr. Burgin? |
| 01:43PM | 2 | Q.  Yeah. |
| 01:43PM | 3 | A.  Where? |
| 01:43PM | 4 | Q.  All right.  Mr. Burgin leaves 56 Grimes in the Tundra, |
| 01:43PM | 5 | right? |
| 01:43PM | 6 | A.  Correct. |
| 01:43PM | 7 | Q.  And you follow him? |
| 01:43PM | 8 | A.  That's correct. |
| 01:43PM | 9 | Q.  And you follow him around a few blocks over to Broadway; |
| 01:43PM | 10 | is that right? |
| 01:43PM | 11 | A.  That's correct. |
| 01:43PM | 12 | Q.  And where is he stopped? |
| 01:43PM | 13 | A.  In the vicinity of Broadway and Memorial. |
| 01:43PM | 14 | Q.  Was he in the Valero station? |
| 01:43PM | 15 | A.  The gas station is right there.  Yes. |
| 01:43PM | 16 | Q.  Was he in it when he was stopped? |
| 01:43PM | 17 | A.  Was he -- he was in his truck.  Yes. |
| 01:43PM | 18 | Q.  Was he in the gas station, in the gas station property -- |
| 01:43PM | 19 | A.  I just said that.  Yes. |
| 01:44PM | 20 | Q.  Was he at a gas pump? |
| 01:44PM | 21 | A.  I don't recall.  He could have been. |
| 01:44PM | 22 | Q.  Who, besides you, was following him? |
| 01:44PM | 23 | A.  Myself and additional units. |
| 01:44PM | 24 | Q.  How many units? |
| 01:44PM | 25 | A.  I don't recall. |

01:44PM   1    Q.  You don't know where his vehicle was stopped?

01:44PM   2    A.  It was at the gas station.  Whether it was at the pumps

01:44PM   3    or not, I don't recall the exact location of his truck at the

01:44PM   4    gas station, but he was at the gas station.

01:44PM   5    Q.  Were any lights put on or anything to pull him over?

01:45PM   6    A.  I don't recall.

01:45PM   7    Q.  So, how is it that he was stopped?  Did people pull in

01:45PM   8    front of him and block him off?

01:45PM   9    A.  I don't recall.  He may have been stopped.

01:45PM  10    Q.  Who put the word out to stop him?

01:45PM  11    A.  I would have.

01:45PM  12    Q.  You did?  What did you tell them to stop him for?

01:46PM  13    A.  He was just observed leaving 56 Grimes.

01:46PM  14    Q.  Right.  And?

01:46PM  15    A.  And he was to be taken into custody.

01:46PM  16    Q.  Now, the only -- at that point in time, the only

01:46PM  17    connection you knew to 56 Grimes was that Rodney Pierce

01:46PM  18    apparently had a black bag that had some narcotics in it when

01:46PM  19    he was arrested, correct, and he was seen coming out of 56

01:46PM  20    Grimes with a similar bag; is that right?

01:46PM  21    A.  That's correct.

01:46PM  22    Q.  But he was also seen going into 56 Grimes with that bag,

01:46PM  23    wasn't he?

01:46PM  24    A.  That's correct.

01:46PM  25    Q.  So, when Mr. Burgin is stopped, where are you when this

01:46PM   1   happens?  Where is your vehicle?

01:46PM   2   A.   Probably in close proximity to his, whether it's right

01:47PM   3   behind it or a second or third car back.

01:47PM   4   Q.   How many other vehicles responded?

01:47PM   5   A.   Several.  I don't recall how many.

01:47PM   6   Q.   One, two, three?

01:47PM   7   A.   More than three.

01:47PM   8   Q.   And was his vehicle surrounded?

01:47PM   9   A.   I'm sure that it would have been.

01:47PM  10   Q.   He clearly was not able to leave if he wanted to, was he?

01:47PM  11   A.   No.

01:47PM  12   Q.   He would have had to hit one of your vehicles to leave,

01:47PM  13   right?

01:47PM  14   A.   That's correct.

01:47PM  15   Q.   And who approaches him?

01:47PM  16   A.   Myself.

01:47PM  17   Q.   And anybody else?

01:47PM  18   A.   I don't recall.

01:47PM  19   Q.   And you remember walking to the front of the car, to the

01:47PM  20   back of the car, do you remember anything about it?

01:47PM  21   A.   I remember walking right up to the driver side of the

01:47PM  22   car.

01:47PM  23   Q.   And what did you do then?

01:47PM  24   A.   I had a conversation with Mr. Burgin.

01:47PM  25   Q.   Through the window?

| 01:47PM | 1 | A.   No.   I believe he was taken out of the car. |
| 01:48PM | 2 | Q.   By whom? |
| 01:48PM | 3 | A.   I don't recall. |
| 01:48PM | 4 | Q.   Were you the first one there? |
| 01:48PM | 5 | A.   I was one of the first couple there, yeah. |
| 01:48PM | 6 | Q.   Was he handcuffed? |
| 01:48PM | 7 | A.   I don't recall if he was handcuffed or not.   He was |
| 01:49PM | 8 | handcuffed at that location at some point.   Whether it was |
| 01:49PM | 9 | right away or minutes after, I don't recall. |
| 01:49PM | 10 | Q.   You asked him where he was coming from; is that right? |
| 01:49PM | 11 | A.   That's correct. |
| 01:49PM | 12 | Q.   Before you asked him that, did you read him his Miranda |
| 01:49PM | 13 | Warnings? |
| 01:49PM | 14 | A.   No, sir. |
| 01:49PM | 15 | Q.   And he said to you he was coming from the gym; is that |
| 01:49PM | 16 | right? |
| 01:49PM | 17 | A.   That's correct. |
| 01:49PM | 18 | Q.   Okay.   Do you know where Mr. Burgin was in the afternoon |
| 01:49PM | 19 | on that date before you saw him at 56 Grimes? |
| 01:49PM | 20 | A.   No, sir. |
| 01:49PM | 21 | Q.   You don't know whether he was at the gym or not, do you? |
| 01:50PM | 22 | A.   No, sir. |
| 01:50PM | 23 | Q.   So, when he said gym, did that enter into your probable |
| 01:50PM | 24 | cause? |
| 01:50PM | 25 | A.   It raised my suspicion, yes. |

