UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

**DECISION AND ORDER**
20-CR-29-A

DAVID BURGIN,

Defendant.

## INTRODUCTION

Defendant David Burgin is charged in 14 counts of a 22-count Superseding Indictment (Dkt. No. 24), returned April 16, 2020, with numerous drug trafficking crimes, including one count of conspiracy to distribute, and possession with intent to distribute, various controlled substances (Count 1); ten counts of possession of controlled substances, to include cocaine, cocaine base, fentanyl, marijuana, 4-ANPP, and heroin (Counts 7-11, 14-18); two counts of maintaining drug-involved premises (Counts 12, 19); and one count of possession of firearms in furtherance of drug trafficking (Count 13). The case was referred to Magistrate Judge H. Kenneth Schroeder, Jr. pursuant to 28 U.S.C. § 636(b)(1) for the conduct of pretrial proceedings.

On May 28, 2024, the Government filed objections (Dkt. No. 686) to Magistrate Judge Schroeder's Report, Recommendation and Order ("RR&O") (Dkt.

No. 632), issued October 6, 2023, and Supplemental Report, Recommendation and Order ("SRR&O") (Dkt. No. 680), issued May 14, 2024, recommending that the Court suppress evidence obtained from 56 Grimes Street, Buffalo, New York ("56 Grimes Street").  After several extensions were granted, Defendant filed a response in opposition (Dkt. No. 707) to the Government's objections, and the Government filed reply papers (Dkt. No. 708).  The Court held extensive oral argument on the Government's objections on September 26 and 27, 2024.[1]

On February 25, 2025, the Court filed a Decision and Order (Dkt. No. 756) remanding the case to Magistrate Judge Schroeder for a report and recommendation on the threshold issue of standing, which was not addressed in either the RR&O or the SRR&O.  The Court also held the Government's objections (Dkt. No. 686) in abeyance until the present time.[2]  Several days later, on February 28, 2025, Magistrate Judge Schroeder issued a Second Supplemental Report, Recommendation and Order ("second SRR&O") (Dkt. No. 758), recommending that the Court find Defendant established a reasonable expectation of privacy in the contested areas of 56 Grimes Street, that is, the second floor and attic.  The Government filed objections (Dkt. No. 760) thereto, and Defendant filed opposition papers (Dkt. No. 765).  The Court notes that in addition to the filings at Docket

---

[1] The Court provided a list of questions to the parties on September 26, 2024, which it posed to them the following day.  *See* Dkt. No. 735 (Court Exhibit).

[2] The Court further adopted the portions of the SRR&O recommending denial of Defendant's suppression motions, on clear error review, which are not at issue in the instant Decision and Order.  This included Section A of the SRR&O's Discussion and Analysis, in which Magistrate Judge Schroeder formally withdrew his recommended finding set forth in Section A of the RR&O.

Numbers 760 and 765, the parties' initial set of objections analyzed the issue of standing, at length (*see* Dkt. No. 686, pp. 5-16; Dkt. No. 707, pp. 1-10).

For the reasons set forth below, the Court adopts the second SRR&O (Dkt. No. 758), as well as the portions of the RR&O (Dkt. No. 632) and SRR&O (Dkt. No. 680) recommending the suppression of evidence obtained from 56 Grimes Street; rejects the Government's corresponding objections thereto (Dkt. Nos. 686, 760); and grants Defendant's motion (Dkt. No. 282) to suppress.

## BACKGROUND

Given the extensive litigation involved in this case, the Court assumes familiarity with the procedural history and the underlying facts, as well as the issues under review.  The Court provides such details only to the extent necessary to explain its reasoning herein.

### Defendant's Suppression Motion

In October 2021, Defendant filed an omnibus motion (Dkt. No. 282), including a motion to suppress evidence obtained by law enforcement from 56 Grimes Street, during its February 19, 2020, search pursuant to two separate New York State search warrants.

In support of his motion, Defendant submitted an affidavit of standing (Dkt. No. 282-2) regarding his expectation of privacy in 56 Grimes Street.  After receipt of Defendant's affidavit and hearing argument on his pretrial motions, Magistrate Judge Schroeder determined that an evidentiary hearing was necessary.  Magistrate Judge Schroeder also granted the defense request for permission to supplement Defendant's affidavit of standing to focus on the attic at 56 Grimes Street, as the

3

Government argued Defendant's affidavit was defective in that regard.  *See*

CM/ECF Minute Entry, 4/28/2022.  Defendant submitted the supplemental affidavit

of standing (Dkt. No. 449) the day the evidentiary hearing commenced.

At the hearing, which was held over the course of five non-consecutive days,[3]

Defendant testified as a defense witness as to the layout of 56 Grimes Street and

relative to his privacy interest in the premises at 56 Grimes Street.

**Defendant's Hearing Testimony, and Connection to 56 Grimes Street**

In orienting itself to the layout of the property, the Court found particularly

helpful Defendant's Exhibits Q and R, which are photographs taken by the defense

in April 2021 and September 2022, respectively, used during Defendant's testimony

for the limited purpose of clarifying where different rooms, doors, etc. of the property

were located and how they were arranged, as well as Defendant's Exhibit T,

Defendant's hand-drawn diagram of the second floor of 56 Grimes Street.  Exhibit T

was not drawn to scale; rather, as defense counsel explained at the hearing, it was

"offered as an aide to the Court to kind of put everything together" insofar as

Defendant testified about the photographs in Exhibits Q and R, and the rooms and

doorways depicted therein.  The Court recognizes that the Government did not

object to admission of Exhibit T, but with the reservation that it did not agree with

Defendant's labels in the diagram.

---

[3] *See* Dkt. Nos. 465 (Hr'g Tr., 8/23/2022), 517 (Hr'g Tr., 12/19/2022), 519 (Hr'g Tr.,
12/20/2022), 518 (Hr'g Tr., 12/21/2022), 544 (Hr'g Tr., 1/11/2023).

Defendant testified that his mother had owned 56 Grimes Street since 2000.
56 Grimes Street was not Defendant's primary residence; in February 2020, he was
living at 79 Brunswick Boulevard, Buffalo, New York ("79 Brunswick Boulevard") with
his daughter and son, where he had lived for decades.  T. 4, 11, 24, 60-61.[4]  Since
2012, Defendant "stayed" in and "used" the upper rear apartment and "slept
overnight there."  T. 11-12.  When asked how often he stayed in the apartment,
Defendant replied, "Couple times a week, maybe.  It all depends.  It all depends."  T.
11-12.  It is undisputed that Defendant was not present at the time of the search (he
was arrested at approximately 6:40 p.m. that evening, at a gas station not far from
56 Grimes Street).  Earlier that day, however, he had picked up all his bills at 79
Brunswick Boulevard and left them in the rear apartment at 56 Grimes Street.

As to the building itself, Defendant explained that 56 Grimes Street is a
"multiple-use" building, with a "bar area" downstairs, and two apartments and an
office upstairs.  T. 4.  It is located across the street from a factory, but there are
"some houses" in the area and the area is residential.  T. 9.  Defendant was
"generally in charge of the property," and he was not paid for his services.  T. 7, 92.
As far as utilities were concerned, there is only one meter because it is an older
building, and the gas bill for 56 Grimes Street was in Defendant's name while the
electric bill was in his brother-in-law, Eric Johnson's, name.  T. 5, 7, 10.  Defendant
had assisted with improvements and remodeling done to the first and second floors

---

[4] The Court refers to pages of the January 11, 2023, hearing transcript at Docket
Number 544 as "T.__."

of the property since it was purchased in 2000, although Johnson did the "primary work" on the building. No improvements were made to the attic. T. 4-5, 92.

The first floor of the building was not used as a bar, but instead to host gatherings, such as parties and a wedding reception, for family and friends. No liquor or food was sold to or provided to attendees of the parties (family and friends had to bring in their own food and drink to these events), and the space was not rented out. However, sometimes attendees chose to give "donations" when using the space. If a family member or friend wanted to host an event there, they would contact Defendant to check for scheduling conflicts. Defendant had "no specific idea" of how many times the first floor had been used in this way, other than "[a] lot." T. 6-7, 92.