01:50PM  1  Q.  If you had not found drugs at 56 Grimes, were you going

01:50PM  2  to charge Mr. Burgin for the drugs that Rodney Pierce had?

01:50PM  3  A.  I can tell you that, on the state side of things, we

01:50PM  4  would not have charged him.  We were relying on the federal

01:50PM  5  government at this point.

01:50PM  6  Q.  When he was taken into custody, you said that he was

01:50PM  7  taken back to 45 Elm, right?

01:50PM  8  A.  That's correct.

01:50PM  9  Q.  Not taken to Homeland Security, right?

01:50PM  10  A.  No, sir.

01:50PM  11  Q.  Was Webb with you?

01:50PM  12  A.  Yes.

01:50PM  13  Q.  Did Webb remain with you?

01:50PM  14  A.  Yes.

01:50PM  15  Q.  You seized his car that day, right?

01:51PM  16  A.  We did.

01:51PM  17  Q.  What was the basis for the seizure of the car?

01:51PM  18  A.  That was based upon our investigation into Mr. Burgin and

01:51PM  19  the drugs that were recovered at 56 Grimes and, again, that

01:51PM  20  was the federal government that seized his vehicle.

01:51PM  21  Q.  Who ordered the seizure of the vehicle?

01:51PM  22  A.  When you say seizure, are you referring to, like, the

01:51PM  23  actual taking possession or are you referring to the vehicle

01:51PM  24  becoming a government vehicle?

01:51PM  25  Q.  I'm talking about taking possession of it by Officer Day,

01:51PM   1   taking the keys to the car, and driving it down to 45 Elm

01:51PM   2   Street.

01:51PM   3   A.   That would have been --

01:52PM   4   Q.   That's a seizure.  That's the taking of a car.

01:52PM   5   A.   I'm aware.  That would have been me.

01:52PM   6   Q.   You told them to do it?

01:52PM   7   A.   I'm sure I did.  Yeah.

01:52PM   8   Q.   Okay.  And that was based upon what; just that he was

01:52PM   9   taken into custody?

01:52PM   10   A.   That's correct.  There was certainly nobody there to

01:52PM   11   drive the vehicle away, and we were going to transport his

01:52PM   12   vehicle from that location to a safer location at our office.

01:52PM   13   Q.   So, you're saying now it was for protection of his

01:52PM   14   vehicle; is that right?

01:52PM   15   A.   The vehicle?

01:52PM   16   Q.   Yeah.

01:52PM   17   A.   Well, yeah.  He certainly wasn't going to drive it away.

01:52PM   18   He was in our custody.

01:52PM   19   Q.   Do you recall whether you had your gun out when you

01:52PM   20   approached him?

01:52PM   21   A.   I don't recall.

01:53PM   22   Q.   Did you approach Mr. Pierce when he was arrested?

01:53PM   23   A.   I wasn't one of the first officers on scene.  No.

01:53PM   24   Q.   Did officers at the Pierce arrest have their guns out?

01:53PM   25   A.   I don't recall.  I'm sure they did.

01:53PM   1   Q.  Did anybody have their guns out when Mr. Burgin was

01:53PM   2   arrested?

01:53PM   3   A.  I don't recall.

01:53PM   4   Q.  Well, you testified a lot about officer safety, right?

01:53PM   5   Certainly, you do protective sweeps, and you wear vests, and

01:53PM   6   do all sorts of things to protect yourselves, right?

01:53PM   7   A.  That's correct.

01:53PM   8   Q.  And pulling somebody over, even on a traffic stop, has

01:53PM   9   some risk for officers; is that right?

01:53PM  10   A.  Certainly does.

01:53PM  11   Q.  And the way you're talking about Mr. Burgin, at least

01:53PM  12   what you had in your mind, you thought that he might be

01:53PM  13   somebody that's bad, right?

01:53PM  14   A.  That's correct.

01:53PM  15   Q.  Okay.  So, would you walk up to somebody like that

01:53PM  16   without your gun out?

01:53PM  17   A.  It would depend on the circumstances.

01:54PM  18   Q.  How about the other -- you can't -- you don't remember

01:54PM  19   seeing anybody else with their gun out?

01:54PM  20   A.  I don't recall.  I'm not saying they didn't.  I don't

01:54PM  21   recall if they did or didn't.

01:54PM  22   Q.  Just go back a moment to when Mr. Burgin came to 56

01:54PM  23   Grimes.  Your knowledge of that is based on the -- his

01:54PM  24   arriving there is based upon seeing the video; is that right?

01:55PM  25   A.  That's correct.