In February 2020, the upper front apartment was rented to an individual named Ray Lowman, who had lived there for the previous four or five years. Defendant explained that 56 Grimes Street had security issues, with a lot of break-ins and vandalizing. In exchange for reduced rent,[5] Lowman helped provide security in the form of his simple presence in the building, and occasional help with the parties that were held on the first floor. Defendant testified that, regarding other security measures, "we" subbed in "block windows" in the lower floor, put in metal "security doors," and "bricked off" the back door. Defendant's family also contracted for a security system to be installed, including a "security camera" at the top of the stairs on the second floor, facing down the stairs. T. 4. 8-10, 16. Lowman had "no

[5] Lowman's rent was originally $300, which was later increased to $400.

access" to the downstairs/ lower front of 56 Grimes Street; Defendant testified that the "only way [Lowman] could access the lower front is if one of us let him in the lower front." Once he entered the front of 56 Grimes Street, though, Lowman could then access the second floor. T. 71-72. Lowman was out of town on February 19, 2020, the date of the search. T. 10.

Defendant testified that he was the only one who used the second-floor office area, which contained his desk and a computer, and was located between the upper front apartment and upper rear apartment. The office was "separated" from the two apartments by walls, and a "locked door" apiece. The door into the office from Lowman's apartment was "[a]lways kept locked," and the door from the office into the upper rear apartment, which opened into that apartment's living room, was also "locked all the time." T. 11-12, 34-36, 43, 79.

The attic contained heating ducts that were connected to the heating system. Defendant also "stored [his] office equipment from a prior business" that had closed in approximately 2009, in the attic, and he kept a "lot of [his] files and paperwork and documents and stuff," and computers, there. T. 34, 90-91. Two doors in the building led to the attic, but only one of the two provided actual access to the attic. The upper front apartment kitchen had one of the doors to the attic, but Defendant testified that it was "always locked," "we never used" that door, and "[w]e didn't even have a key to [it]." The other door to the attic is a "locked" door located in the upper rear apartment kitchen. Defendant had keys to that door, and it served as the "only access to the attic." T. 38-39, 44-45.

There were two ways for Defendant to access the upper rear apartment. He could go through the upper front apartment—which was never a problem between him and Lowman—and then through the office into the upper rear apartment. Alternatively, he could go to the rear of the bar area on the first floor, and up the stairway into the upper rear apartment. Defendant used both points of access. T. 35-36. The "landing back hall" depicted in Defendant's diagram of the second floor was the "rear steps entry to [the rear] apartment," which had a "locked door" between the landing and the upper rear kitchen. T. 44. The only way to get to the upper rear bathroom, for example, was once an individual was inside the upper rear apartment. T. 44.

Defendant testified that his mother, Lowman, Johnson, and his co-defendant Rodney Pierce,[6] all had access to the premises, generally, of 56 Grimes Street. He was not sure who else had access, although sisters would have had access, as well, and "whoever else had a key." T. 61-62. Beyond the individuals who he knew had keys and access to the building, Defendant could not say who else had keys. Defendant stated, "Honestly, the premises been [sic] there for years, so we're talking 22 years. I don't know who all [sic] has keys." However, Defendant was "pretty sure there's probably other people." T. 86. When asked whether the individuals who had keys to the building would have been able to open the doors to both the lower area and the upper rear apartment, Defendant testified, "[n]o, everyone didn't have keys

---

[6] From previous filings, the Court is aware that Pierce is also Defendant's nephew.

8

to my upper rear apartment." He testified that his mother did not have keys to his apartment. T. 62.

**Execution of the Two State Search Warrants**

With respect to the evidence on the alleged Fourth Amendment violations, 56 Grimes Street is on the corner of Grimes Street and Milburn Street and has multiple entrances: one "front door" entrance located on Grimes Street, and two "side" doors located on the right side of the building, on Milburn Street (referred to herein as the "first side door" and the "second side door," the first side door being the closest of those two doors to both the front of the building and Grimes Street).

The first search warrant obtained by officers described 56 Grimes Street as a two-and-a-half story, "multiple residence building," and authorized a search of the "lower front," only. Testimony at the hearing established that officers who obtained the warrant purposefully limited the search to the "lower front" of the building based on observations they had made of comings-and-goings by Defendant and Pierce at that address, *through the front entrance*. Officers also testified that they were "solely focused" on the front of the building and were "unaware" of where the two side doors led to. When they executed the first search warrant, however, instead of entering the front door to the building, on Grimes Street, officers entered the first side door to the building, on Milburn Street. Detective Daniel Granville, Chief of Narcotics at the Erie County Sheriff's Office, who oversaw the search warrant operation at 56 Grimes Street, testified that law enforcement did not have any information that there was anyone inside the premises when the search warrant was executed.

The following sequence of events that occurred on February 19, 2020, is set forth in greater detail, and in narrative form, in the RR&O.

- **8:32 p.m.**: Hon. Kenneth F. Case, Erie County Court Judge, signed the first search warrant, authorizing a search of the *"lower front"* of 56 Grimes Street.

- **8:40 p.m.**:  Granville was initially headed to the *front door* on Grimes Street but instead went in the *first side door* on Milburn Street supposedly at the suggestion of Special Agent Thomas Webb of Homeland Security Investigations, and into a stairwell.  Eight other officers followed Granville into the stairwell/ hallway and up a flight of stairs, and after forcing open a door at the top of the stairs with a pry bar, onto the *second floor*.

- **8:40:21 p.m.-8:43:17 p.m.**: Officers entered the *second floor* of 56 Grimes Street, where they conducted a purported "protective sweep" for individuals,[7] and simultaneously observed (a) a piece of mail, *i.e.*, a National Fuel bill addressed to Defendant at 79 Brunswick Boulevard, purportedly lying in plain view on top of garbage in a garbage can and with the top lid to the garbage can open;[8] and (b) electronic storage devices. Officers also conducted a "protective sweep" of the *attic*.  Officers then went back down the flight of stairs they had climbed up and exited the first side door to the building that they had previously entered. Officers did not encounter any individual present in the building during their "protective sweep."

- **8:44:35 p.m.**: Granville and other officers entered the *lower front* of 56 Grimes Street, through the *front door* to the building on Grimes Street.

- **8:47:27-8:53:24 p.m.**:  Granville proceeded up another flight of stairs onto the *second floor* and conducted an unauthorized search, rifling through drawers and plastic bags, and possibly cabinets as well.

---

[7] A "protective sweep," also known as a "security sweep" or "safety sweep," is a search for individuals who may constitute a safety threat to law enforcement officers.  As is explained further herein, a sweep is not a full search of the entire premises but rather is limited to a cursory inspection of spaces where a person may be found.

[8] At footnote 5 of the RR&O, Judge Schroeder states his opinion that the Government's photograph of the National Fuel bill "is a staged photograph because of the way the various papers are juxtaposed and too convenient in the context of the issue at hand."

- **8:56:45 p.m.**:  Granville went up again to the ***second floor***, this time escorting Webb.  Sometime around 9:00 p.m., Granville was alerted by another agent or law enforcement officer that there was an operating security camera on the second floor, pointed in his direction.  The camera was then turned to the side and stopped operating.

- **Sometime before 9:48 p.m.**: To establish probable cause for issuance of a second search warrant, Granville told Erie County Detective Patrick McMahon about the observations he made during the "safety sweep" (including the piece of mail addressed to Burgin), as well as a door they observed that led to the upstairs/ upper rear and ultimately, the attic. Granville also conveyed to McMahon that they had recovered other items identifying Defendant, and some DVR equipment.  McMahon relayed this information to Judge Case.

- **9:48 p.m.**:  Judge Case signed a second search warrant, identical to the first, other than: 1) it specified law enforcement could search "upper rear, attic and detached garage"; and 2) Paragraph 2a was added, which read: "On 02/19/2020, a search warrant was executed at 56 Grimes Street, Lower Front.  During the execution of that search warrant, a door was discovered leading to the Upper Rear, which leads to the attic.  Those areas were cleared for officer safety and documents, electronic storage devices and material identifying David Burgeon [sic] were seen in plain view, as well as a DVR surveillance system for 56 Grimes Street."