01:55PM  1   Q.  So, the video shows him pulling up on from Milburn,

01:55PM  2   turning left, and then backing up toward the front of 56

01:55PM  3   Grimes across the street; is that right?

01:55PM  4   A.  That's correct.

01:55PM  5   Q.  Was Mr. Pierce's Caravan there, do you know?

01:55PM  6   A.  No.

01:55PM  7   Q.  Okay.

01:55PM  8          THE COURT:  No, you don't know; or no, it wasn't

01:55PM  9   there?

01:55PM  10          THE WITNESS:  No, it wasn't there.

01:55PM  11   BY MR. HARRINGTON:

01:55PM  12   Q.  Were you on surveillance then?

01:55PM  13   A.  When he arrived, no.

01:55PM  14   Q.  Had Pierce already left?

01:56PM  15   A.  I don't recall the timing of it.

01:56PM  16   Q.  Are you saying that Pierce came to 56 Grimes after

01:56PM  17   Burgin?

01:56PM  18   A.  I know, at one point, they were there at the same time.

01:56PM  19   I don't recall exactly when and in the exact -- the events.

01:56PM  20   Q.  But you don't know from your own personal knowledge that

01:56PM  21   Mr. Burgin was there, do you, until after Pierce was

01:56PM  22   arrested, right?

01:56PM  23   A.  Other than the video, no.

01:56PM  24   Q.  While you were still at 56 Grimes the night of the

01:57PM  25   execution of the search warrant, and after the searches were

01:57PM   1   conducted, did anybody from Mr. Burgin's family arrive while

01:57PM   2   you were there?

01:57PM   3   A.  I don't recall.

01:57PM   4   Q.  Did you learn that anybody from -- that was working with

01:57PM   5   you that night was there when anybody from Mr. Burgin's

01:57PM   6   family arrived?

01:57PM   7   A.  I don't recall.

01:57PM   8   Q.  When you took Mr. Burgin into custody that night, how

01:58PM   9   long did you think you had the authority to hold him?

01:58PM  10   A.  I don't know.  That had yet to be determined.  The

01:58PM  11   investigation was ongoing.

01:58PM  12   Q.  Who would have made that determination?

01:58PM  13   A.  Either myself or Special Agent Webb.

01:58PM  14   Q.  Okay.  Well, you said it, somehow or another, had become

01:58PM  15   a federal investigation now, right?

01:58PM  16   A.  That's correct.

01:58PM  17   Q.  Could you have made that determination to let him go?

01:58PM  18   A.  For a period, yes.

01:58PM  19   Q.  When did that period end?

01:59PM  20   A.  When -- probably when we found the drugs and guns and --

01:59PM  21   Q.  That's when the determination was to go federal?

01:59PM  22   A.  No.  That determination was made at -- because I believe

01:59PM  23   Mr. Pierce would have been charged federally.  So, they were

01:59PM  24   heavily involved by then already.  So, whether that -- I

01:59PM  25   could have authorized Mr. Burgin to be released.  I don't

01:59PM   1   know.  Maybe I couldn't have.

01:59PM   2   Q.  So, this -- after Pierce is arrested, the decision is

01:59PM   3   made to go federal on it; is that right?  That's what you

01:59PM   4   said?

01:59PM   5   A.  That's correct.

01:59PM   6   Q.  And yet, you persisted in going to get a state search

01:59PM   7   warrant; is that right?

01:59PM   8   A.  That's correct.

01:59PM   9   Q.  You testified earlier Mr. Lynch showed you the video of

02:00PM   10  someone you identified as David Burgin going into and leaving

02:00PM   11  56 Grimes; is that right?

02:00PM   12  A.  That's correct.

02:00PM   13  Q.  Where you were there that evening, right, did you see

02:00PM   14  that go in and out?

02:00PM   15  A.  I did see him depart the location.

02:00PM   16  Q.  Did you see him arrive?

02:00PM   17  A.  No, sir.

02:00PM   18  Q.  But you saw him leave?

02:00PM   19  A.  That's correct.

02:00PM   20  Q.  Right?  And did you know he was David Burgin then?

02:01PM   21  A.  No.

02:01PM   22  Q.  Now, you said that the DVR was taken to the Homeland

02:01PM   23  Security for safekeeping; is that right?

02:01PM   24  A.  What's that?  I didn't say that.

02:01PM   25  Q.  Oh, I thought you did.  I'm sorry.  Where was it -- when

| | | |
|---|---|---|
| 02:01PM | 1 | it was seized, where it was taken? |
| 02:01PM | 2 | A.  I don't know. |
| 02:01PM | 3 | Q.  Okay.  How about the other evidence?  That was taken |
| 02:01PM | 4 | initially to 45 Elm; is that right? |
| 02:01PM | 5 | A.  That's correct. |
| 02:01PM | 6 | Q.  And, at some point in time, was that transferred to |
| 02:02PM | 7 | Homeland Security? |
| 02:02PM | 8 | A.  Yes, sir. |
| 02:02PM | 9 | Q.  All of it? |
| 02:02PM | 10 | A.  I believe so. |
| 02:02PM | 11 | Q.  Did you get Judge Case's permission to do that? |
| 02:02PM | 12 | A.  I don't think so. |
| 02:02PM | 13 | Q.  You testified earlier that part of the reason for this |
| 02:03PM | 14 | protective sweep was because of this group, quote unquote, |
| 02:03PM | 15 | that Mr. Burgin was involved in, and then you testified about |
| 02:03PM | 16 | Mr. Washington being a violent or dangerous person; is that |
| 02:03PM | 17 | right? |
| 02:03PM | 18 | A.  That's correct. |
| 02:03PM | 19 | Q.  You had no knowledge that Mr. Burgin was, in fact, |
| 02:03PM | 20 | violent or dangerous, did you? |
| 02:03PM | 21 | A.  No, sir. |
| 02:03PM | 22 | Q.  I am correct, right? |
| 02:03PM | 23 | A.  You are correct. |
| 02:03PM | 24 | Q.  During the evening what the search warrants were |
| 02:04PM | 25 | obtained, did you have any communications with Paul McMahon? |

02:04PM   1    A.  I did.