- **Sometime after 9:48 p.m.**:  Officers conducted a search of the ***second floor and attic area***, resulting in the seizure of evidence.

To summarize, Granville went to the second floor a total of three times before the second warrant was obtained: first, with eight other officers, during which the "protective sweep" occurred; second, by himself, when he conducted an unauthorized search; and third, with Webb.  The security footage also depicts other officers returning to and exiting the second-floor multiple times.  *See* Gov't Exhibit 17; Def Exhibit W (compilation of video clips from Gov't Exhibit 17).  For example, Special Agent Francis Zabawa from the Department of Homeland Security, who testified at the hearing, entered 56 Grimes Street on February 19, 2020, via the

**second side door**, a little after 8:30 p.m., and remained on the **second floor** of the building until about 1:00 a.m. the next morning.  Zabawa first went up to the second floor alone but testified that there were others already up there.  He was eventually joined by "at least 13 people."

When law enforcement executed the two search warrants at 56 Grimes Street, they did not come across any individual in the building.  The search of the second floor and attic area yielded the seizure of various controlled substances (specifically, 100 grams of fentanyl, nearly two kilograms of cocaine, 45 grams of cocaine base, and 17 grams of marijuana), *see* Dkt. No. 686, p. 2; four firearms; electronics equipment; drug paraphernalia; and $260,000 in U.S. currency.   Most of these items were recovered in the attic, or on the landing of/along the rear staircase leading up to the attic.  The remainder of the evidence was recovered in the "upper rear bedroom," "upper closet area," and "upper kitchen."  *See* Gov't Exhibits 8 and 9 (Erie County Sheriff's Office Property receipt, which does not specify in which bedroom, closet, or kitchen on the second floor these items were located).

<u>STANDARD OF REVIEW</u>

A district court reviews specific objections to an R&R on a dispositive issue, such as a motion to suppress, *de novo*, pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59(b)(3).  "When a party does not object to a portion of an R&R…, a district court reviews those portions for clear error."  *United States v. Parlato*, Case # 15-CR-149-FPG, 2019 U.S. Dist. LEXIS 33035, *3 (W.D.N.Y. Feb. 28, 2019) (internal citations omitted).  Following review of the R&R,

the district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).

## DISCUSSION

I.    **Defendant's Privacy Interest in 56 Grimes Street**

Before this Court may reach the merits of Defendant's suppression motion, it must first determine whether Defendant has a legitimate expectation of privacy in the areas searched, to challenge the search as a violation of the Fourth Amendment.

"It has been clear for a generation that 'Fourth Amendment rights are personal rights . . . [that] may not be vicariously asserted.'"  *United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002), quoting *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978).  As such, "a defendant's Fourth Amendment rights are violated 'only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party.'"  *Haqq*, 278 F.3d at 47 (emphasis in original), quoting *United States v. Payner*, 447 U.S. 727, 731 (1980).  "The burden is on the defendant to prove that his Fourth Amendment rights were violated by the challenged search or seizure and, therefore, that he has standing."  *United States v. Mikelic*, 3:10-cr-132 (CFD), 2011 U.S. Dist. LEXIS 50300, *11-13 (D. Conn. May 11, 2011), citing *Rawlings v. Kentucky*, 448 U.S. 98, 104-05 (1980), and *United States v. Ostorio*, 949 F.2d 38, 40 (2d Cir. 1991).  In other words, "[t]he defendant must show that he had a legally cognizable privacy interest in the searched premises at the time of the search."  *United States v. Rico*, 18-cr-661 (PGG), 2019 U.S. Dist. LEXIS 144647, *33 (S.D.N.Y. Aug. 26, 2019).

13

In determining whether a defendant has a "legitimate expectation of privacy" in the area searched or the item seized, "[t]his inquiry involves two distinct questions: first, whether the individual had a subjective expectation of privacy; and second, whether that expectation of privacy is one that society accepts as reasonable."  *United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir. 2008) (internal citations omitted).

With respect to the first question, the Court must decide whether the defendant "conducted himself and dealt with the property in a way that indicated a subjective expectation of privacy" (*United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993)); stated differently, the defendant must show that he had "the subjective expectation" that the property in question "would remain free from Government intrusion" (*United States v. Gerena*, 662 F. Supp. 1218, 1256 (D. Conn. 1987)); *see also United States v. Pollino*, 850 F.2d 93, 97 (2d Cir. 1988) ("the person challenging the search must demonstrate a subjective desire to keep his or her effects private"), *cert. denied*, 490 U.S. 1052 (1989).  The Second Circuit has explained that "what a person knowingly exposes to the public…does not receive Fourth Amendment protection, yet what a person tries to keep private…may be entitled to constitutional protection."  *United States v. Davis*, 326 F.3d 361, 365 (2d Cir. 2003).

The second question involves a determination whether the expectation of privacy manifested by the defendant is one that "society [is] willing to recognize…as reasonable."  *United States v. McKenzie*, 13 F.4th 223, 232 (2d Cir. 2021) (internal quotation marks and citation omitted); *see United States v. Melvin*, 20-CR-61-A, 2024 U.S. Dist. LEXIS 73044, *11-12 (W.D.N.Y. Apr. 22, 2024) ("even if defendant

14

did harbor a subjective expectation of privacy…, this Court must still determine whether that subjective expectation…was, under the totality of the circumstances, 'legitimate' in that it is 'one that society is prepared to recognize as reasonable.'"), quoting *Rakas*, 439 U.S. at 143 n.12.  "Determining whether society would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values which the Fourth Amendment protects."  *Melvin*, 2024 U.S. Dist. LEXIS 73044, at *12, citing *California v. Ciraolo*, 476 U.S. 207, 212 (1986).  To elaborate, "[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.  One of the main rights attaching to property is the right to exclude others…, and *one who owns or lawfully possess*[es] *or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude*."  *Perea*, 986 F.2d at 640 (emphasis in original).  Conversely, "[a] defendant who, at the time of the search, neither owned nor occupied the premises nor had any dominion or control over them has no standing to contest a search of the premises."  *United States v. Villegas*, 899 F.2d 1324, 1333 (2d Cir. 1990).

In the second SRR&O, Magistrate Judge Schroeder explains that he found Defendant's statements set forth in his affidavits of standing, and the Government's response in opposition thereto, created a factual dispute warranting a hearing that would address Defendant's reasonable expectation of privacy in the subject premises, and at which Defendant could challenge the alleged Fourth Amendment violations.  The Court sees no reason to disagree with that finding.  *See Hamilton*,

538 F.3d at 168-70 ("If the asserted facts, or the inferences drawn from them, were contested, the court would need to hold a hearing to determine the contested issues."), citing *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992).

Magistrate Judge Schroeder then credits Defendant's testimony at the evidentiary hearing concerning his privacy interest in 56 Grimes Street.  It is well-established that "[t]he Second Circuit has instructed that where a Magistrate Judge conducts an evidentiary hearing and makes credibility findings on disputed issues of fact, the district court will ordinarily accept those credibility findings."  *United States v. Lawson*, 961 F. Supp. 2d 496, 499 (W.D.N.Y. 2013), citing *Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008); *see also Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999) (holding that "without an evidentiary hearing, the District Court could not reject the Magistrate Judge's proposed credibility finding").  The Court therefore accepts the Magistrate Judge's credibility findings as to Defendant's testimony.

Judge Schroeder further recommends in the second SRR&O that this Court should find Defendant's testimony and the hearing proof "clearly" established Defendant's "use and control" of the 56 Grimes Street property, and that he had a reasonable expectation of privacy in the second-floor areas and attic of 56 Grimes Street.  The Government asserts in its objections that, even accepting the Magistrate Judge's credibility findings, this Court should conclude that Defendant has not established an objectively reasonable expectation of privacy in 56 Grimes Street, or "at a minimum," in the attic.  The Court concludes, as did Magistrate Judge Schroeder, that Defendant established a subjective expectation of privacy in the contested areas of 56 Grimes Street.  Defendant's objective expectation of privacy—

what the Government most strongly disputes here—is a closer issue, although the

Court ultimately concludes that Defendant has demonstrated an expectation of

privacy that society accepts as reasonable.