02:04PM   2    Q.  And how did you communicate with him?

02:04PM   3    A.  On his phone and in person.

02:04PM   4    Q.  Okay.  So, during the period of time that the search

02:04PM   5    warrants are being obtained, did you talk to Paul on the

02:04PM   6    phone?

02:04PM   7    A.  I talked to him at some point.  I'd have to look at the

02:04PM   8    record to tell you.

02:04PM   9    Q.  Do you know what you talked about?

02:04PM  10    A.  I don't.  It would have been prior to the second warrant,

02:04PM  11    in between the first and the second.

02:05PM  12    Q.  Do you know what role he played in the either the

02:05PM  13    drafting, preparation, or interaction with Judge Case?

02:05PM  14    A.  No, sir.

02:05PM  15    Q.  When you did the protective sweep at 56 Grimes, did

02:05PM  16    anybody have their weapons out?

02:06PM  17    A.  Yes.

02:06PM  18    Q.  Did everybody?

02:06PM  19    A.  I don't know.

02:06PM  20    Q.  That's standard procedure, correct?

02:06PM  21    A.  That's correct.

02:06PM  22    Q.  You testified yesterday about some question Mr. Lynch did

02:07PM  23    about the envelope you claim you saw in the protective sweep?

02:07PM  24    A.  Yes, sir.

02:07PM  25    Q.  That was in a -- looks like a plastic garbage container,

02:07PM    1    correct?

02:07PM    2    A.  Yes, sir.

02:07PM    3    Q.  Do you know where that container was?

02:07PM    4    A.  It was in the kitchen, towards the rear of the kitchen.

02:07PM    5    Q.  So, you're saying it's in the apartment, what I'm calling

02:07PM    6    the apartment in the rear?

02:07PM    7    A.  That's correct.

02:07PM    8         MR. HARRINGTON:  If I could have just a minute?

02:08PM    9    BY MR. HARRINGTON:

02:08PM   10    Q.  Chief Granville, when you mentioned before that you had

02:08PM   11    communications while doing the Pierce arrest or what led up

02:08PM   12    to that, you said that you used the official communications

02:08PM   13    within your department correct --

02:08PM   14    A.  No.

02:08PM   15    Q.  -- for part of the communications?

02:08PM   16    A.  No.  It's a secure repeater channel that we utilize.

02:08PM   17    Q.  Are those recorded?

02:08PM   18    A.  No.  No, sir.

02:08PM   19    Q.  Not recorded?

02:08PM   20    A.  No.

02:08PM   21    Q.  Obviously, not stored?

02:08PM   22    A.  There's no record.

02:08PM   23         MR. HARRINGTON:  That's all I have right now, Judge.

02:09PM   24         THE COURT:  Mr. Lynch?

02:09PM   25         MR. LYNCH:  Can I just have a moment, Judge?

02:09PM 1    BY MR. LYNCH:

02:09PM 2    Q.  Do you recall when Mr. Harrington was talking to you

02:10PM 3    about the DVR system?

02:10PM 4    A.  Yes.

02:10PM 5    Q.  And do you understand that DVR system is a digital video

02:10PM 6    recorder system?

02:10PM 7    A.  Yes.

02:10PM 8    Q.  All right.  Now, referring you to Government Exhibit

02:10PM 9    number -- if we can pull up 9?

02:10PM 10          THE COURT:  Nine is the second search warrant.

02:10PM 11    BY MR. LYNCH:

02:10PM 12    Q.  Yes.  Now, on the page -- what page is that?

02:10PM 13       On page 8, do you see that there's sort of groups of

02:10PM 14    information that's put on there including, like,

02:10PM 15    miscellaneous paperwork is item number 2?

02:10PM 16    A.  Yes.

02:10PM 17    Q.  Okay.  And then item number 1, there's a list of 11

02:11PM 18    computer hard drives, correct?

02:11PM 19    A.  Correct.

02:11PM 20    Q.  And there's no -- it's not specifically delineated what

02:11PM 21    those hard drives are?

02:11PM 22    A.  No.

02:11PM 23    Q.  So, for all you know, the DVR system is included in that?

02:11PM 24    A.  It could be, yes.

02:11PM 25    Q.  Okay.  Now, going back to the stop with David Burgin, I

02:11PM   1   just want to just clarify what information you had that day.

02:11PM   2   I mean, you had a historical investigation of David Burgin,

02:11PM   3   correct?

02:11PM   4   A.  That's correct.

02:11PM   5   Q.  You spoke with the CI that day, and what did the CI tell

02:11PM   6   you about where he got the cocaine from that he had?

02:12PM   7   A.  From David Burgin.

02:12PM   8   Q.  Okay.  So -- and he said he was dealing with somebody

02:12PM   9   related to David Burgin, correct?