The Court finds instructive a non-exhaustive list of "key factors" courts have

looked to in determining "the objective reasonableness of a given defendant's

professed expectation" of his privacy, set forth in *United States v. Gerena*, 662 F.

Supp. 1218 (D. Conn. 1987), no single factor which is determinative:

> 1) ownership of or other conventional property interests in
> the premises or its contents; 2) use of the location as a
> residence; 3) use of the premises on a regular basis for
> professional, political, religious, or business purposes; 4)
> presence at the time of the search, or at other times; 5)
> security measures undertaken by the defendant to ensure
> the privacy of the particular area searched; 6) a
> defendant's authority over the premises; 7) a defendant's
> ability or right to exclude others from the area; 8) use of
> the particular location as a repository for the defendant's
> personal belongings; 9) […]; and 10) whether any of the
> defendant's interests or efforts taken to ensure privacy
> were in existence or were undertaken at the time of the
> search or seizure.

*Id.* at 1253-54.

To start, the Government posits that 56 Grimes Street is not a residential

premises, but is instead "primarily" a commercial building, in asserting that

Defendant had a lower privacy expectation than if 56 Grimes Street was a

residential property.  It is well-settled that "[a]n expectation of privacy in commercial

premises…is different from, and indeed less than, a similar expectation in an

individual's home."  *New York v. Burger*, 482 U.S. 691, 700 (1987); *compare Florida

v. Jardines*, 569 U.S. 1, 7 (2013) ("Privacy expectations are 'most heightened' in

17

one's home") (internal citation omitted).  While the first floor of 56 Grimes Street

operated as a quasi-commercial space, there is no evidence that the second floor or

the attic, the areas where the evidence was recovered, were used in that manner.

In addition, Defendant's testimony—which the Magistrate Judge credited—was that

the entire second floor was used for residential purposes, with two apartments that

each had a bathroom and a kitchen, and a central area used by Defendant as his

office.  *See* Defense Exhibit T.  As such, the Court rejects the Government's

commercial property argument as to the second floor.[9]

The Government also asserts that the entire second floor of 56 Grimes Street

was accessible from both staircases in the building, on the premise that "skeleton

keys" opened both the door to the upper front apartment, located at the top of the

front staircase, and the door to the upper rear apartment, located at the top of the

rear staircase.  *See* Gov't Exhibits 10-23 and 10-24 (photographs purportedly

showing the same key, with a green rubber cover, placed in the locks to both doors).

In addition, according to the Government, neither of the two doors to the attic had

deadbolt locks on them; rather, they also had "skeleton key" locks, such that the

---

[9] The Government attempted to show at the hearing and argues again in its objections that "supplies consistent with commercial use" were found in the upper rear apartment kitchen.  *See* Gov't Exhibits 10-51 through 10-54 (photographs introduced at the hearing).  On cross-examination, however, Defendant was asked, "you used the upstairs sometimes for storing some of the supplies you used when food was catered into the premises, correct?", to which Defendant replied, "No."  Defendant explained that the items depicted in the photographs were left over from parties on the first floor and he had simply brought them upstairs to use himself, as he did not want to waste them. T. 62-65.

same key would work in both the attic door in the upper front apartment and the attic door in the upper rear apartment.

Thus, the Government argues that 56 Grimes Street was a single-occupancy dwelling, rather than a multi-family dwelling with two apartments. The Government's alternative argument is that the attic is a "common area" in which Defendant has no reasonable privacy interest. *See United States v. Bartee*, 13-cr-365 (RJS), 2013 U.S. Dist. LEXIS 166366, *14-16 (S.D.N.Y. Nov. 12, 2013) ("The Second Circuit's decisions establish that 'the common halls and lobbies of multi-tenant buildings are not within an individual's zone of privacy' or part of the 'home,' even when they are guarded by locked doors or otherwise inaccessible to the public at large."), quoting *United States v. Holland*, 755 F.2d 253, 256 (2d Cir. 1985); *but see United States v. Lewis*, 62 F.4th 733, 742 (2d Cir. 2023) (declining to adopt a "categorical rule regarding shared spaces in multi-unit buildings" as the Circuit "[did] not understand [its] precedents to hold that the Fourth Amendment *never* protects a tenant's rights in such shared spaces," and holding instead that a district court should "engage in a fact-specific, individualized assessment") (emphasis in original).

Magistrate Judge Schroeder "entirely rejected" the Government's "speculative" attempt to show that some of the doors in 56 Grimes Street used "skeleton keys," however. The Court finds that the Government's argument concerning "skeleton keys" is unsupported by any hearing proof. As the parties are surely aware, an attorney's argument is not admissible evidence. *See generally United States v. Garcia*, 18-CR-178 (AT), 2018 U.S. Dist. LEXIS 110293, *8 (S.D.N.Y. June 5, 2018); *see also United States v. King*, 3:17-CR-149 (JBA), 2018

19

U.S. Dist. LEXIS 142863, *9 (D. Conn. Aug. 22, 2018) ("[F]acts proclaimed solely in an attorney's memorandum are not evidence at all.") (internal quotation marks and citation omitted).  No Government witness testified about the keys or locks depicted in the photographic exhibits, including where the keys came from or which keys opened which doors, if any.  Defendant agreed on cross-examination that the lock on the door between the upper front apartment and the attic in the photographic exhibits "appeared" to be a "skeleton key lock," as did the lock on the door between the upper rear apartment and the attic, as well as the locks on the doors between the office and upper front and upper rear apartments.  T. 65-75, 80-85; *see* Gov't Exhibits 10-1, 10-5, 10-6, 10-12, 10-23, 10-24; Def's Exhibits Q-9, Q-13, Q-15, Q-18.  When Defendant was shown the photographs of keys in locks, however, he could not say if the keys depicted in the photographs were his.  He was also not asked what the term "skeleton keys" meant to him.

The Government goes even further to argue that the doors to certain areas within the second floor, including to the attic, must have been unlocked, "consistent with" the testimony of Granville and Zavala.  Setting aside Defendant's testimony to the contrary (that interior doors on the second floor remained locked), neither Granville nor Zavala testified that such doors were unlocked.  Granville's testimony was simply that he did not recall if there were any locked doors after law enforcement breached the first side door, including whether any doors to the attic were locked (*see* Hr'g Tr., 12/19/2022, p. 56, 150-151).  Zavala did not testify at all about whether he encountered any locked doors.  Rather, Zavala testified that it "appeared the whole apartment was the whole second floor," or, in other words, he

assumed it was all one living unit.  Zavala believed there was only one bathroom

and one kitchen: he testified that he did not see a second kitchen or a second

bathroom, although he did not go looking for another bathroom (Hr'g Tr.,

12/20/2022, pp. 125-126, 130, 161-163).

Defendant does not claim any property interest in 56 Grimes Street; rather, he

testified that his mother was the owner of the building.  However, and as Magistrate

Judge Schroeder notes in his second RR&O, "while property ownership is clearly a

factor to be considered in determining whether an individual's Fourth Amendment

rights have been violated . . ., property rights are neither the beginning nor the end

of this Court's inquiry."  *United States v. Salvucci*, 448 U.S. 83, 91 (1980); *Rico*,

2019 U.S. Dist. LEXIS 144647, at *35 ("Fourth Amendment coverage is not co-

extensive with ownership, and a defendant 'need not be the owner of the property

for his privacy interest to be one that the Fourth Amendment protects'"), quoting

*Perea*, 986 F.2d at 639-40.

Instead of ownership, Defendant asserts that his managerial-type position

with respect to the property, as well as his use of and access to areas of the second

floor and the attic, is sufficient to confer standing.  There was no proof at the hearing

that Defendant paid rent or other compensation to use the premises, or that he had

a lease or any other formal agreement with respect to the upper rear apartment.  As

Defendant acknowledged, his primary residence was elsewhere, but he did testify to

staying overnight regularly and using the upper rear apartment.  Simply put,

Defendant was an occupant of the apartment, not a tenant.  Moreover, while

Defendant was not present at the time of the search, he was clearly present at other

21

times, including earlier that same day when he dropped off mail from his primary residence in the upper rear apartment. In addition, although Defendant was not the main individual who did work on the building, he assisted with improvements and obtaining security to protect 56 Grimes Street.