02:12PM  10   A.  That's correct.

02:12PM  11   Q.  And who was that?

02:12PM  12   A.  Mr. Pierce.

02:12PM  13   Q.  And then, you had Mr. -- you had the CI make contact with

02:12PM  14   Mr. Pierce, correct?

02:12PM  15   A.  That's correct.

02:12PM  16   Q.  And what was the purpose of making that contact?

02:12PM  17   A.  To obtain cocaine.

02:12PM  18   Q.  And that cocaine was -- was there cocaine seized from

02:12PM  19   Mr. Pierce?

02:12PM  20   A.  There was.

02:12PM  21   Q.  At the place where the CI was supposed to meet with

02:12PM  22   Pierce?

02:12PM  23   A.  Yes.

02:12PM  24   Q.  And were Burgin and Pierce observed in the same area that

02:12PM  25   evening?

02:12PM   1    A.   They were.

02:12PM   2    Q.   Where is that?

02:12PM   3    A.   Fifty-six Grimes.

02:12PM   4    Q.   And, in fact, you stopped Mr. Burgin after he left 56

02:13PM   5    Grimes?

02:13PM   6    A.   That's correct.

02:13PM   7    Q.   And do you also agree that there's a difference between

02:13PM   8    probable cause to arrest and maybe what a prosecutor might

02:13PM   9    decide to go to trial with?

02:13PM  10    A.   Yes.

02:13PM  11    Q.   Okay.  Two different decision-making processes?

02:13PM  12    A.   Yes.

02:13PM  13    Q.   Now, Mr. Harrington also asked you about sometimes

02:13PM  14    Mr. Case -- Judge Case, I'm sorry -- has come to the 45 Elm

02:13PM  15    to interview informants?

02:13PM  16    A.   Yes.

02:13PM  17    Q.   And have other judges done that too?

02:14PM  18    A.   Yes.

02:14PM  19    Q.   And why is that?  Why do they come to 45 Elm sometimes?

02:14PM  20    A.   It's a lot safer than running an informant in and out of

02:14PM  21    a court building or a judge's chambers or some other not-so-

02:14PM  22    discreet location.

02:14PM  23    Q.   So, safety not only to the informant, but maybe to other

02:14PM  24    people who might encounter the informant?

02:14PM  25    A.   That's correct.

02:14PM    1    Q.  I mean, is it a goal of law enforcement to protect the

02:14PM    2    confidential informant's identification?

02:14PM    3    A.  It is.

02:14PM    4    Q.  Now, remember photograph number -- Exhibit Number 11, the

02:14PM    5    bill that was found in the garbage?

02:14PM    6    A.  Yes.

02:14PM    7    Q.  I just want to make sure I'm clear with this.  You didn't

02:14PM    8    move anything in that garbage before you saw that bill,

02:14PM    9    correct?

02:15PM   10    A.  No.

02:15PM   11    Q.  Okay.  Now, you previously testified (inaudible) you did

02:15PM   12    not have to manipulate this garbage in any way to view that

02:15PM   13    bill?

02:15PM   14    A.  No.

02:15PM   15    Q.  Okay.  But you admit there were other garbage bags you

02:15PM   16    went through prior to the second warrant being obtained,

02:15PM   17    correct?

02:15PM   18    A.  That's correct.

02:15PM   19    Q.  But not this -- not before you saw this bill?

02:15PM   20    A.  No.

02:15PM   21    Q.  Now, Mr. Harrington also asked you about how you document

02:15PM   22    information with reports and things, correct?

02:15PM   23    A.  That's correct.

02:15PM   24    Q.  Now, in this case, did you -- he asked you how you

02:16PM   25    document certain things, correct?

02:16PM   1   A.   That's correct.

02:16PM   2   Q.   Now, you documented the search with photographs, correct?

02:16PM   3   A.   We did.

02:16PM   4   Q.   You documented some of the information when you obtained

02:16PM   5   the search warrant from Judge Case, correct?

02:16PM   6   A.   That's correct.

02:16PM   7   Q.   You had a property receipt form, correct?

02:16PM   8   A.   That's correct.

02:17PM   9          MR. LYNCH:   Just one moment.   Judge, I don't have any

02:17PM  10   other questions for Chief Granville.

02:17PM  11          THE COURT:   Anything further, Mr. Harrington?

02:17PM  12          MR. HARRINGTON:   No, Judge.   The other things that we

02:18PM  13   had we will cover through other witnesses.

02:18PM  14          THE COURT:   All right.   Chief Granville, I have a

02:18PM  15   couple of questions that I need some clarification on.

02:18PM  16          MR. HARRINGTON:   Judge, could we just -- can we have

02:18PM  17   a minute?   Let me talk to my client before you -- I just want

02:18PM  18   to --

02:18PM  19   (An off-the-record discussion was held.)

02:18PM  20          MR. HARRINGTON:   We need to resolve an issue, Judge

02:22PM  21   (inaudible).

02:22PM  22          THE COURT:   Okay.   Are you asking for a recess?

02:22PM  23          MR. LYNCH:   Yes.   Can we take a ten-minute recess?

02:23PM  24          THE COURT:   Okay.

02:23PM  25          MR. GLABERSON:   Yes.

02:23PM  1                    THE COURT:  All right.  It's 3:30.  We'll return at

02:23PM  2      3:40.

02:23PM  3                    MR. LYNCH:  That's fine.

02:23PM  4      (A recess was taken from 3:30 p.m. to 3:41 p.m.)