It is undisputed that Defendant maintained keys to the property, including keys that opened the office area, the upper rear apartment, and the attic. He testified that he was the only person to use the office. He also testified that he kept personal belongings of his in the office and in the attic. While Defendant did not testify about what personal belongings he had in the upper rear apartment, other than his mail that he had left there on February 19, 2020, his affidavit stated that he "often had clothes and furniture at the property" and he "regularly had overnight guests stay with [him]" there. Dkt. No. 282-2, ¶ 9. Defendant's affidavit also stated that he could "come and go from these premises as [he] pleased." Dkt. No. 282-2, ¶ 12. Moreover, Defendant testified that the only point of access to the attic was through the locked door in the upper rear apartment, as that was the only door to the attic with a corresponding key. There were two points of access to the upper rear apartment—through the upper front apartment and through the office, or through a "landing back hall"—both which had locked doors. Defendant explained during the hearing that, considering the age of the property, Defendant did not know every individual who had keys or access to 56 Grimes Street. He also clarified that not everyone had keys or access to the upper rear apartment, his mother included.

As the Second Circuit has explained, "[t]here is no authority for the proposition that one need live in the premises, or exercise control over them, in

order to enjoy a privacy interest in those premises.  Privacy interests have been…found where one was merely a guest at the premises…Nor has possession of a key or a deed or lease in one's own name been deemed indispensable to establishment of a privacy interest, where the claimant's understanding with those in charge of the premises was the basis of the expectation of privacy."  *Hamilton*, 538 F.3d at 169.

In *Hamilton*, for example, the defendant proffered that he had purchased the house in question, which was registered in his wife's name; he could "come and go as he pleased"; and he went to the house "two to three times a week for years." *Hamilton*, 538 F.3d at 168.  The Second Circuit found that, taking the defendant's allegations as true and if he were to sustain such allegations at a hearing, the defendant "ha[d] not only free and frequent access, but also probably effective control, and a solid expectation of privacy at the…[h]ouse."  *Id.* at 168-70.  This was despite defendant's admission that he did not live at the house, he had no key, and he was not the named owner on the deed.  *Id.* at 169.

Although Defendant lived elsewhere than 56 Grimes Street, he had his own key; enjoyed unlimited access to the upper rear apartment and the attic; and spent significant time there, including staying overnight.  Considering this confluence of factors and the others discussed above, the Court concludes that Defendant established a reasonable expectation of privacy in the two pertinent areas of the building.  He established that his contacts with the searched premises were regular and personal enough to confer standing.  *See Perea*, 986 F.2d at 639-40 ("[O]ne who, with permission of the owner, is in possession of and has complete dominion

and control over a residence that is not his own home, and can exclude others from it…, can have legally sufficient interests…so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place."); *see*, *e.g.*, *United States v. Hay*, 2021 U.S. Dist. LEXIS 263499, *41 n.10 (W.D.N.Y. Dec. 29, 2021) (the Government did not challenge the defendant's standing to challenge a search where the defendant's affidavit asserted he "occasionally stayed overnight at the residence during the relevant time period," his girlfriend and children lived there, he "kept some clothing there" and he " 'shared a key,' " and he "regarded it as a place that he could expect privacy"); *United States v. Berry*, 3:05-CR-40 (CFD), 2006 U.S. Dist. LEXIS 9429, *7 (D. Conn. Mar. 2, 2006) (defendant had standing to challenge the search where he "presented evidence that he was a frequent social and occasional overnight guest of the family living at [the home at issue]").

Defendant's expectation of privacy would presumably not, however, extend to the upper front apartment where Lowman was the tenant, or the lower area where parties were held and to which multiple family members had keys. *See United States v. Cruz*, 475 F. Supp. 2d 250, 253 (W.D.N.Y. 2007) (where the defendant was the landlord of the property, "his tenants, not the defendant, had an expectation of privacy in their leased premises").

Because the Court finds that Defendant has met his burden of demonstrating a reasonable expectation of privacy in the areas searched at 56 Grimes Street, the Court turns to the question of the constitutionality of the search conducted at the premises. *See United States v. Cepeda*, 3:21-CR-183 (JCH), 2022 U.S. Dist. LEXIS 220317, *5-6 (D. Conn. Dec. 6, 2022) ("[F]or a motion to suppress, the initial burden

24

is on the defendant to show that he has standing…From there, the burden shifts to the government to prove that the search or seizure was valid under the Fourth Amendment.") (internal quotation marks and citation omitted).

**II.**    **Execution of the First Search Warrant Authorizing a Search of the Lower Front of 56 Grimes Street, and Lawfulness of the "Protective Sweep" of the Second Floor**

Magistrate Judge Schroeder recommends that this Court find that law enforcement invalidly executed the first search warrant by failing to abide by its scope limiting the search to the "lower front" of 56 Grimes Street.  Namely, the officers were noncompliant with the warrant by going through a side door of the building and up a stairway to the second floor.[10]  The Government does not explicitly object to this finding, and the Court finds no clear error with respect to it.  *See United States v. Wilbert*, 16-CR-6084, DGL, JWF, 2017 U.S. Dist. LEXIS 77818, *6 (W.D.N.Y. Mar. 28, 2017) ("[T]he Fourth Amendment's particularity requirement is measured by the terms of the warrant [itself]."), *report and recommendation adopted by* 16-CR-6084L, 2017 U.S. Dist. LEXIS 77141 (W.D.N.Y. May 22, 2017); *see also*

---

[10] Judge Schroeder concludes that Granville's explanation for why he chose to enter the first side door instead of the front door, and to lead other officers through the first side door, *i.e.*, "because it was dark and tough to see which door," was "disproven by the government's own exhibits."  Granville then attempted to "explain away" this contradiction when pressed on the issue by Judge Schroeder, but Judge Schroeder "rejected" Granville's follow-up explanation.

Granville first testified that he entered the first side door at Webb's suggestion that it was the correct door, even though the investigation—which Webb had knowledge of—revealed that both Defendant and Pierce had gone in and out of the front entrance. The RR&O remarks that Webb was not called as a witness by the Government despite the Magistrate Judge's indication that he wanted to hear Webb explain why law enforcement had entered a side door rather than the front door.  Magistrate Judge Schroeder found the lack of testimony by Webb on this issue "most distressing."

*United States v. Fennell*, 496 F. Supp. 2d 279, 281 (S.D.N.Y. 2007) ("The [particularity] requirement ensures that [a] search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers [of the U.S. Constitution] intended to prohibit.") (internal quotations marks and citations omitted). Indeed, the Government makes the following concessions: Judge Schroeder was "rightfully concerned about law enforcement's decision to access the second floor of 56 Grimes [Street] on multiple occasions prior to the second warrant for 56 Grimes [Street] being obtained," and "Chief Granville should not have conducted any search of the contents of the second floor at 56 Grimes [Street], no matter how brief, before obtaining the second warrant."

Because the second floor was excluded from the authorized search area in the first search warrant, the Government had to establish an exception to the warrant requirement for the entrance of the officers onto the second floor. The Government takes issue with Magistrate Judge Schroeder's recommended finding that the Government failed to establish any "exigent circumstances" to justify their warrantless intrusion into the second floor of 56 Grimes Street. Specifically, Judge Schroeder recommends finding that what the Government characterizes as a "protective sweep" for officer safety was actually a warrantless search for which no exception to the exclusionary rule applies, such that anything observed by the officers on the second floor was impermissible.

The Fourth Amendment protects "[t]he right of the people to be secure…against unreasonable searches and seizures," U.S. Const. amend IV, and

26

the Supreme Court has found an exception to the warrant requirement for searches inside a home "in the case of searches that fall under the definition of 'protective sweep': A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person may be hiding."  *United States v. Hassock*, 631 F.3d 79, 84 (2d Cir. 2011) (internal quotation marks omitted), quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990).  "Unlike most warrantless searches, which focus on the immediate danger posed by a suspect, a *Buie* protective sweep allows officers to stop a potential ambush by searching for unseen third parties."  *United States v. Gandia*, 424 F.3d 255, 261 (2d Cir. 2005).