02:23PM  5                    THE CLERK:  Back on the record.

02:23PM  6                    THE COURT:  You have resolved whatever you needed to

02:23PM  7      resolve?

02:23PM  8                    MR. HARRINGTON:  Well, we reached an accord in trying

02:24PM  9      to resolve it.

02:24PM  10                    THE COURT:  All right.

02:24PM  11                    MR. HARRINGTON:  Judge, the next thing that we

02:24PM  12     propose to do would involve playing out loud the conversations

02:24PM  13     between the informant and Mr. Pierce.  The problem with that

02:24PM  14     is, it's a confidential informant, and Mr. Lynch advises me he

02:24PM  15     has to get special permission in order to be able to do that.

02:24PM  16     And so, we would ask that -- and my understanding is Chief

02:24PM  17     Granville has other commitments, so that we would ask that we

02:24PM  18     be allowed to recall him if we make that determination some

02:24PM  19     time after this week when he's back.

02:24PM  20                    THE COURT:  Certainly, but I do want to ask my

02:24PM  21     questions of Chief Granville this afternoon.

02:24PM  22          Chief Granville, you had indicated that, as I understand

02:25PM  23     it and recall it, that you had previous occasions to be in the

02:25PM  24     vicinity of 56 Grimes before February 19th, 2020; is that

02:25PM  25     correct?

02:25PM    1            THE WITNESS:  That's correct.

02:25PM    2            THE COURT:  Do you know if Special Agent Webb was

02:25PM    3   with you during any of those periods or if he had any prior

02:25PM    4   knowledge of 56 Grimes?

02:25PM    5            THE WITNESS:  I know that he did have prior

02:25PM    6   knowledge.  I don't believe he was with -- I don't think we

02:25PM    7   were personally together, though.

02:25PM    8            THE COURT:  The reason I ask is, the testimony and

02:25PM    9   the exhibits indicate that both Mr. Pierce and Mr. Burgin were

02:25PM   10   allegedly seen going in and out of the building at 56 Grimes

02:25PM   11   in the front entrance on Grimes.

02:25PM   12            THE WITNESS:  That's correct.

02:25PM   13            THE COURT:  You also indicated that it was Special

02:26PM   14   Agent Webb who said entry should be made through that side

02:26PM   15   door.

02:26PM   16            THE WITNESS:  That's correct.

02:26PM   17            THE COURT:  Did he indicate why?

02:26PM   18            THE WITNESS:  I believe that -- and it caused me some

02:26PM   19   hesitation that night because it was dark, and it was tough to

02:26PM   20   see from the view that we were in.  It was tough to see which

02:26PM   21   door.  We just knew it was from, at the very least, at the

02:26PM   22   front of the building.  Whether that was the side front, or

02:26PM   23   the front, it was the front of the building.

02:26PM   24            THE COURT:  But the photograph clearly shows there

02:26PM   25   are two side doors and a front door.

02:26PM  1        THE WITNESS:  That's correct.  I'm referring to,

02:26PM  2   under the cover of darkness, looking out our back, whether

02:26PM  3   it's a rearview mirror, back window that's all steamed up, it

02:26PM  4   was tough to see.

02:26PM  5        THE COURT:  But you're already by the building on

02:26PM  6   foot when Webb says we should go through the side door?

02:26PM  7        THE WITNESS:  That's correct.

02:27PM  8        THE COURT:  And you had flashlights and streetlights.

02:27PM  9   All I'm trying to figure out is why Webb would say go through

02:27PM 10   the side door when, at least, it seems that everybody was

02:27PM 11   talking about the front entrance and Pierce going in the front

02:27PM 12   entrance, Pierce coming out of a front entrance, and

02:27PM 13   Mr. Burgin being seen going in and out of a front entrance.

02:27PM 14   I'm just trying to figure out why Webb would say let's go

02:27PM 15   through the side door if you know or if he indicated anything

02:27PM 16   as to why?

02:27PM 17        THE WITNESS:  I don't.  I believe it was to do our --

02:27PM 18   where we were located and the fact that it was a nighttime

02:27PM 19   event, it was tough to see.  I believe it was tough to tell

02:27PM 20   where they were coming from.  And once we were able to,

02:28PM 21   obviously, recover and review the video, we knew for certain

02:28PM 22   they were coming from the front of the building.

02:28PM 23        THE COURT:  In your conversation with Patrick

02:28PM 24   McMahon, prior to his actually getting the second warrant, did

02:28PM 25   you tell him about the attic and the garage as well as the

02:28PM      1    second floor?

02:28PM      2          THE WITNESS:  I believe we told him that there was a

02:28PM      3    garage, and there was an attic, so we should include all

02:28PM      4    common places within the property to cover ourselves.

02:28PM      5          THE COURT:  But how did you know there was an attic?

02:28PM      6    How did you know there was an attic when you were talking to

02:28PM      7    McMahon?

02:28PM      8          THE WITNESS:  I believe the attic was cleared for

02:28PM      9    security search.

02:29PM     10          THE COURT:  So, entry was made into the attic as well

02:29PM     11    as the second floor?

02:29PM     12          THE WITNESS:  That's correct.

02:29PM     13          THE COURT:  Had entry been made in the garage?

02:29PM     14          THE WITNESS:  No.

02:29PM     15          THE COURT:  You also testified that when you went up

02:29PM     16    to the second floor the second time, you were by yourself

02:29PM     17    personally.