The Second Circuit has determined that "[a]lthough the Supreme Court in *Maryland v. Buie*[, 494 U.S. 325,] found that officers may conduct a protective sweep incident to arrest, officers may also conduct a protective sweep when they are 'present in a home under lawful process.'"  *United States v. Williams*, 365 F. Supp. 3d 343, 347 (S.D.N.Y. 2019), quoting *United States v. Miller*, 430 F.3d 93, 98 (2d Cir. 2005).  When officers are lawfully present in a home, such as pursuant to an order of protection (*see, e.g.*, *Miller*, 430 F.3d at 100) or a search warrant, to justify a protective sweep, they must still point to " 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the…scene.' "  *Miller*, 430 F.3d at 98, quoting *Buie*, 494 U.S. at 334.  "Articulable facts demonstrating a threat to officers' safety can include, for example, specific threats against those at the scene…; shuffling noises or movements from

27

behind a door…; an at-large suspect known to be armed and dangerous inside the premises…; and a report of a gunshot from a premises known for drug trafficking[.]" *Williams*, 365 F. Supp. 3d at 347-48 (collecting cases, internal citations omitted).

Even assuming for the sake of argument the officers' lawful presence on the second floor, no such articulable facts are present here. As Magistrate Judge Schroeder concluded, while Granville may have subjectively believed he and the other officers needed to proceed up to the second floor to conduct a protective sweep, that belief was not objectively reasonable under the circumstances.

Law enforcement was aware that neither Defendant nor Pierce was present at 56 Grimes Street when officers approached the property with the first search warrant, because Defendant and Pierce had been arrested earlier that same day— Pierce at an Auto Zone parking lot not far from 56 Grimes Street, and Defendant at a gas station across from the Auto Zone parking lot. *See* SRR&O, pp. 4-8. These arrests away from the premises of 56 Grimes Street made it less likely that the arrests would have been known to anyone remaining in the building, a situation which may have heightened the danger posed to the officers who were executing the search warrant. *See, e.g.*, *United States v. Wolfe*, 5:15-cr-68-1, 2015 U.S. Dist. LEXIS 168390, *14 (D. Vt. Dec. 15, 2015), citing *United States v. Agapito*, 620 F.2d 324, 336 (2d Cir. 1980); *compare United States v. Cabrera*, 23-CR-209 (VEC), 2023 U.S. Dist. LEXIS 226793, *15-17 (S.D.N.Y. Dec. 20, 2023) (officers acted reasonably in entering an apartment to conduct a protective sweep where they had arrested the person who had opened the door, in the threshold of the doorway, and

through the open apartment door they heard "noises emanating from the bathroom, indicating another individual was, in fact, inside").

Officers did testify at the evidentiary hearing regarding their knowledge of 56 Grimes Street. Granville testified that he knew the property had been "identified as an after-hours kind of social club bar" that was owned and operated by Defendant, and Erie County Detective Adam Day testified to prior information that 56 Grimes Street was used as a "stash house for [co-defendant] David Washington." However, no officer testified that they saw anyone enter 56 Grimes Street during their surveillance on February 19, 2020, other than Pierce and Defendant, who had entered and already left the building separate from each other and had subsequently been arrested. *See, e.g.*, *Wolfe*, 2015 U.S. Dist. LEXIS 168390, at *14-15 ("Given that law enforcement had established continuous surveillance of the apartment for hours and saw two men leave (and no one enter), it was not objectively reasonable to believe anyone else was in the apartment at the time of the sweep…While of course there was the possibility that someone else was present, such a possibility is different from a reasonable likelihood."). There was also no indication when the officers arrived at 56 Grimes Street and approached the building with the first search warrant in hand that anyone was inside. The officers did not testify that they made any visual observations such as parked vehicles, an individual in a window, or movement, or that they heard any sounds suggesting the presence of a third party in 56 Grimes Street or, more specifically, on the second floor.

The articulable facts in this case are a far cry from those in *United States v. Baker*, 07-CR-126A, 2010 U.S. Dist. LEXIS 58432 (W.D.N.Y. June 14, 2010), which

the Government relies upon.  In *Baker*, officers performed a protective sweep of a

front apartment when executing a search warrant for a different area of the building,

that is, the rear apartment.  The similarities end there, however.  In executing the

warrant for the rear apartment, law enforcement encountered one defendant armed

with an assault rifle, and another resident of the apartment with an attack dog that

was released to harm the agents.  *Id.* at *5.  Based on those two threats, the agents

determined a sweep of the building was necessary to determine whether the second

defendant and other known participants of the drug operation (including an individual

who was known to live in the building) "had been lying in wait to harm them."  *Id.* at

*6-7.  They then knocked on the front apartment door, and when the second

defendant opened the door, he identified himself, and the agents (1) realized he had

access to the front apartment and must have retreated there during the controlled

purchase in the rear apartment; (2) realized the other drug-operation participant was

in the building at the time and was another potential threat; and (3) smelled

marijuana before they even entered the front apartment, suggesting ongoing

criminal activity that could have provided these two individuals with another reason

to be armed.  *Id.* at *6-7.  This Court determined that this confluence of factors—

none of which are present here—justified entry into the front apartment and a

protective sweep of that area.  *Id.* at *7.

The Government argues generally that large-scale narcotics traffickers

frequently use associates to transport, protect, and hide their drugs and money, and

often protect those associates with firearms.  In addition, the Government relies on

Granville's testimony that after gathering years of intelligence on the

30

Burgin/Washington drug trafficking network, he believed this organization was "very large" and that Washington was a "very violent" associate of Defendant who was "connected to homicides and assaults." The Government further argues that "the entry team could not rule out that there were armed members of the drug trafficking organization present and capable of posing a threat to the entry and search teams."

The Second Circuit, however, "has made clear…that *mere lack of information* as to the presence of other persons on the scene cannot amount to reasonable suspicion." *United States v. Barone*, 721 F. Supp. 2d 261, 272 (S.D.N.Y. 2010) (emphasis added), citing *Gandia*, 424 F.3d at 264 ("Officers must point to facts that give rise to an individualized suspicion and cannot rely solely on generalizations that suspects are usually accompanied by dangerous third parties.") and *United States v. Morgan Vargas*, 376 F.3d 112, 116-17 (2d Cir. 2004) (rejecting "generalizations" such as those presented by the Government as "insufficient to justify a protective sweep," *i.e.*, "that the agents had a reasonable belief that other people might be in the motel room due to their suspicion that [defendant] was a drug courier, their experience that drug couriers often meet up with their contacts, and their awareness that drug traffickers are frequently armed and dangerous").

Law enforcement's inability to "rule out" the presence of dangerous individuals, in other words, inability to eliminate this possibility, did not justify a warrantless protective search. Otherwise, in any large-scale drug case, officers could conduct a protective sweep of a home where they are uncertain who is in a residence on the basis that they suspect persons may be present. This lack of knowledge runs counter to the reasonable articulable belief of danger required by

*Buie* and *Miller*. *See United States v. Archibald*, 589 F.3d 289, 300 (6th Cir. 2009) ("Clearly, *Buie* requires more than ignorance or a constant assumption that more than one person is present in a residence.").

Furthermore, Granville's testimony about a "fatal funnel" is irrelevant to his belief that a dangerous person was present on the second floor. He explained that the "fatal funnel" was the vulnerable and exposed position he found himself in upon opening the first side door and standing at the foot of the staircase that led up to the second floor, which Granville asserted prompted him to proceed up the stairs with the other officers and to "clear" the second floor. The Government argues this testimony should inform the Court's analysis of whether it was objectively reasonable of the officers to conduct a protective sweep of the second floor.