02:29PM     18          THE WITNESS:  That's correct.

02:29PM     19          THE COURT:  There had been a prior visit to the

02:29PM     20    second prior with you and Webb?

02:29PM     21          THE WITNESS:  No.  That --

02:30PM     22          THE COURT:  There were three altogether?

02:30PM     23          THE WITNESS:  There were three altogether, the first

02:30PM     24    one --

02:30PM     25          THE COURT:  The first being with everybody and doing

02:30PM    1    the sweep, then you and Webb went up there.

02:30PM    2             THE WITNESS:  No.  I was the second one.  The third

02:30PM    3    one was myself and Webb.

02:30PM    4             THE COURT:  All right.  So, when you went up the

02:30PM    5    second time, is that when you were looking through drawers?

02:30PM    6             THE WITNESS:  Yes.

02:30PM    7             THE COURT:  Do you recall just how many drawers and

02:30PM    8    what else you might have been rummaging through?

02:30PM    9             THE WITNESS:  It was in the kitchen.  There was a

02:30PM   10    couple of drawers and cabinets that I had looked in, and there

02:30PM   11    was a -- some plastic bags on the floor.

02:30PM   12             THE COURT:  But you found nothing?

02:30PM   13             THE WITNESS:  That's correct.

02:30PM   14             THE COURT:  Did you ever indicate that to McMahon,

02:30PM   15    Patrick McMahon, when he was applying for the second warrant?

02:30PM   16             THE WITNESS:  I don't recall, but I don't believe

02:30PM   17    that I did.

02:30PM   18             THE COURT:  And then, why did you and Webb go up?

02:31PM   19             THE WITNESS:  The third time?

02:31PM   20             THE COURT:  The third time.

02:31PM   21             THE WITNESS:  I believe I was giving him kind of,

02:31PM   22    like, the layout of what we were looking at as far as the

02:31PM   23    search was concerned and kind of what we were looking at as

02:31PM   24    far as bodies go.

02:31PM   25             THE COURT:  But by this time, you said it had become

| 02:31PM | 1 | a federal investigation because Pierce had already been |
| 02:31PM | 2 | arrested. |
| 02:31PM | 3 | THE WITNESS:  That's correct. |
| 02:31PM | 4 | THE COURT:  So, why would Webb, as a federal officer, |
| 02:31PM | 5 | be going up there without a warrant; do you know? |
| 02:31PM | 6 | THE WITNESS:  I don't.  He was with me. |
| 02:31PM | 7 | THE COURT:  Okay.  That takes care of my questions. |
| 02:32PM | 8 | You are excused. |
| 02:32PM | 9 | THE WITNESS:  Thank you. |
| 02:32PM | 10 | MR. LYNCH:  Thank you, Judge.  So, Judge, tomorrow, |
| 02:32PM | 11 | were prepared to call Patrick McMahon and Frank Zabawa. |
| 02:32PM | 12 | THE COURT:  Okay.  Am I -- we didn't have Deputy |
| 02:32PM | 13 | Robert Galbraith, did we? |
| 02:32PM | 14 | MR. LYNCH:  Yeah.  We had him on the first day. |
| 02:32PM | 15 | THE COURT:  Okay. |
| 02:32PM | 16 | MR. LYNCH:  He had the dog sniff. |
| 02:32PM | 17 | THE COURT:  And we had Deputy Adam Day, right? |
| 02:32PM | 18 | MR. LYNCH:  Correct. |
| 02:32PM | 19 | THE COURT:  So, it's just Detective Patrick McMahon |
| 02:32PM | 20 | and Special Agent Zabawa? |
| 02:32PM | 21 | MR. LYNCH:  Correct. |
| 02:32PM | 22 | THE COURT:  And with the right to defense to recall |
| 02:33PM | 23 | Chief Granville. |
| 02:33PM | 24 | MR. HARRINGTON:  Right.  And, Judge, I have to talk |
| 02:33PM | 25 | to Mr. Lynch about recalling the earlier witnesses based upon |

| | | |
|---|---|---|
| 02:33PM | 1 | what Granville had said, but I'll try to sort that out with |
| 02:33PM | 2 | him. |
| 02:33PM | 3 | THE COURT:  All right. |
| 02:33PM | 4 | MR. LYNCH:  Thank you, Judge. |
| 02:33PM | 5 | THE COURT:  All right.  Anything else at this time? |
| 02:33PM | 6 | MR. LYNCH:  No. |
| 02:33PM | 7 | THE COURT:  All right.  For the record, |
| 02:33PM | 8 | Mr. Harrington, does the defendant, once again, acknowledge |
| 02:33PM | 9 | and agree that there is presently pending a motion on his |
| 02:33PM | 10 | behalf; that is, a motion to suppress the evidence in this |
| 02:33PM | 11 | case, and that by the filing of that motion, that |
| 02:33PM | 12 | automatically caused the Speedy Trial clock to stop and to |
| 02:33PM | 13 | remain stopped pursuant to Title 18 of the United States Code, |
| 02:33PM | 14 | Section 3161(h)(1)(D); and, therefor, the time will not count |
| 02:33PM | 15 | against the government for purposes of the time requirement |
| 02:33PM | 16 | set forth in the Speedy Trial Act and any other statutory time |
| 02:34PM | 17 | requirements that might be applicable? |
| 02:34PM | 18 | MR. HARRINGTON:  Yes, Judge.  Judge, just so -- we |
| 02:34PM | 19 | intend to have some witnesses.  I'm still not sure exactly how |
| 02:34PM | 20 | many, but there will be several, but one of them is Judge |
| 02:34PM | 21 | Case.  And I haven't been in the office today.  I don't know. |
| 02:34PM | 22 | I let him know that this was going on.  I'm hoping to get him |
| 02:34PM | 23 | in there this week so we can take him. |
| 02:34PM | 24 | THE COURT:  Okay.  And I'm not going to tell anybody |
| 02:34PM | 25 | how to do their business, but I know from past experience |