The Court agrees with Magistrate Judge Schroeder's finding, however, that Granville's explanation for why he traveled up the stairs to the second floor "ma[de] no sense," as it would have been more reasonable for him, upon realizing he was in a narrow, confined area at the bottom of a set of stairs, to simply back out through the first side door to the outside before any other officers entered the building, and then proceed to the front door of 56 Grimes Street. Judge Schroeder "rejected" Granville's explanation for why he and his officers did not do this, which echoes reasoning employed by the Sixth Circuit where the Government also asserted that officers' perceived vulnerability in a "fatal funnel," created by the doorway of a residence, was a requisite articulable fact supporting their protective sweep. *See Archibald*, 589 F.3d at 299-300 (The Government's burden under *Buie* was "not reduced because the officers were unable to view the entire residence or because

they felt 'particularly vulnerable' based solely on their location.  In fact, if, as the officers testified, entry into a 'fatal funnel' poses a greater risk to law enforcement, the prudent course of action would have been to back away from the door, not proceed through it.").

The Government also argues that Magistrate Judge Schroeder made an erroneous factual finding in the RR&O that was not corrected in the SRR&O.  Judge Schroeder found that Granville testified that law enforcement did not conduct a protective sweep of the attic when Granville first entered the second floor; they completed a protective sweep of the second floor, only, despite Granville's knowledge that 56 Grimes Street was a 2 ½-story building.  *See* RR&O, p. 25. Judge Schroeder states that the failure to conduct a security sweep of the attic made him "question the necessity of a so-called security sweep of the second floor." The Court follows the logic of this reasoning, if the RR&O accurately reflected Granville's testimony.  *See*, *e.g.*, *Williams*, 365 F. Supp. 3d at 348-49 ("The inference that the threat, if any, had abated is further supported by [the searching officer]'s brief delay in performing the protective sweep, and the other officers' decision not to perform a protective sweep at all…Although the Court evaluates the facts through the eyes of a reasonable officer, not any particular officer, it is telling that several other officers encountering the same circumstances did not feel the need to conduct a protective sweep.").  However, the finding in the RR&O that there was no protective sweep of the third floor when Granville and his officers first entered the second floor is erroneous, based on clear testimony to the contrary. Granville testified that he did not personally conduct a sweep of the attic but

explained that he believed other officers did so.  *See* Dkt. No. 517 (Hr'g Tr., 12/19/2022), pp. 21-22, 56-57, 141, 176.  The Magistrate Judge conceded this point in a Supplemental Report, Recommendation and Order as to Washington, issued the same day as the SRR&O as to Defendant.  *See* Dkt. No. 681, p. 4 n.3.

A corrected finding in this regard, however, does not alter the Court's ultimate determination, as recommended by Judge Schroeder, that there is insufficient evidence "that would establish or even reasonably imply that there were any other individuals in the second floor area [who] would constitute a possible threat to the safety of the officers so as to justify a 'protective sweep' of that area"—or a protective sweep of the attic.  For similar reasons, the Government has also failed to meet its burden of showing that a potential destruction of evidence justified the protective sweep.  "[A] warrantless entry is justified where the agents have a[n objectively] reasonable belief that there are persons inside the residence who might…destroy evidence."  *United States v. Schaper*, 903 F.2d 891, 894 (2d Cir. 1990); *see, e.g.*, *Wolfe*, 2015 U.S. Dist. LEXIS 168390, at *16-17 ("[L]aw enforcement had no reason to conclude that the destruction of the contraband was imminent…there was no evidence to suggest that anyone else was either inside the apartment or aware that [defendant] and [a co-defendant] had been arrested.").

Without sufficient articulable facts that would warrant a reasonable belief that someone might have destroyed evidence or posed a threat to the officers' safety, this Court finds that the search of the second floor and attic of 56 Grimes Street violated Defendant's Fourth Amendment rights.

34

Additionally, as found by Magistrate Judge Schroeder, the officers' "overall observation of everything in the apartment"—a search made "under the guise" of performing a protective sweep—was not permitted under the "plain view" doctrine because the officers' entry onto the second floor was unlawful.  "An essential predicate to this doctrine is that the initial intrusion was lawful; in other words, the officer was authorized to be in the area where he saw the evidence."  *United States v. Muyet*, 946 F. Supp. 302, 309 (S.D.N.Y. 1996), citing *United States v. George*, 975 F.2d 72, 78 (2d Cir. 1992); *see United States v. Barone*, 721 F. Supp.2d 261, 276 (S.D.N.Y. 2010) ("The 'plain view' exception permits the warrantless seizure of an object, if police are lawfully in a position from which they view [the] object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object…Patently incriminating evidence in plain view during a *proper security check* may be seized without a warrant.") (emphasis added).

The Court incorporates Judge Schroeder's account of the events that followed the purported security sweep of the second floor:  the subsequent entries and searches of the second floor before the second search warrant was issued.  *See* RR&O, pp. 28-33.  While Judge Schroeder does not make any explicit credibility findings with respect to Granville or Zabawa, it is evident that he (1) disbelieved Granville's explanation for proceeding up to the second floor a second time as "mak[ing] no sense";[11] (2) disagreed with Granville's characterization of searching

---

[11] Granville testified that he went up to the second floor a second time to correct "mistakes" made by officers in "missing something," and to "get the lay of the land or see what we're dealing with up on the second floor."

through drawers, garbage bags, and cabinets without an authorized warrant as a simple "lapse of judgment" or a "mistake"—instead, this was "most disconcerting" and an "egregious violation of the Fourth Amendment"; (3) found Granville's third foray onto the second floor yet a third time before the second warrant was issued as "[e]ven more astonishing"; and (4) disbelieved Zabawa's stated purpose for going up to the second floor (to "hold the premises"), noting that "[f]urther damning evidence" of law enforcement's unlawful conduct was found in Zabawa's testimony.  The Court accepts these findings.  *See United States v. Quintana*, 12-CR-214S, 2018 U.S. Dist. LEXIS 19420, *3 (W.D.N.Y. Feb. 6, 2018) ("As a general matter, this Court defers to a magistrate judge's credibility findings in a criminal suppression context.").

III.    **Execution of the Second Search Warrant Authorizing a Search of the Second Floor and Attic of 56 Grimes Street**

Magistrate Judge Schroeder further recommends finding that any evidence obtained pursuant to the second search warrant should be suppressed as "fruit of the poisonous tree" (*see Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)), because the "sole basis" for the second warrant was information obtained by Granville and other officers while previously, unlawfully present on the second floor and in the attic.  Judge Schroeder concludes, "[b]oth Detective Granville and Deputy McMahon admitted such in their testimony."[12]

---

[12] Magistrate Judge Schroeder cites to the following pages of the hearing transcript, in support of this conclusion: (1) Dkt. No. 517 (Hr'g Tr., 12/19/2022), pp. 43, 55, 128-29, 147-49; and (2) Dkt. No. 519 (Hr'g Tr., 12/20/2022), pp. 21, 24, 29-30, 31-32, 78-79, 85-87.

In the SRR&O, Magistrate Judge Schroeder also concludes that Judge Case did not have probable cause to issue the second search warrant because the additional information provided to him, from law enforcement's unauthorized search pursuant to the first search warrant, did not constitute evidence of criminal activity. Magistrate Judge Schroeder likewise finds that evidence obtained pursuant to a search warrant Judge Schroeder issued on February 26, 2020, authorizing a search of the contents of a "DVR player" seized from 56 Grimes Street pursuant to the second search warrant, was fruit of the poisonous tree.

The Court adopts these findings and conclusions by Judge Schroeder and finds no further discussion is necessary.

## IV.    **Inevitable Discovery and Independent Source Doctrines**

The Government argues in the alternative that, should the Court find the "protective sweep" of the second floor was unlawful, the evidence on the second floor and in the attic would have been inevitably discovered and/or independently obtained by lawful means and thus said evidence should not be suppressed. Neither the RR&O nor the SRR&O address this argument, although the Government did raise it below.

"[T]he Supreme Court has recognized several exceptions to the exclusionary rule, three of which 'involve the causal relationship between the unconstitutional act and the discovery of evidence:' (1) the independent source doctrine, (2) the inevitable discovery doctrine, and (3) the attenuation doctrine." *United States v. Rucker*, 15-CR-6079-FPG-JWF, 2018 U.S. Dist. LEXIS 33607, *12 (W.D.N.Y. Mar. 1, 2018), quoting *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016).