02:34PM   1   there is something that has to be done through the -- I always

02:34PM   2   mix up the Administrative Office and the Office of Court

02:34PM   3   Administration.  New York is the Office of Court

02:34PM   4   Administration.  In order for a judge to testify, I'm assuming

02:34PM   5   that that is not going to present a problem or it's going to

02:35PM   6   be taken care of?

02:35PM   7           MR. HARRINGTON:  Judge, when we started this issue, I

02:35PM   8   heard from at lawyer from the OCA, told him what my position

02:35PM   9   was.  I had you sign a second warrant to address the technical

02:35PM  10   issue that he raised.  So, I served Judge Case again, and I

02:35PM  11   have not heard from him.

02:35PM  12           THE COURT:  Okay.  I'm just putting it out there so

02:35PM  13   we --

02:35PM  14           MR. HARRINGTON:  I know.  I know.

02:35PM  15           THE COURT:  -- know there may be objections filed by

02:35PM  16   somebody from Office of Court Administration.

02:35PM  17           MR. HARRINGTON:  And I asked him what the objections

02:35PM  18   were, and what they were based on, and he wouldn't tell me.

02:35PM  19           THE COURT:  Okay.  We can address that when we need

02:35PM  20   to.

02:35PM  21           MR. LYNCH:  Well, I mean, I'm assuming -- I mean,

02:35PM  22   Mr. Harrington, are we prepared to call those witnesses

02:35PM  23   tomorrow just so we know?

02:35PM  24           MR. HARRINGTON:  Judge Case anyway, yes.  The other

02:35PM  25   ones, probably not.

02:35PM    1                    MR. LYNCH:  Okay.

02:35PM    2                    THE COURT:  Do you expect Special Agent Zabawa to be

02:35PM    3      long?

02:36PM    4                    MR. GLABERSON:  Both of them much shorter than Chief

02:36PM    5      Granville (inaudible).

02:36PM    6                    THE COURT:  Oh, all right.  Because I'm starting to

02:36PM    7      run into some scheduling problems for Wednesday and Thursday.

02:36PM    8      All right.

02:36PM    9                    MR. LYNCH:  Thank you Judge.

02:36PM   10                    THE COURT:  Thank you, everyone.

02:36PM   11                    MR. LYNCH:  Judge, your question had to do with the

02:36PM   12      Wite Out that's included on Government Exhibit Number 8?

02:36PM   13                    THE COURT:  Yes.

02:36PM   14                    MR. LYNCH:  The government did -- as part of its

02:36PM   15      response to Mr. Burgin's pretrial motions, we attached an

02:37PM   16      affidavit from Patrick McMahon explaining what happened.  But,

02:37PM   17      in addition, Detective McMahon, we expect, is going to explain

02:37PM   18      what happened.  When they got the original warrant, he still

02:37PM   19      had the original warrant in his possession.  When they went to

02:37PM   20      go back to get the second warrant, there was -- and I don't

02:37PM   21      want to, you know --

02:37PM   22                    THE COURT:  You don't.

02:37PM   23                    MR. LYNCH:  Yeah.  He'll testify about what his

02:37PM   24      interaction was with Judge Case that led him to do that and

02:37PM   25      then, how he created a second warrant.

| | | |
|---|---|---|
| 02:37PM | 1 | THE COURT:  Okay.  Am I going to hear -- |
| 02:37PM | 2 | MR. LYNCH:  You're going to hear who -- |
| 02:37PM | 3 | THE COURT:  -- who actually did the whiting out? |
| 02:37PM | 4 | MR. LYNCH:  Yes. |
| 02:37PM | 5 | THE COURT:  And do we know where the whited out |
| 02:37PM | 6 | warrant is now? |
| 02:37PM | 7 | MR. LYNCH:  We've seen it.  Mr. Harrington and I went |
| 02:37PM | 8 | to the clerk's office in Erie County and saw it. |
| 02:37PM | 9 | THE COURT:  Okay. |
| 02:37PM | 10 | MR. HARRINGTON:  Judge, that's under subpoena.  I'll |
| 02:37PM | 11 | have the deputy bring it. |
| 02:37PM | 12 | THE COURT:  Okay.  I just wanted to know.  That's |
| 02:38PM | 13 | all. |
| 02:38PM | 14 | MR. LYNCH:  Yeah. |
| 02:38PM | 15 | THE COURT:  All right. |
| 02:38PM | 16 | MR. LYNCH:  Okay. |
| 02:38PM | 17 | THE COURT:  Thank you, everyone. |
| 02:38PM | 18 | MR. LYNCH:  Thank you, Judge. |
| 02:38PM | 19 | (Proceedings concluded at 3:42 p.m.) |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1            *    *    *    *    *    *    *

2

3            I certify that the foregoing is a

4       correct transcription of the proceedings

5       recorded by me in this matter.

6

7

8

9                           s/ Megan E. Pelka, RPR

10                          Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25