The independent source doctrine "permits the admission of otherwise excludable evidence where law enforcement officers obtain a valid search warrant based on 'sources [that are] wholly unconnected with the [unlawful] entry and [were] known to the agents well before the[ir] initial entry.'" *United States v. Bonczek*, 391 F. App'x 21, 24 (2d Cir. Apr. 19, 2010) (summary order).   It is the Government's burden to demonstrate the applicability of to this exception, by showing that "(1) the warrant . . . [is] supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant [was] not . . . prompted by information gleaned from the illegal conduct." *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993).

The Court finds the independent source doctrine does not apply in this instance, "since the agents' illegal search motivated [them] to apply for [the second] search warrant." *Rucker*, 2018 U.S. Dist. LEXIS 33607, at *12.  As such, the Court limits its analysis to the inevitable discovery doctrine.

For the inevitable discovery doctrine to apply, the Government must demonstrate that the evidence would have been acquired lawfully through an independent source absent the government misconduct.  *See Murray v. United States*, 487 U.S. 533, 539 (1988); *see also United States v. Eng*, 971 F.2d 854, 859 (2d Cir. 1992), citing *Nix v. Williams*, 467 U.S. 431, 448-50 (1984) (discovery of a murder victim's body would have been obtained lawfully irrespective of a coerced confession taken from the defendant in which he told law enforcement the location of the body, as a search for the body by 200 volunteers—covering the area in which the body was located—was already underway when defendant's statement was

38

unlawfully taken).  Put differently, evidence will not be suppressed where "the Government can prove that the evidence would have been obtained inevitably even if there had been no statutory or constitutional violation."  *United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002).

The inevitable discovery doctrine does not apply simply because "a reasonable police officer *could* have" lawfully discovered the evidence at issue; rather, it applies where the record establishes "with a sufficiently high degree of certainty that a reasonable police officer *would* have" lawfully discovered the evidence regardless of the disclosure of any legal defect in the actual discovery of the evidence.  *United States v. Lauria*, 70 F.4th 106, 123 (2d Cir. 2023) (emphases added).  "The focus on demonstrated historical facts keeps speculation to a minimum, by requiring the 'district court to determine, viewing affairs as they existed at the instant before the unlawful search occurred, what *would have happened* had the unlawful search never occurred.'"  *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) (emphasis in original), quoting *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992).  The doctrine applies "only where there is a high level of confidence that each of the contingencies required for the discovery of the disputed evidence would in fact have occurred."  *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006).

Here, the Government's inevitable discovery argument starts from its contention that upon entering 56 Grimes Street, agents realized there was no "lower front" as described in the search warrant application for the first search warrant, but instead, the interior of the building was "all connected."  The Government reasons

39

that (1) had law enforcement officers initially entered 56 Grimes Street through the front door to the building (and absent any initial "protective sweep" of the second floor), they would have then realized that 56 Grimes Street was a single occupancy dwelling, not divided into any sub-units/apartments; (2) a protective sweep of the second floor would have been necessary to protect the agents on the first floor because of the risk and danger posed to them, as described by Granville; and (3) in the protective sweep of the second floor, agents would have inevitably discovered the evidence on the second floor.

Magistrate Judge Schroeder states in the RR&O, "[i]n the case at bar, we are dealing with **two separate, distinct areas**, *i.e.*, the "lower front" area which was covered by the [first] search warrant and the second-floor area which was not included in the [first] search warrant" (emphasis in original). It does appear to the Court that there was not actually a "lower front" to the building, as described in the search warrant. Stated differently, the entire first floor was an open space, and it was not subdivided into "lower front" and "lower rear" apartments. Even so, as the Court explained at length, above, the second floor *was* divided into two apartments, a front apartment and a rear apartment. Moreover, there is no evidence that a protective sweep of the second floor would have been necessary to protect officers' safety.[13]

As such, the Court concludes that the inevitable discovery doctrine does not apply. It does not have a "high level of confidence" that each of the contingencies

---

[13] *See supra*, pp. 28-34.

asserted by the Government would have occurred, and that the evidence would have been lawfully recovered, absent the constitutional violation described above.

## V.    Application of the Exclusionary Rule

Although the Court has identified a Fourth Amendment violation in this case, "[a]s the Supreme Court has instructed, '[t]he fact that a Fourth Amendment violation occurred—*i.e.*, that a search…was unreasonable—does not necessarily mean that the exclusionary rule applies.'"  *United States v. Maher*, 120 F.4th 297, 320 (2d Cir. 2024), quoting *Herring v. United States*, 555 U.S. 135, 140 (2009); *see United States v. Felder*, 993 F.3d 57, 75 (2d Cir. 2021) ("The identification of Fourth Amendment error does not automatically entitle a defendant to the suppression of evidence.").  The Supreme Court has instructed that "the exclusionary rule must be the judiciary's 'last resort, not [its] first impulse' when evidence has been procured in violation of the Fourth Amendment."  *Felder*, 993 F.3d at 75, quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).  "The [exclusionary] rule's corrective value justifies its cost when the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights…But when police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, exclusion simply cannot pay its way." *United States v. Raymonda*, 780 F.3d 105, 117-18 (2d Cir. 2015) (internal quotation marks and citations omitted).

Judge Schroeder writes in both the RR&O and the SRR&O that the conduct of law enforcement at 56 Grimes Street was in "blatant violation of the Fourth Amendment" and is "precisely the type of activity that the exclusionary rule was

formed to address and deter."  Thus, he recommends finding the "good faith

principle" in *United States v. Leon*, 468 U.S. 897 (1984), does not apply, and

recommends suppressing all evidence obtained from the premises.  The

Government argues that the Magistrate Judge erroneously employed the

exclusionary rule for an "isolated incident of negligence" on the part of a single

officer, Granville, and argues that law enforcement sought a second warrant only "in

the interest of being cautious" and in seeking to adhere to the Fourth Amendment's

particularity requirement for search warrants.  The Government asserts that, should

the evidence obtained at 56 Grimes Street be suppressed, the Government and the

public will be "punished for this cautiousness."

    As described herein (*see supra*, pp. 9-12), law enforcement acted recklessly

and with grossly negligent disregard for Defendant's Fourth Amendment rights, and

Granville was not the only law enforcement officer who acted in such a manner

although Granville's actions were particularly egregious.  While the Court recognizes

the great importance of the evidence obtained from 56 Grimes Street to the

Government,[14] the Court finds that suppression of this evidence against Defendant

is warranted, as it will serve to deter future Fourth Amendment violations.

---

[14] Defense counsel previously stated during Defendant's bail hearing in 2023 that the evidence seized at 56 Grimes Street is the "primary evidence" or "key evidence" against Defendant.  Dkt. No. 625 (Oral Argument Tr., 7/25/2023), pp. 2, 5.  The Government acknowledges in its objections that this evidence is "significant evidence" against Defendant (Dkt. No. 686, p. 40), and the Government has previously indicated that it will likely file an interlocutory appeal should this Court reject its objections and conclude that the evidence will be suppressed.

## <u>CONCLUSION</u>

For the foregoing reasons, it is ORDERED that Magistrate Judge Schroeder's second SRR&O (Dkt. No. 758), recommending that the Court find Defendant established standing in the contested areas of 56 Grimes Street, is adopted, and the Government's corresponding objections (Dkt. No. 760) are rejected; and it is further

ORDERED that Magistrate Judge Schroeder's RR&O (Dkt. No. 632) and portions of the SRR&O (Dkt. No. 680, Sections B and D of Discussion and Analysis), recommending the suppression of evidence obtained from 56 Grimes Street, are adopted, and the Government's corresponding objections (Dkt. No. 686) are rejected; and it is further

ORDERED that Defendant's motion (Dkt. No. 282) to suppress evidence obtained in the search of 56 Grimes Street is granted; and it is further

ORDERED that Defendant and the remaining co-defendants in this case shall appear before this Court on **May 30, 2025, at 9:00 a.m.**, for a status conference to schedule a trial date.


**IT IS SO ORDERED.**

_s/Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated:  May 29, 2025
      Buffalo, New York